## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**ERIN ELIZABETH FINN,**                          Case No. _____
**RIZZA ISLAM, SAYER JI,**
**CHRISTIANE NORTHRUP,**
**BEN TAPPER,**
**and SHERRI TENPENNY,**

      Plaintiffs,

vs.

**GLOBAL ENGAGEMENT CENTER,**
**CENTER FOR COUNTERING DIGITAL HATE, INC.,**
**CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY,**
**ACTING DIRECTOR OF CISA BRIDGET BEAN, in her official capacity,**
**U.S. DEPARTMENT OF STATE,**
**SECRETARY OF STATE MARCO RUBIO, in his official capacity,**
**U.S. DEPARTMENT OF HOMELAND SECURITY,**
**SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY**
**KRISTI NOEM, in her official capacity,**
**FEDERAL BUREAU OF INVESTIGATION, DIRECTOR OF THE FEDERAL**
**BUREAU OF INVESTIGATION KASH PATEL, in his official capacity,**
**FEDERAL COMMUNICATIONS COMMISSION, FCC CHAIRMAN**
**BRENDAN CARR, in his official capacity,**
**PRESIDENT DONALD J. TRUMP, in his official capacity,**
**META PLATFORMS, INC., a Delaware corporation,**
**GOOGLE LLC, a Delaware limited liability company,**
**X CORP., a Nevada corporation, ROB FLAHERTY, individually,**
**VIVEK MURTHY, individually, ELVIS CHAN, individually,**
**IMRAN AHMED, and JOHN and JANE DOES 1-10,**

      Defendants.

_____/

## COMPLAINT FOR DECLARATORY AND
## <u>INJUNCTIVE RELIEF AND DAMAGES</u>

Plaintiffs bring this Complaint for damages and injunctive and declaratory relief against the Defendants.

## INTRODUCTION

*"We are not afraid to entrust the American people with unpleasant facts, foreign ideas, alien philosophies, and competitive values. For a nation that is afraid to let its people judge the truth and falsehood in an open market is a nation that is afraid of its people."*

— President John F. Kennedy

1.      The Plaintiffs are healthcare professionals, researchers, and advocates who have built substantial online presences and businesses centered around health freedom, informed consent, and discussion of alternative approaches to conventional medicine. For years prior to the events described in this Complaint, Plaintiffs maintained active social media accounts with hundreds of thousands of followers, published research, books, and articles, hosted podcasts, presented at conferences, and operated successful businesses providing health-related information, products, and services. Through these platforms, Plaintiffs exercised their First Amendment rights to express views that sometimes challenged mainstream medical consensus, particularly regarding vaccination policies, safety, and efficacy—expressions that fall squarely within the realm of constitutionally protected speech on matters of profound public concern.

2.      Beginning in early 2021, Plaintiffs became the targets of an

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 2 of 105

unprecedented and coordinated censorship campaign orchestrated through the collaboration of government officials, agencies, non-governmental organizations, and social media platforms. The Defendants' censorship campaign was catalyzed by the publication of the Center for Countering Digital Hate's Disinformation Dozen report ("Disinformation Dozen Report") — a methodologically opaque and scientifically unsound document that made the extraordinary claim that 12 individuals, including all Plaintiffs, were allegedly responsible for "up to 65%" of "anti-vaccine content" online. Despite its lack of transparency, peer review, or verifiable data, this report was rapidly embraced by high-ranking government officials and the media, who weaponized its conclusions to justify an aggressive suppression of Plaintiffs' constitutionally protected speech. Imran Ahmed, the public face of the Center for Countering Digital Hate, amplified the claims made in the Disinformation Dozen Report, and publicly declared that the Plaintiffs were defined by their "psychological need . . . to cause pain and to cause chaos" and that they were "profiting from causing death." What followed was not merely private content moderation but a government-directed program of censorship that leveraged the immense regulatory power of federal agencies to coerce platforms into silencing specific individuals whom the government deemed problematic for challenging preferred narratives on public health policies.

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 3 of 105

3. The ensuing censorship campaign against Plaintiffs represents one of the most severe threats to free speech in the digital age—a systematic effort to excise certain viewpoints from the public square through the entanglement of government power and private platform control. Government officials, including those at the White House, explicitly targeted Plaintiffs by name, demanding their removal from social media platforms and threatening regulatory consequences for non-compliance. Social media executives, responding to this government pressure, implemented synchronized enforcement actions that resulted in Plaintiffs being deplatformed, shadow-banned, demonetized, and publicly maligned. The consequences for Plaintiffs have been devastating—the destruction of their digital presence built over many years, substantial financial losses, severe reputational damage, and an ongoing inability to participate in public discourse on matters of critical importance. Most troublingly, this campaign established a dangerous precedent whereby government officials can circumvent First Amendment protections by using their coercive power to deputize private companies as agents of state censorship—a constitutional violation that strikes at the very heart of America's democratic tradition of free and open debate.

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 4 of 105

## JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under the First, Fifth, Seventh, and Fourteenth Amendments to the United States Constitution.

5.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(e)(1) because Plaintiffs Elizabeth Finn and Sayer Ji reside in this district, no real property is involved in the action, and Defendants include agencies of the United States and officers and employees of the United States and its agencies acting in their official capacities.

## PARTIES

**A.    Plaintiffs**

6.    **Plaintiff Elizabeth Finn** (aka Erin Elizabeth) is and at all times relevant to the Complaint has been a citizen of, and domiciled in St. Johns County, Florida, where she has continuously resided since 2003. Ms. Finn operates Health Nut News, a health advocacy platform with offices in Volusia County, Florida, and maintained substantial social media accounts with approximately 1.2 million likes and followers on Facebook, more than 150,000 followers on Instagram, tens of thousands of subscribers on YouTube and nearly 1 billion views before the censorship actions described in this Complaint. Ms. Finn conducts the majority of

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 5 of 105

her business activities from Florida, including publishing content, hosting online events, and managing her health advocacy operations, all of which were substantially disrupted by Defendants' actions within this jurisdiction.

7.    **Plaintiff Rizza Islam** is and at all times relevant to the Complaint has been a citizen of, and domiciled in, Los Angeles County, California, where he has continuously resided since birth. Dr. Islam maintained substantial social media accounts with approximately 539,000 followers on Instagram and approximately 146,000 subscribers on YouTube prior to the censorship actions described in this Complaint. In total, Dr. Islam was making 15 to 18 million impressions per week across Facebook, Instagram, Twitter and YouTube. Dr. Islam regularly conducts business activities that reach into Florida, including book sales and speaking engagements, and has suffered economic and reputational harm that directly and negatively impacted his operations and followers within Florida. Dr. Islam holds an honorary doctorate in education.

8.    **Plaintiff Sayer Ji** is a citizen of, and domiciled in, Miami-Dade County, Florida. Dr. Ji has continuously resided in Florida since 1998. Dr. Ji is the founder of GreenMedInfo LLC, a Florida-based health information platform with its principal place of business in Miami-Dade, Florida. Dr. Ji is the co-founder of Stand for Health Freedom, a 501(c)(4) nonprofit organization, and the author of

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 6 of 105

*Regenerate,* an internationally best-selling book. Prior to the censorship actions described in this Complaint, Dr. Ji operated social media accounts with over 500,000 followers on Facebook, approximately 150,000 followers on Instagram, and tens of thousands of followers on Twitter/X and a similar number of subscribers on YouTube, through which he conducted substantial business activities including content publishing, product marketing, and educational outreach. Dr. Ji has dedicated his professional life to sharing evidence-based information about the healing potential of foods, supplements, natural remedies, and lifestyle practices aimed at empowering individuals to make informed decisions about their health. Dr. Ji holds a B.A. in Philosophy from Rutgers University.

9.     **Plaintiff Christiane Northrup** is and at all times relevant to the Complaint has been a citizen of, and domiciled in, the State of Maine, since 1981. Dr. Northrup is a board-certified OB/GYN physician, a New York Times bestselling author, and former assistant clinical professor at the University of Vermont College of Medicine. Prior to the censorship actions described in this Complaint, Dr. Northrup maintained substantial social media accounts with approximately 2 million followers across multiple platforms and regularly conducted business activities that reached into Florida, including speaking

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 7 of 105

engagements, educational outreach, webinars, and book sales. Dr. Northrup has suffered economic and reputational harm from Defendants' actions that directly and negatively impacted her livelihood, women's health education and outreach operations, book sales, and professional affiliations.

10.    **Plaintiff Ben Tapper** is and at all times relevant to the Complaint has been a citizen of, and domiciled in, Washington County, Nebraska where he has continuously resided since 2012. Dr. Tapper is a licensed chiropractor and prior to the censorship actions described in this Complaint, maintained social media accounts making 3 to 4 million impressions per month across multiple platforms. Dr. Tapper has suffered economic and reputational harm from Defendants' actions that directly and negatively impacted his professional practice, his social media following, his business operations, and his fundraising activities.

11.    **Plaintiff Sherri Tenpenny** is and at all times relevant to the Complaint has been a citizen of, and domiciled in, Cuyahoga County, Ohio, residing in Olmstead Falls, Ohio, where she has continuously resided since 1996. Dr. Tenpenny is a board-certified osteopathic medical doctor, and prior to the censorship actions described in this Complaint, maintained substantial social media accounts with hundreds of thousands of followers across multiple social media platforms. Dr. Tenpenny regularly conducted business activities that

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 8 of 105

reached into Florida, including speaking engagements, educational outreach, book sales, and supplement sales, and has suffered economic and reputational harm from Defendants' actions that directly impacted her operations and professional engagements within Florida.

12.    Plaintiffs bring claims for violation of their constitutional rights, seeking injunctive and declaratory relief, as well as common law and state law claims for civil conspiracy, tortious interference with contract, and defamation.

**B.    Defendants**

13.    The **Global Engagement Center** ("GEC"), though no longer operational after December 23, 2024, was at all material times relevant to this action an interagency center housed in and funded by the State Department, and headquartered in Washington, D.C. Despite its dissolution when Congress declined to renew its authorization in the 2025 National Defense Authorization Act the GEC remains a proper party to this action under the doctrine of successor liability, with the Department of State maintaining responsibility for the GEC's past actions, records, and legal obligations. The GEC originated in 2011 under Executive Order 13584 as the Center for Strategic Counterterrorism Communications and operated under the Bureau of Public Affairs using data analytics and funding for external research to combat so-called disinformation.

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 9 of 105

The GEC collaborated with agencies such as the Federal Bureau of Investigation and the U.S. Department of Homeland Security ("DHS") to influence social media content moderation and used its capabilities to censor American citizens under the guise of fighting foreign disinformation.

14.     **Center for Countering Digital Hate, Inc.** ("CCDH") is a non-profit Non-Governmental Organization ("NGO") organized and existing under the laws of Washington, D.C., with its principal place of business in Washington, D.C. CCDH established itself as a U.S.-based nonprofit in 2021 but originated in the United Kingdom, where its parent organization continues operations. CCDH maintains substantial contacts with this district through its nationwide activities, including deliberately targeting Florida residents such as Plaintiffs Elizabeth Finn and Sayer Ji through its publications. This Court has personal jurisdiction over CCDH under Florida's long-arm statute because CCDH committed tortious acts within Florida by publishing defamatory and harmful content specifically concerning Florida residents with knowledge that such content would cause injury within this jurisdiction. CCDH purposefully availed itself of the privilege of conducting activities in Florida by directing its operations at Florida residents and entities, creating a substantial connection with this forum sufficient to render the exercise of jurisdiction reasonable and consistent with traditional notions of

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 10 of 105

fair play and substantial justice. CCDH's publication of the Disinformation Dozen Report and related materials targeting Plaintiffs was expressly calculated to reach audiences within this jurisdiction and to influence content moderation decisions affecting Florida residents' online speech and business activities.

15.      The **Cybersecurity and Infrastructure Security Agency** ("CISA") is a federal agency within the Department of Homeland Security tasked with protecting the nation's critical infrastructure, including its information and communication systems. Under the guise of addressing cyber threats and ensuring election security, CISA expanded its mission to monitor and suppress online speech labeled as "misinformation" or "disinformation." Through programs such as "switchboarding" and its partnerships with social media platforms, CISA amplified and operationalized the Disinformation Dozen Report, pressuring platforms to take enforcement actions against individuals named in the report, including Plaintiffs. By coordinating closely with private platforms to influence content moderation decisions, CISA blurred the line between public and private action, acting as a central instrument in the government's unconstitutional suppression of protected speech. These actions caused direct harm to Plaintiffs' reputations, businesses, and expressive rights, violating their First Amendment protections.

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 11 of 105

16.     **Acting Director of the Cybersecurity and Infrastructure Security Agency Bridget Bean,** as successor to Jen Easterly ("Easterly"), who served as the Director of CISA within the Department of Homeland Security, where she oversaw efforts to address cyber threats and safeguard critical infrastructure, including the information space. Under Easterly's leadership, CISA engaged in extensive coordination with social media platforms to monitor and suppress online speech labeled as "misinformation" or "disinformation," often targeting viewpoints critical of government policies. Easterly's agency was instrumental in amplifying and operationalizing the findings of the Disinformation Dozen Report, leveraging its partnerships with platforms to ensure enforcement actions against individuals identified in the report, including Plaintiffs. By orchestrating "switchboarding" and other collaborative efforts with social media companies, Easterly's actions blurred the lines between public and private functions, resulting in the unconstitutional suppression of protected speech and causing direct economic and reputational harm to the Plaintiffs. Her conduct exemplifies the pervasive entwinement of government and private entities in violating First Amendment rights.

17.     The **U.S. Department of State** ("State Department") is an executive agency of the United States of America, headquartered in Washington, D.C. As the

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 12 of 105

nation's lead foreign affairs agency, the State Department played a pivotal role in the government's coordinated censorship campaign by leveraging its diplomatic influence, resources, and global information operations to target and suppress protected speech domestically. Under the pretext of combating foreign disinformation and securing U.S. interests abroad, the State Department funded and directed initiatives through its Global Engagement Center and other diplomatic channels to develop censorship technologies, tactics, and partnerships with social media platforms that were ultimately deployed against American citizens, including the Plaintiffs. The State Department established formal meetings with technology companies, pressured platform executives through diplomatic channels, and diverted taxpayer resources intended for countering foreign threats toward the surveillance and suppression of lawful domestic speech. State Department officials routinely shared information derived from the Disinformation Dozen Report with foreign counterparts and international organizations, amplifying the false narrative that Plaintiffs were spreading dangerous misinformation, thereby legitimizing censorship efforts both domestically and internationally. Through these actions, the State Department transcended its statutory authority and constitutional limitations, transforming tools designed for diplomatic engagement into instruments of domestic speech

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 13 of 105

suppression in direct contravention of the First Amendment protections afforded to all Americans, including Plaintiffs.

18.    **Marco Rubio**, in his official capacity as United States Secretary of State, is a Defendant and the successor to former Secretary of State Antony Blinken. As Secretary of State, Blinken oversaw the Department of State and its subordinate agencies, including the Global Engagement Center, which played a critical role in the censorship activities described in this Complaint. Secretary Rubio is responsible for the Department of State's policies, operations, and practices, including those that existed during his predecessor's tenure and collusive activity with social media platforms to suppress Plaintiffs' constitutionally protected speech. Under the principle of successor liability for official capacity suits, Secretary Rubio is automatically substituted as a defendant for claims against the office, regardless of whether the challenged actions occurred prior to his appointment. His inclusion as a Defendant is necessary to ensure complete relief for Plaintiffs, including the implementation of any injunctive measures ordered by this Court to remedy the constitutional violations alleged herein.

19.    The **U.S. Department of Homeland Security** ("DHS") is an executive agency of the United States of America, headquartered in Washington, D.C.

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 14 of 105

Created in response to the September 11 attacks through the Homeland Security Act of 2002, the DHS is tasked with public security responsibilities focusing on terrorism, border security, immigration, cybersecurity, and disaster prevention and management. Through its subordinate agencies and offices, including the Cybersecurity and Infrastructure Security Agency, the DHS played a central role in the government's efforts to monitor, flag, and suppress online speech deemed "misinformation" or "disinformation." The DHS leveraged its cybersecurity mission to expand into content moderation, establishing formalized partnerships with social media companies that resulted in the censorship of protected speech, including that of the Plaintiffs. These actions were carried out under the pretense of protecting critical infrastructure and addressing national security concerns, yet effectively served to silence legitimate political and scientific discourse that challenged government narratives.

20.   **Kristi Noem,** in her official capacity as the Secretary of the Department of Homeland Security, is the successor to former Secretary of the Department of Homeland Security Alejandro Mayorkas ("Mayorkas"). Mayorkas oversaw the agency's operations, including its involvement in addressing disinformation through entities like the Cybersecurity and Infrastructure Security Agency. Under Mayorkas' leadership, DHS played a critical role in coordinating

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 15 of 105

government efforts to monitor and suppress online speech deemed "misinformation" or "disinformation," including by leveraging partnerships with social media platforms. Mayorkas amplified and endorsed the use of tools like the Disinformation Dozen Report to target and silence individuals whose viewpoints contradicted government narratives, including Plaintiffs. By enabling and directing DHS components to collaborate with private platforms in suppressing speech, Secretary Mayorkas facilitated unconstitutional actions that caused economic, reputational, and expressive harm to Plaintiffs while eroding First Amendment protections. His actions represent a central component of the government's joint participation in a censorship campaign against dissenting voices. Secretary Noem is responsible for the Department of Homeland Security's policies, operations, and practices, including those that existed during her predecessor's tenure. Under the principle of successor liability for official capacity suits, Secretary Noem is automatically substituted as a Defendant for claims against the office, regardless of whether the challenged actions occurred prior to her appointment. Her inclusion as a Defendant is necessary to ensure complete relief for Plaintiffs, including the implementation of any injunctive measures ordered by this Court to remedy the constitutional violations alleged herein.

21.    The **Federal Bureau of Investigation** ("FBI" or "Bureau") is the

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 16 of 105

principal federal law enforcement agency of the United States, operating as a component of the Department of Justice and headquartered in Washington, D.C. Despite its statutory mandate to investigate federal crimes and protect national security, the FBI exceeded these boundaries by establishing systematic coordination with social media platforms to flag, monitor, and suppress lawful speech that challenged government narratives on matters of public concern. Through dedicated communication channels with technology companies, regular meetings with platform executives, and the development of specialized units focused on "combating misinformation," the FBI pressured private entities to take enforcement actions against individuals identified in the Disinformation Dozen Report, including Plaintiffs. The Bureau leveraged its significant investigative authority and law enforcement power to create a climate of intimidation among platforms, implying potential regulatory or criminal consequences for failing to address content the FBI deemed problematic. This entanglement of government authority with private censorship decisions transformed platform content moderation into state action, effectively circumventing First Amendment protections that would otherwise prohibit direct government censorship. The FBI's actions directly resulted in the suppression of Plaintiffs' protected speech, causing substantial harm to their reputations, businesses, and constitutional rights.

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 17 of 105

22.    **Kash Patel** ("Patel"), in his official capacity as Director of the Federal Bureau of Investigation, is a Defendant and the successor to former FBI Director Christopher Wray. As FBI Director, Patel oversees all operations, policies, and personnel of the Bureau, including the continuation or potential reformation of programs established under his predecessor that facilitated coordination with social media platforms for content moderation purposes. Director Patel bears responsibility for the ongoing effects of his agency's past unconstitutional actions against Plaintiffs and the continuing harm resulting from the institutional infrastructure created to suppress lawful speech. Under established principles of successor liability in official capacity suits, Director Patel is automatically substituted as a Defendant for claims against the office, regardless of whether the specific challenged actions occurred during former Director Wray's tenure. His inclusion as a Defendant is necessary to ensure complete relief for Plaintiffs, including the implementation of any injunctive measures ordered by this Court to remedy the constitutional violations alleged herein.

23.    The **Federal Communications Commission** ("FCC") is an independent agency of the United States government, created by statute to regulate interstate communications by radio, television, wire, satellite, and cable across the United States. Headquartered in Washington, D.C., the FCC operates

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 18 of 105

under the authority of the Communications Act of 1934, as amended, and is directed by five Commissioners appointed by the President and confirmed by the Senate. The FCC played a significant role in the government's coordinated censorship campaign by leveraging its regulatory authority over broadcast and digital media to pressure platforms into suppressing Plaintiffs' protected speech. Under the pretext of combating "misinformation" and ensuring "media responsibility," the FCC established formal and informal channels of communication with social media companies, encouraging the outright banning of the Disinformation Dozen and removal of content associated with the Disinformation Dozen, including Plaintiffs. Specifically, in approximately April 2022, the FCC directly pressured the social platform and messaging app "Community" to ban Plaintiff Rizza Islam's account for allegedly violating the FCC's COVID-19 misinformation policies. This intervention resulted in the immediate termination of Dr. Islam's account, which served as a critical channel for his health advocacy and educational outreach. The FCC's involvement was particularly problematic given its statutory power to issue or revoke broadcasting licenses and impose substantial fines on regulated entities, creating an implicit threat of adverse regulatory action for platforms that failed to comply with censorship demands. Through public statements, private communications, and

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 19 of 105

regulatory guidance, FCC officials signaled to platforms that removing Plaintiffs'
content would be viewed favorably in regulatory matters, effectively converting
private content moderation decisions into state action subject to First Amendment
constraints. The FCC's actions directly contributed to the suppression of Plaintiffs'
constitutionally protected speech, causing substantial economic, reputational, and
expressive harm that continues to this day.

24.    **Brendan Carr** ("Carr"), in his official capacity as Chairman of the
Federal Communications Commission, is a Defendant and the successor to former
FCC Chairwoman Jessica Rosenworcel. As Chairman, Carr oversees all
operations, policies, and personnel of the Commission, including the continuation
or potential reformation of programs established under his predecessor that
facilitated coordination with social media platforms for content moderation
purposes. Chairman Carr bears responsibility for the ongoing effects of his
agency's past unconstitutional actions against Plaintiffs and the continuing harm
resulting from the institutional infrastructure created to suppress lawful speech.
During Chairwoman Rosenworcel's tenure, the FCC leveraged its regulatory
authority to pressure digital communication platforms, including "Community,"
to remove content associated with the Disinformation Dozen, including Plaintiff
Rizza Islam's account in or about April 2022, despite having no direct regulatory

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 20 of 105

authority over such content. These actions represented a significant overreach of the FCC's statutory mandate and violated Plaintiffs' First Amendment rights. Under established principles of successor liability in official capacity suits, Chairman Carr is automatically substituted as a Defendant for claims against the office, regardless of whether the specific challenged actions occurred during former Chairwoman Rosenworcel's tenure. His inclusion as a Defendant is necessary to ensure complete relief for Plaintiffs, including the implementation of any injunctive measures ordered by this Court to remedy the constitutional violations alleged herein.

25.    **President Donald J. Trump,** as successor to President Joseph R. Biden, in his official capacity as President of the United States, is responsible for supervising the executive branch of government, including the White House and federal agencies such as the U.S. Department of State, the Department of Homeland Security, the Global Engagement Center, the Cybersecurity and Infrastructure Security Agency, and the Federal Bureau of Investigation. Under President Biden's leadership, the executive branch engaged in coordinated efforts to suppress lawful speech on social media platforms, often relying on reports like the Disinformation Dozen Report to justify these actions. These efforts included coercing platforms to adopt censorship policies targeting individuals, including

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 21 of 105

Plaintiffs, whose viewpoints challenged the administration's preferred narratives on critical issues like public health and elections. President Biden's administration directed and encouraged government agencies and officials, including senior White House staff, to engage in unconstitutional collusion with private platforms, resulting in the suppression of protected speech and causing economic, reputational, and expressive harm to Plaintiffs. President Biden's conduct exemplifies the pervasive entwinement of government authority with private actors to silence dissent in violation of the First Amendment. [1] Although President Trump was uninvolved in the conduct alleged herein (and even opposed it), his inclusion as a Defendant in his official capacity is necessary to ensure complete relief for Plaintiffs, including the implementation of any injunctive measures ordered by this Court to remedy the constitutional violations alleged herein.

26.    **Meta Platforms, Inc.** ("Meta" or "Facebook") is a Delaware corporation with its principal place of business in Menlo Park, California, operating the social media platform known as Facebook, which targets users and generates revenue in this District. This Court has personal jurisdiction over Meta Platforms, Inc. because it conducts substantial and continuous business in Florida,

---

[1] The preceding Defendants identified beginning at paragraph 13 and through this paragraph are collectively referred to as the "Government" or the "Government Defendants".

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 22 of 105

maintains a significant user base within the state, and derives considerable revenue from Florida-based users and advertisers. Meta maintains specific jurisdiction in this forum through its targeting of Florida residents through data-driven advertising, content delivery systems, and personalized algorithmic features designed specifically for Florida audiences. Meta Platforms, Inc. played a central role in the government-coordinated censorship campaign by participating in regular meetings with federal officials where they discussed targeted enforcement actions against the Disinformation Dozen. Following these discussions, Meta implemented a systematic campaign of censorship against Plaintiffs, taking specific adverse actions including: deleting Plaintiff Sayer Ji's GreenMedInfo Facebook account with over 500,000 followers on July 3, 2021; removing multiple Instagram accounts belonging to Plaintiff Rizza Islam between March and May 2021; imposing "penalties" against "nearly two dozen additional Pages, groups or accounts" linked to the Disinformation Dozen; penalizing Plaintiff Christiane Northrup by shadow banning her posts and reducing her follower count across Facebook and Instagram by more than 2,000,000; and subjecting Plaintiff Ben Tapper to account restrictions, content filtering, engagement throttling, and temporary suspensions. Meta's internal communications, as revealed in the complaint, demonstrate that it took these

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 23 of 105

actions in direct response to "policy pressure" from the White House, which was explicitly "exerting policy pressure" to remove the Plaintiffs' accounts having been identified as members of the Disinformation Dozen. These purposeful activities directed at Florida residents, including the Plaintiffs, establish minimum contacts sufficient to support jurisdiction.

27. **Google LLC** ("Google"), a Delaware limited liability company with its principal place of business in Mountain View, California, operates the video-sharing platform known as YouTube. This Court has personal jurisdiction over Google LLC because it conducts substantial business in Florida, maintains offices within the state, and operates interactive platforms that are regularly accessed by millions of Florida residents, including Plaintiffs. Google LLC purposefully availed itself of this jurisdiction by marketing its services to Florida residents, collecting data from Florida users, and generating significant revenue from Florida-based activities. Google LLC participated directly in the government-coordinated censorship campaign by attending regular meetings with federal officials where they discussed content moderation actions targeting the Disinformation Dozen. In response to government pressure, Google LLC implemented its "medical misinformation policy" in a manner that disproportionately targeted Plaintiffs, resulting in the removal of their content and

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 24 of 105

channels from YouTube. Specifically, on September 29, 2021, Google LLC notified Plaintiff Elizabeth Finn that it had removed her YouTube channel, citing unspecified violations of "Medical Misinformation" policies. Google LLC also deleted Plaintiff Rizza Islam's YouTube channel on March 22, 2021, and Plaintiff Sayer Ji's GreenMedInfo YouTube channel on July 22, 2021. Google LLC's censorship activities directly harmed Plaintiffs' reputations, businesses, and constitutional rights, and these effects continue to the present day as Google LLC maintains the infrastructure, algorithms, and policies developed during its collusion with government officials. These systematic contacts with Florida and direct actions affecting Florida residents render Google LLC subject to this Court's jurisdiction.

28.    **X Corp.**, ("X" or "Twitter"), a Nevada corporation with its principal place of business in Bastrop, Texas, operates the social media platform known as X (formerly Twitter). This Court has personal jurisdiction over X Corp. because it maintains continuous and systematic contacts with Florida through its interactive platform that is accessible to and regularly used by millions of Florida residents, including Plaintiffs. The censorship activities alleged in this Complaint primarily occurred when the platform was known as Twitter, Inc. ("Twitter"), prior to its October 2022 acquisition by Elon Musk and subsequent rebranding as X Corp. in

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 25 of 105

April 2023. However, X Corp., as Twitter's corporate successor, bears legal responsibility for the actions, policies, and content moderation decisions implemented by its predecessor entity. During the relevant period, Twitter, Inc. participated in regular meetings with government officials, including representatives from the FBI, DHS, CISA, and the White House, where they were pressured to take specific actions against the Disinformation Dozen, including Plaintiffs. Twitter, Inc. responded to this government coercion by shadow-banning, flagging, restricting, and ultimately removing Plaintiffs' accounts, including permanently deleting Dr. Ji's GreenMedInfo account on March 7, 2021, which had been in good standing for 13 years prior to the government's censorship campaign. X Corp.'s continued enforcement of content policies developed during this period of government coercion, and its maintenance of records and data related to the censored accounts, make it a necessary party for complete relief in this action.[2]

<u>Government Officials (Individually)</u>

29.    **Rob Flaherty** ("Flaherty") served as Deputy Assistant to the President and Director of the Office of Digital Strategy at the White House, where he played

---

[2] Google, Meta, and X are collectively referred to in this Complaint as the "Social Media Defendants".

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 26 of 105

a central role in coordinating the Biden Administration's efforts to influence social media platforms' moderation of content. Flaherty actively pressured platforms such as Facebook, Twitter, and Google to suppress speech deemed contrary to the administration's preferred narratives, including content critical of government policies on public health and elections. Flaherty amplified the findings of the Disinformation Dozen Report and demanded swift action against individuals named within it, including Plaintiffs, by questioning the platforms' commitment to combating misinformation and implying regulatory consequences for non-compliance. Through frequent communications with social media executives, Flaherty used his authority to significantly encourage or coerce platforms into removing, suppressing, or de-amplifying speech protected under the First Amendment, directly resulting in harm to Plaintiffs' reputations, businesses, and expressive rights. Flaherty's actions, including specific emails sent on or about May 6, 2021, to executives at Facebook, explicitly demanding the removal of Plaintiffs' posts, constitute a direct violation of their First Amendment rights to free speech, akin to unconstitutional government coercion recognized in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). His conduct falls within the scope of *Bivens*[3] liability, as it mirrors unlawful government overreach into private speech,

---

[3] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 27 of 105

and no special factors—such as national security or statutory remedies—preclude relief, given the absence of alternative mechanisms like the APA to compensate Plaintiffs' economic and reputational damages. Flaherty's demands were not general policy directives but targeted interventions against Plaintiffs, violating clearly established law that prohibits government officials from coercing private entities to censor protected speech, as a reasonable official in his position would have known.

30.    **Vivek Murthy** ("Murthy") served as the Surgeon General of the United States during the relevant time period. On July 13, 2021, Murthy published the report titled 'Confronting Health Misinformation,' which explicitly referenced and legitimized the CCDH's Disinformation Dozen Report as an authoritative source to justify his desired censorship of Plaintiffs. Murthy cited the Disinformation Dozen Report as the sole source for claiming the existence of COVID-19 misinformation "super-spreaders" and recommended that technology platforms 'prioritize early detection' of these individuals and 'impose clear consequences' for their accounts. Murthy's personal involvement in amplifying and operationalizing the CCDH report through official government channels directly resulted in the targeted suppression of Plaintiffs' protected speech across multiple platforms. By using his position and authority to pressure private

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 28 of 105

companies to take specific adverse actions against the Plaintiffs based on their viewpoints, Murthy personally participated in the violation of Plaintiffs' constitutional rights. Murthy's actions went beyond merely advocating for general health policy in his role as Surgeon General and instead directly targeted Plaintiffs. Murthy's conduct, including his public statements during the summer of 2021 and direct communications with social media platform executives, constituted government-orchestrated censorship akin to the unconstitutional interference in *Bantam Books, Inc.*, 372 U.S. at 58, and is redressable under *Bivens* as an extension of recognized protections against government overreach into private expression. No special factors counsel hesitation, as Murthy's actions were not tied to national security, and no alternative remedy, such as injunctive relief against the Surgeon General's office, addresses Plaintiffs' past financial and reputational losses. By knowingly endorsing a report he knew or should have known improperly targeted Plaintiffs' lawful speech, Murthy violated a clearly established First Amendment right against viewpoint-based censorship, which any reasonable official would recognize as unlawful under existing precedent.

31.    **Elvis Chan** ("Chan") is a Supervisory Special Agent with the Federal Bureau of Investigation who served as a key intermediary between federal agencies and social media platforms in addressing so-called disinformation and

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 29 of 105

misinformation. In his role, Chan coordinated regular meetings with executives from major platforms, including Facebook, Twitter, and Google, to influence their content moderation policies and enforcement actions. Chan actively promoted government narratives regarding the spread of online misinformation and amplified the findings of the Disinformation Dozen Report, which unfairly targeted Plaintiffs as alleged "super-spreaders" of misinformation. His actions, including urging platforms to take punitive measures against the individuals identified in the report, directly contributed to the suppression of constitutionally protected speech, causing economic, reputational, and operational harm to the Plaintiffs. Chan's conduct represents a central element of the government's pervasive entwinement with private entities to silence dissenting voices in violation of the First Amendment. Chan's specific directives, including meetings throughout 2021 in which he instructed the Social Media Defendants to suspend Plaintiffs' accounts based on the Disinformation Dozen Report, mirror the coercive government action prohibited in *Bantam Books, Inc.*, 372 U.S. at 58, and warrant *Bivens* relief as an analogous violation of constitutional speech protections. No special factors bar this claim, as Chan's actions were not driven by legitimate national security concerns but by viewpoint discrimination, and no statutory remedy compensates Plaintiffs' losses. By deliberately targeting Plaintiffs'

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 30 of 105

protected speech for suppression, Chan violated a clearly established First Amendment right, as any reasonable FBI agent would understand under precedents prohibiting government-induced censorship.

<u>Other Individuals</u>

32.    **Imran Ahmed** ("Ahmed") is the public face of the Center for Countering Digital Hate. This Court has personal jurisdiction over Defendant Imran Ahmed, an individual residing in or conducting significant activities from Washington, D.C., pursuant to Florida's long-arm statute, Fla. Stat. § 48.193, and consistent with the Due Process Clause of the Fourteenth Amendment. Ahmed, as the Chief Executive Officer of the Center for Countering Digital Hate, purposefully directed tortious activities at Florida residents, including Plaintiffs Elizabeth Finn and Sayer Ji, by authoring, publishing, and promoting the Disinformation Dozen Report and subsequent CCDH reports, which specifically targeted these Plaintiffs with defamatory and harmful allegations. These actions were calculated to cause reputational and economic injury in Florida, where Ms. Finn and Dr. Ji reside and operate their businesses. Ahmed's public statements, including his March 28, 2021, appearance on the podcast *DOOMED with Matt Binder*, where he accused Plaintiff Sayer Ji of "profiting from causing death," were disseminated to a national audience, including Florida, with the intent to amplify the report's impact and

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 31 of 105

provoke censorship of Florida-based Plaintiffs. Additionally, Ahmed's coordination with other Defendants, including government officials and social media platforms, to suppress Plaintiffs' speech further demonstrates his purposeful availment of this forum, as these actions directly affected Florida residents' ability to engage in protected speech and conduct business. Ahmed's contacts with Florida are sufficient to establish specific jurisdiction, as the claims arise from his intentional conduct targeting Florida residents, and the exercise of jurisdiction comports with fair play and substantial justice given the significant harm suffered by Plaintiffs in this district.

33.    **John and Jane Does 1-10** are currently unidentified federal government officials, employees, contractors, agents, representatives of non-governmental organizations, or private individuals who acted in concert with federal officials and under color of federal law in the coordinated campaign to censor, suppress, or deplatform Plaintiffs as described in this Complaint. These individuals include, but are not limited to: (a) government officials who communicated with social media companies to flag, target, or pressure for removal of Plaintiffs' content; (b) government employees who participated in regular meetings with social media platforms where enforcement actions against the Disinformation Dozen were discussed; (c) individuals who contributed to,

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 32 of 105

amplified, or operationalized the CCDH's report within government agencies; (d) federal officials who directed, supervised, or facilitated the creation or implementation of systems, policies, or procedures designed to monitor or suppress Plaintiffs' protected speech; (e) representatives of currently unidentified non-governmental organizations who collaborated with federal officials to target Plaintiffs through joint initiatives, information sharing, resource coordination, or participation in private-public partnerships focused on content moderation; and (f) individuals employed by or affiliated with non-profit organizations who received federal funding, guidance, or direction to flag, monitor, or suppress Plaintiffs' protected speech while acting as de facto agents of the government. Plaintiffs intend to amend this Complaint to name these individuals once their identities are revealed through discovery. This Court has subject matter jurisdiction over claims against these Defendants pursuant to 28 U.S.C. §§ 1331 and 1343 because the claims arise under the United States Constitution and 42 U.S.C. § 1983, and personal jurisdiction because these individuals purposefully directed their activities at residents of this forum, causing harm that they knew or should have known would be suffered in this District.

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 33 of 105

## STATEMENT OF FACTS

### The Disinformation Dozen Report

34.    On or about March 24, 2021, Defendant Center for Countering Digital Hate, Inc.   published a report titled *The Disinformation Dozen* which accused 12 individuals,[4] including each of the Plaintiffs, of being responsible for "up to 65%" of anti-vaccine content on social media generally, and "up to 73%" of the anti-vaccine content on Facebook specifically.



A copy of the Disinformation Dozen Report is attached to this Complaint as **Exhibit A**.

35.    The clear implication was (and is) that if these 12 people could be

---

[4] There are actually 13 individuals named on the CCDH's list, but it still referred to them as the Disinformation *Dozen*, which was just the first of many liberties CCDH took with the facts.

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 34 of 105

effectively silenced, the vast majority of anti-vaccine "misinformation" could be removed.

36.    The CCDH recklessly published and promoted its Disinformation Dozen Report to stoke fear and anger against and discredit —i.e., destroy the reputations of— the so-called Disinformation Dozen. Imran Ahmed promoted the Disinformation Dozen Report on an episode of *Doomed with Matt Binder*, published on or about March 28, 2021, in which Ahmed claimed that the Plaintiffs were defined by "a psychological need . . . to cause pain and to cause chaos" and specifically accused Plaintiff Sayer Ji of "profiting from causing death."

37.    The Disinformation Dozen Report targeted Plaintiffs and the others as leading sources of so-called "misinformation," urging social media platforms to act against them, including explicitly calling for censoring and deplatforming them.

**Deplatform the Disinformation Dozen**

The most effective and efficient way to stop the dissemination of harmful information is to deplatform the most highly visible repeat offenders, who we term the Disinformation Dozen. This should also include the organisations these individuals control or fund, as well as any backup accounts they have established to evade removal.

1. Joseph Mercola
2. Robert F. Kennedy, Jr.
3. Ty and Charlene Bollinger
4. Sherri Tenpenny
5. Rizza Islam
6. Rashid Buttar
7. Erin Elizabeth
8. Sayer Ji
9. Kelly Brogan
10. Christiane Northrup
11. Ben Tapper
12. Kevin Jenkins

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 35 of 105

38.     CCDH's Disinformation Dozen Report became a central tool used by various actors, including other Defendants, to justify and excuse harmful and adverse actions against Plaintiffs.

39.     The Disinformation Dozen Report purported to rely on an "analysis of social media content" to identify individuals spreading misinformation. However, CCDH failed to disclose any detailed methodology or criteria for its analysis.

40.     The Disinformation Dozen Report:

a.     Did not provide data sources, algorithms, or metrics used to calculate the claim that the Disinformation Dozen were responsible for "65%" of vaccine misinformation.

b.     Omitted any explanation of how content was categorized as "misinformation" or the qualifications of those making such determinations.

c.     Lacked peer review or independent verification, rendering its conclusions unverifiable and unscientific.

41.     CCDH's failure to articulate a transparent and reproducible methodology raises significant questions about bias and the reliability of its conclusions. The organization's stated mission to combat "digital hate" and "disinformation" suggests a predisposition to target individuals with views

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 36 of 105

opposing mainstream narratives. By focusing disproportionately on individuals with large followings, such as Plaintiffs, CCDH appeared to prioritize their visibility and influence over any objective assessment of their content's accuracy or public harm.

42.     CCDH explicitly called for social media platforms to remove or restrict the accounts of the listed individuals. This recommendation was made without presenting concrete evidence linking the Plaintiffs to demonstrable harm or establishing that their content violated applicable laws. The report's inflammatory language and conclusory claims were crafted to provoke a reaction from platforms and the public, effectively weaponizing the report as a tool for censorship.

43.     CCDH published a follow-up report, *The Disinformation Dozen: The Sequel,* on or about April 28, 2021, (the "Sequel Report") which pressured social media companies and Big Tech to increase censorship of the "Disinformation Dozen".

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 37 of 105





THE DISINFORMATION DOZEN: THE SEQUEL

How Big Tech is failing to act on leading anti-vaxxers despite bipartisan calls from Congress

Appearing before Congress in March, tech CEOs promised to act on twelve anti-vaxxers who are responsible for almost two-thirds of anti-vaccine content circulating on social media. One month on, our report shows that Big Tech has failed to act, allowing the spread of vaccine disinformation that has been viewed up to 29 million times.

Download report    Find out more

A copy of The Sequel Report is attached to this Complaint as **Exhibit B.**

44.    Despite CCDH's evident lack of rigor, other Defendants—including government agencies, social media platforms, and NGOs—repeated and amplified the report's conclusions. These Defendants cited the CCDH report as an authoritative source, even though they knew or should have known that its methodology was opaque and its conclusions unsubstantiated. By doing so, these Defendants perpetuated the harm caused by CCDH's baseless allegations, contributing to the reputational and economic damage suffered by Plaintiffs.

45.    For one of many examples, on May 6, 2021, Deputy Assistant to the President, Rob Flaherty, emailed a contact at Facebook encouraging Facebook to deplatform the Plaintiffs. Flaherty is not an academic or law enforcement agent; he is a political operative, having worked for the Democratic National Committee

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 38 of 105

and on various Democratic campaigns. He is not a credentialed specialist.

46.    In his email to Facebook's moderation team, Flaherty specifically referenced the "disinfo dozen," invoking the Disinformation Dozen Report.



47.    In other words, the most powerful political administration in the world —the White House—secretly targeted law-abiding private citizens and attempted to injure them for no other reason than saying things with which the White House disagreed.

48.    The other Defendants, who each claimed to have relied on the Disinformation Dozen Report, failed to exercise basic due diligence before adopting its conclusions. They ignored the report's lack of transparency, absence of peer review, and evident ideological bias.

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 39 of 105

49.    These failures were particularly egregious given the significant consequences of acting on such an unverified document, including the suppression of Plaintiffs' speech, reputational harm, and loss of business opportunities.

### The Government's Role in
### Amplifying CCDH's Disinformation Dozen Report

50.    After the publication of the CCDH's Disinformation Dozen Report, government officials and agencies quickly embraced its findings, adopting the report as a cornerstone of their censorship efforts.

51.    High-ranking officials from the White House, including Deputy Assistant to the President Rob Flaherty, directly engaged with social media platforms, citing the CCDH's conclusions as justification for their demands for content moderation. The government's reliance on the CCDH's report, despite its lack of transparency and scientific rigor, marked a critical escalation in the suppression of dissenting speech.

52.    As CNN reported, "[t]he White House seized on [the CCDH Disinformation Dozen] report and hammered the platform [Facebook] in July for

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 40 of 105

allowing the people identified in the report to remain on its platform."[5]

53.    Emails and communications revealed in *Missouri v. Biden*[6] show that Flaherty and other White House officials actively pressured Facebook and Twitter to take aggressive action against the individuals named in the CCDH report. For example:

    a.    Flaherty chastised Facebook for not removing posts by the Disinformation Dozen, explicitly demanding stricter content moderation and threatening further scrutiny if the platforms failed to comply.

    b.    These communications demonstrated the government's intent to suppress constitutionally protected speech under the guise of combating "misinformation."

54.    Various agencies, including the Centers for Disease Control and Prevention ("CDC"), the Cybersecurity and Infrastructure Security Agency, and the Surgeon General's Office, held regular meetings with social media companies to address the spread of purported "misinformation." In these meetings:

    a.    Government    representatives    presented    data    and

---

[5] Oliver Darcy, <u>Facebook takes action against 'disinformation dozen' after White House pressure</u>, CNN Business (Aug. 18, 2021, 8:17 PM), https://www.cnn.com/2021/08/18/tech/facebook-disinformation-dozen/index.html.
[6] *Missouri v. Biden*, No. 22-cv-1213 (W.D. La., July 4, 2023).

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 41 of 105

recommendations derived from the CCDH report, framing the Disinformation Dozen as uniquely dangerous actors responsible for a disproportionate amount of vaccine-related misinformation online.

> b.    Social media platforms were instructed to adjust algorithms, reduce the visibility of posts by these individuals, and in some cases, remove their accounts entirely.

55.    The Government and Social Media Defendants jointly implemented multiple formalized censorship mechanisms to systematically suppress Plaintiffs' speech. One primary mechanism was the 'switchboard' operation run through CISA's Mis-, Dis-, and Malinformation ("MDM") team, which began functioning in early 2021. As CISA openly admitted on April 12, 2022, the 'MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms' and has 'expanded the breadth of reporting to include... more social media platforms.' This centralized reporting system allows government officials across agencies to funnel censorship requests through a single channel, effectively laundering censorship demands through CISA to maintain plausible deniability.

56.    A second mechanism involved the creation of privileged reporting channels exclusively for government use. Beginning in February 2021, Facebook trained CDC and Census Bureau officials on how to use a specialized 'Facebook

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 42 of 105

misinfo reporting channel,' giving government officials priority access to censorship requests unavailable to ordinary users. Similarly, Twitter established a 'Partner Support Portal' specifically for government officials to expedite censorship demands, while YouTube granted 'trusted flagger' status to Census Bureau officials, ensuring privileged and expedited consideration of government-flagged content. These dedicated portals were operational throughout 2021 and 2022, giving government officials direct access to platform decision-makers.

57.    A third mechanism consisted of regular, formalized censorship meetings between government officials and social media representatives. Starting in late 2020, CDC officials organized recurring 'Be On The Lookout' (BOLO) meetings with representatives from Twitter, Facebook/Meta, and Google/YouTube. During these meetings, which continued through at least 2022, government officials provided platforms with specific examples of posts to be censored and categories of content to target. After these meetings, CDC officials would distribute 'slides' containing examples of posts flagged for removal with instructions that platforms should 'Be On the Lookout' for similar content, explicitly directing platforms not to share these directives 'outside your trust and safety teams.' Upon information and belief, Plaintiffs were targeted by these 'Be On the Lookout' advisories.

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 43 of 105

58.    A fourth mechanism involved detailed reporting requirements imposed on the Social Media Defendants. Beginning in 2021, government officials demanded that platforms provide regular reports on their censorship activities to demonstrate compliance with government expectations. For example, by July 23, 2021, Meta was sending biweekly 'content reports' to the Surgeon General and White House officials detailing their censorship actions against COVID-19 'misinformation.' These reporting relationships continued into 2022, with White House Digital Director Rob Flaherty demanding on June 13, 2022, that Meta continue producing these reports specifically to track suppression of speech regarding COVID-19 vaccines for children under 5 years old. These reporting requirements created a supervisory relationship where social media platforms functioned as subordinates accountable to government overseers.

59.    Building on these censorship mechanisms, on July 13, 2021, Vivek Murthy published the Surgeon General's report, *Confronting Health Misinformation*, which referenced the CCDH's Disinformation Dozen Report as an authoritative source. Murthy adopted the CCDH's report and cited the Disinformation Dozen Report as the sole source for the following claim: "Researchers have identified leading sources of COVID-19 misinformation, including misinformation "super-spreaders". The Surgeon General's recommended actions for technology

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 44 of 105

platforms included:

> a.    **Prioritize early detection of misinformation "super-spreaders"[7] and repeat offenders. <u>Impose clear consequences</u> for accounts that repeatedly violate platform policies**.

> b.    **[T]ake responsibility for addressing the harms.** Redesign recommendation algorithms to avoid amplifying misinformation, build in "frictions" – such as suggestions and warnings – to reduce the sharing of misinformation.

60.    Amplifying Murthy's coercive tactics, President Biden pressured the social media companies to censor Plaintiffs by claiming they were killing people, stating on July 19, 2021: "**Facebook isn't killing people, <u>these twelve people</u> are out there giving misinformation. Anyone listening to it is getting hurt by it. It's killing people.**"  He continued: "My hope is, that Facebook, instead of taking it personally . . . that they would do something about the misinformation. The outrageous misinformation about the vaccine."

61.    During congressional sessions, senators and representatives publicly pressured Meta, Twitter, and Google to remove the accounts of and censor the

---

[7] The only reference to so-called "super-spreaders" in the Surgeon General's report was made in reference to the "Disinformation Dozen". The Surgeon General, in the same report, demanded the imposition of clear consequences for these "super-spreaders".

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 45 of 105

Disinformation Dozen. On or about March 26, 2021, Representative Mike Doyle pressured Mark Zuckerberg, Jack Dorsey, and Sundar Pinchai (CEOs of the respective entities) to deplatform the Disinformation Dozen immediately. On or about May 14, 2021, Senator Amy Klobuchar, citing the Disinformation Dozen Report, proudly stated: "I have called on social media platforms to take action against the accounts propagating the majority of these lies." Senator Klobuchar co-wrote a letter with Senator Ben Ray Lujan pressuring Dorsey and Zuckerberg to remove the Disinformation Dozen from their platforms based on the CCDH's Disinformation Dozen Report.

62. Congressional representatives did not limit their pressure campaign to social media companies. On December 15, 2021, Representative Jake Auchincloss boasted about "[leading] a letter urging PayPal to ban users who disseminate disinformation and deactivate the accounts of the Disinformation Dozen." The letter was joined by 18 members of Congress.

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 46 of 105



63.    Social media and payment companies, under significant pressure from federal agencies, implemented algorithmic changes and content moderation policies directly targeting individuals flagged in the CCDH report:

a.    Facebook and Twitter deprioritized posts from the Disinformation Dozen, effectively reducing their reach and engagement.

b.    Platforms applied broad labels such as "misinformation" and "disinformation" to content associated with these individuals, further chilling their ability to communicate and interact with their audiences.

c.    Google, through YouTube, and Meta, through Instagram, censored and deplatformed the Plaintiffs.

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 47 of 105

d.    PayPal disabled Plaintiffs' accounts.

64.    The courts in *Missouri v. Biden* found that government officials went beyond mere persuasion, instead employing coercive tactics to compel compliance from social media platforms:

a.    Officials implied that failure to comply with government demands could result in adverse regulatory actions or loss of Section 230 protections under the Communications Decency Act.

b.    This "joint participation" blurred the lines between private and public actions, making social media platforms de facto agents of government censorship.

65.    Facebook's internal communications have confirmed that the White House was using the CCDH Disinformation Dozen Report to "guide major governmental policy decisions" and that the White House was "exerting policy pressure" to "remove[] these 12 accounts."

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 48 of 105



From: ███████████ @fb.com>
Date: Friday, July 16, 2021 at 11:58 AM

CONFIDENTIAL TREATMENT REQUESTED -                                    META-118HJC-0058
NOT FOR DISTRIBUTION - MEMBERS & STAFF ONLY

To: ███████████ @fb.com>, ███████████ @fb.com>,
███████████ @fb.com>, ███████████ ███████████ @fb.com>,
███████████ @fb.com>

Cc: ███████████ @fb.com>, Brian Rice <███████████ @fb.com>,
███████████ @fb.com>, ███████████ @fb.com>,
███████████ @fb.com>, ███████████ @fb.com>, ███████████ @fb.com>,
███████████ @fb.com>, ███████████ @fb.com>

Subject: Re: Push back on CCDH vaccine misinformation report

Thanks all!

It seems like these data are now being used to guide major governmental policy decisions.

If they are misleading or incorrect, that can be damaging to (our and their shared) efforts to arrive at productive and substantive solutions, so I think critical we establish some shared understanding of truth. People also trust the USG to not put out information that is false or misleading and to have policy decisions be based on grounded data -- if USG is not doing so, this can result in worse outcomes for the broader ecosystem of efforts here and be counterproductive to our shared goal of improving health.

For example, it seems like the WH thinks that if we just removed these 12 accounts, this would cause 65 percent of anti-vax misinformation to go away ("there's about 12 people who are producing 65 percent of anti- vaccine misinformation on social media platforms"). If this were true, I also would want us to do this and feel tremendous urgency that we had not -- including exerting policy pressure as they are doing -- but it unfortunately isn't that simple. I'm sure we can do better, and would love to discuss how, but it's much more nuanced -- and we have executed on many of the obvious things. (Understand that some of the accounts are still on our platform, but removing them won't have any appreciable impact on anti-vax misinfo, which I think is the actual substantive goal).

66.     On August 18, 2021, Monika Bickert, Vice President of Content Policy at Facebook, wrote of the CCDH's Disinformation Dozen report: "People who have advanced this narrative contend that these 12 people are responsible for 73% of online vaccine misinformation on Facebook. There isn't any evidence to support this claim." Ms. Bickert continued: "In fact, these 12 people are responsible for about just 0.05% of all views of vaccine-related content on Facebook."

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 49 of 105

67.     Facebook knew that the premise for censoring and deplatforming Plaintiffs was false, yet it persisted and willingly participated in the censorship campaign alongside the co-conspirator Defendants.

68.     At the time, Facebook, through Ms. Bickert, admitted that it had "removed over three dozen Pages, groups and Facebook or Instagram accounts linked to these 12 people, including at least one linked to each of the 12 people." Ms. Bickert also admitted that Facebook had "imposed penalties on nearly two dozen additional Pages, groups or accounts linked to these 12 people, like moving their posts lower in News Feed so fewer people see them or not recommending them to others. We've applied penalties to some of their website domains as well so any posts including their website content are moved lower in News Feed."

69.     Despite its knowledge of the falsity of CCDH's claims, Facebook has persisted in its censorship of Plaintiffs, making the removals permanent, continuously imposing penalties on Plaintiffs, and has prohibited Plaintiffs from re-establishing their accounts.

70.     The Government Defendants have similarly persisted in the orchestrated scheme to censor Plaintiffs despite Facebook's admission that the Disinformation Dozen Report was and is, ironically, disinformation.

71.     Google has maintained its ban and persisted in its censorship efforts

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 50 of 105

in removing Plaintiffs' YouTube accounts.

72.    Meta's CEO, Mark Zuckerberg, publicly confirmed in an August 26, 2024, letter to Congress that "senior officials from the Biden Administration, including the White House, repeatedly pressured [Facebook's] teams for months to censor certain COVID-19 content."

73.    Elvis Chan, in his role as Supervisory Special Agent overseeing the FBI's Cyber Branch in San Francisco, operated a command post that was central to the FBI's efforts to combat "disinformation". From this command post, Chan coordinated regular interactions with executives from major social media platforms, including Facebook, Twitter, and Google, sharing intelligence on content the FBI identified as problematic and directing these platforms to take action against accounts or posts that violated their terms of service, particularly those related to "disinformation" disseminated by Plaintiffs.

74.    Plaintiffs were among the primary targets of this government-orchestrated campaign:

   a.    Their content was flagged and suppressed across multiple platforms, directly affecting their ability to reach their audience and promote their various business operations.

   b.    The CCDH's flawed and ideologically driven report provided

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 51 of 105

a pretext for government actors to silence Plaintiffs, who were deemed politically inconvenient due to their dissenting views on vaccines and health freedom.

75.    The government's adoption of the CCDH report as a censorship blueprint had tangible consequences for Plaintiffs:

a.    Plaintiffs lost substantial revenue streams due to reduced visibility and diminished audience engagement.

b.    The dissemination of the CCDH's claims, amplified by government officials, caused irreparable reputational damage, permanently branding the vilified Plaintiffs as untrustworthy and dangerous in the eyes of the public.

76.    <u>Plaintiff Elizabeth Finn</u>: Erin Finn was systematically de-platformed as a direct and proximate result of Defendants' coordinated censorship campaign:

a.    On September 29, 2021, Google notified Erin Finn that it had removed her channel from YouTube. In its notice, Google cited multiple, unspecified, server violations of "Medical Misinformation". Before being censored, Ms. Finn had tens of thousands of subscribers to her channel. Google's censorship of Ms. Finn has continued to the present day.

b.    Facebook banned multiple accounts maintained by Ms. Finn,

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 52 of 105

with total followership of approximately 2,000,000. Facebook additionally banned Ms. Finn on Instagram. On or about May 16, 2022, Facebook instituted a permanent ban on all of Ms. Finn's accounts.

c.      Twitter banned Ms. Finn's account, and she remains subject to block bans.

d.      The Defendants' censorship campaign has had lasting negative impact on Ms. Finn's business. In the most recent year, Ms. Finn's revenue was less than 50% of the revenue Ms. Finn's business generated in the year prior to the Defendants' censorship campaign. Ms. Finn has lost more than $2,000,000 in revenue as a direct and proximate result of Defendants' actions. As a direct and proximate result, HealthNutNews has been forced to lay off two full-time employees.

Ms. Finn has suffered lasting reputational harm.

77.     Plaintiff Rizza Islam: Dr. Islam was systematically de-platformed as a direct and proximate result of Defendants' coordinated censorship campaign:

a.      Meta repeatedly and systematically censored Rizza Islam, tracking him and deleting four separate Instagram pages between the release of the Disinformation Dozen Report and May 10, 2021. Before being censored, Dr. Islam had 539k followers on his original Instagram page. On

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 53 of 105

July 8, 2021, Instagram removed a post made by Dr. Islam referring to the COVID-19 "vaccine" as an experimental shot promoted by the CDC. As basis for this removal, Instagram cited "recognized health organizations" who took a position contrary to Dr. Islam's. Instagram repeatedly disabled Dr. Islam's Instagram accounts. Each time that Dr. Islam created a new Instagram page, Meta deleted Dr. Islam's pages on no less than seven occasions.

b.      Facebook disabled Dr. Islam's account and he was unable to access his account from approximately 2021 through early 2023.

c.      Google took similar collusive action, deleting Dr. Islam's YouTube channel on March 22, 2021. Dr. Islam attempted to re-create his YouTube account, but YouTube deleted his subsequent accounts on three separate occasions. Dr. Islam's YouTube access has never been restored and his accounts have not been reinstated.

d.      Twitter disabled Dr. Islam's account following publication of the Disinformation Dozen Report. Dr. Islam's account was eventually restored on January 26, 2023, but Dr. Islam's followers were substantially diminished upon account restoration.

e.      The FCC declared Dr. Islam to have violated Covid

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 54 of 105

misinformation policies, and Dr. Islam was banned from the messaging app Community, which he attempted to use to reach his followers to conduct health advocacy and educational outreach in light of the other social media platforms' collusion with the Government Defendants to effect broad censorship.

As a result of the Defendants' broad censorship efforts, Dr. Islam was prevented from promoting his health supplements and products to his fans and followers, resulting in substantial financial harm from reduced sales.

Dr. Islam has suffered lasting reputational harm.

78.    <u>Plaintiff Sayer Ji</u>:  Sayer Ji was directly and maliciously targeted. CCDH's CEO Imran Ahmed publicly stated on or about March 28, 2021: "Sayer Ji sells death." Sayer Ji was systematically de-platformed as a direct and proximate result of Defendants' coordinated censorship campaign:

a.    On March 7, 2021, Twitter deleted Dr. Ji's GreenMedInfo account, which had existed in good standing for 13 years.

b.    Meta took similar action, deleting GreenMedInfo's Instagram and Facebook accounts on or about July 3, 2021 and deleting Dr. Ji's personal account. Dr. Ji had more than 500,000 followers on Instagram alone.

c.    On July 22, 2021, Google deleted GreenMedInfo's YouTube

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 55 of 105

account.

    d.    On March 15, 2022, PayPal shut down GreenMedInfo's business account and Dr. Ji's personal PayPal and Venmo accounts, stating that the measures were taken "due to the nature of [Dr. Ji's] activities." As a direct result, Dr. Ji suffered financial damages.

    Dr. Ji has suffered lasting reputational harm.

79.    <u>Plaintiff Christiane Northrup</u>: Dr. Northrup was systematically de-platformed as a direct and proximate result of Defendants' coordinated censorship campaign.

    a.    Facebook announced on or about August 18, 2021, that it had "removed over three dozen Pages, groups and Facebook or Instagram accounts linked to these 12 people, <u>including at least one linked to each of the 12 people</u>." Facebook "also imposed penalties on nearly two dozen additional Pages, groups or accounts linked to these 12 people, and applied penalties to some of their website domains." Dr. Northrup was particularly affected by Facebook's actions. Facebook deactivated Dr. Northrup's ability to boost her posts, a feature she had previously relied upon. Dr. Northrup's followers declined from over 2 million followers in early 2020 down to less than 500,000 by mid-2021 and below 200,000 by the end of 2022. Separately,

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 56 of 105

Instagram reduced her followers by approximately 200,000. Facebook and Instagram both shadow banned Dr. Northrup's posts on the platforms, and Facebook's shadow banning of Dr. Northrup continues to the present day.

b.      YouTube repeatedly shut down or removed YouTube Posts/videos in which Dr. Northrup was interviewed, and demonetized the hosts who dared to interview Dr. Northrup.

c.      Dr. Northrup lost her ability to accept payments through PayPal. On December 15, 2021, PayPal sent Dr. Northrup an email with the subject line "You can no longer do business with PayPal." In the email, PayPal claimed to have determined that Dr. Northrup was "in violation of the Acceptable Use Policy" without any further elaboration. When Dr. Northrup called to inquire, PayPal confirmed its ban, and declared, "You can no longer use PayPal," without further explanation.

d.      Dr. Northrup's publisher refused to market new editions of her widely published books and New York Times bestsellers.

e.      As a direct and proximate result of these censorship activities, Dr. Northrup's business has suffered and she has maxed out her personal line of credit to pay staff salaries and keep her business afloat. Dr. Northrup has suffered lasting reputational harm.

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 57 of 105

80. <u>Plaintiff Ben Tapper</u>: Dr. Tapper was systematically de-platformed as a direct and proximate result of Defendants' coordinated censorship campaign:

a. Dr. Tapper was targeted directly by CCDH's CEO, Imran Ahmed, who repeated his hyperbolic and unsubstantiated claims on local news programs in Nebraska, where Dr. Tapper lives and works. Mr. Ahmed stated as fact: "[t]welve individuals are responsible for two-thirds of the misinformation shared on social media." Mr. Ahmed continued: "He's [Ben Tapper] someone who seeks to undermine vaccines. Full stop." Mr. Ahmed took issue with Dr. Tapper's assertion that "the vaccine isn't safe; it doesn't give you immunity."

b. Facebook repeatedly censored Dr. Tapper. Dr. Tapper was advised that Facebook had: (1) filtered his content so that "[n]o one else [could] see [his] post."; (2) added restrictions to his account; (3) censored him for spreading "false information about COVID-19"[8]; (4) moved his posts "lower in News Feed"; (5) restricted others from sharing Dr. Tapper's posts; (6) suspended his account and prohibited him from posting for up to 30 days; (7) tagged his posts as "False Information" citing "independent

---

[8] Facebook's censorship was targeted at Dr. Tapper's public comment at a local government meeting where he spoke against mask mandates.

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 58 of 105

fact-checkers"; and (8) reduced distribution of his Page and imposed "other restrictions because of repeated sharing of **false news**".

      c.    Similarly, Instagram (also owned by Meta) (1) labeled Dr. Tapper's posts as "False information" based on unidentified "third-party fact-checkers" who "said the [ ] information was false in another post"; (2) prohibited users from mentioning 'dr.bentapper'; (3) advised him that his posts were "limit[ing] [his] account's reach"; removed his posts and stories on multiple occasions for "harmful false information"; (4) and deleted his accounts, severing his ability to communicate with more than 500,000 followers.

      d.    YouTube (owned by Google) removed Dr. Tapper's content, including Dr. Ben Tapper's Podcast episodes and multiple interviews, because his "content didn't follow [YouTube's] **medical misinformation policy."**[9]

      e.    Twitter indefinitely suspended Dr. Tapper's account.

      f.    PayPal permanently banned Dr. Tapper from using PayPal's services. Following the release of the Disinformation Dozen Report, Dr.

---

[9] YouTube cited "a serious risk of egregious harm by spreading medical misinformation about currently administered vaccines that are approved and confirmed to be safe and effective."

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 59 of 105

Tapper's TheTimeIsNow.movie and bhtapper personal account's were suspended indefinitely by PayPal. Dr. Tapper had used PayPal, and its subsidiary Venmo, to fundraise for his documentary *The Time is Now*, but those fundraising efforts were terminated by PayPal.

Dr. Tapper suffered lasting reputational harm.

81.  <u>Plaintiff Sherri Tenpenny</u>: Dr. Tenpenny was systematically de-platformed as a direct and proximate result of Defendants' coordinated censorship campaign:

a.  Facebook permanently banned Dr. Tenpenny.

b.  Instagram permanently banned Dr. Tenpenny.

c.  YouTube permanently banned Dr. Tenpenny.

d.  Twitter indefinitely suspended Dr. Tenpenny's account, and when eventually reinstated, her followers had decreased by approximately 200,000.

e.  Under pressure by the Government Defendants, Podbean (a podcast hosting service) deleted Dr. Tenpenny's account on the same day that she surpassed 1,000,000 downloads.

f.  PayPal shut down Dr. Tenpenny's account, interrupting her various domestic and international business lines, directly impacting Dr.

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 60 of 105

Tenpenny's business income.

g.    CCDH boasted about the effectiveness of its collusion with the government and social media companies in its report titled, *Pandemic Profiteers, The business of anti-vaxx* (the "Pandemic Profiteers Report"), published on or about June 1, 2021.





*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 61 of 105



# Sherri Tenpenny

*Anti-vaxx entrepreneur profiting from training an "army" of activists*

| Followers | 262,335 (-346,658) | Revenue | $2,130,000 |
|-----------|--------------------|---------|-----------|
| Facebook | 79,963 (-234,190) | PPP Loans | $72,500 |
| Instagram | 88,495 (-112,468) | Employees | 13 |
| YouTube | 0 | Salary | N/A |
| Twitter | 93,877 | | |

Sherri Tenpenny is a practising osteopathic physician and alternative health entrepreneur who offers paid-for "boot camps" on anti-vaccine activism. The self-proclaimed "doctor, speaker, educator, consultant" promotes her services through a network of social media accounts with 260,000 followers.[164]

In its Pandemic Profiteers Report, CCDH boasted of the dramatic reduction in followers based on the censorship campaign.[10]

Dr. Tenpenny suffered lasting reputational harm. Dr. Tenpenny lost speaking engagements, live and podcast interviews, and business opportunities as a result of Defendants' censorship campaign.

## COUNT I
### 42 USC § 1983 — First Amendment Freedom of Speech
*Against the Government and Social Media Defendants*

82.    Plaintiffs reincorporate paragraphs 1 to 81 above.

83.    The Government Defendants used their influence and coercive power

---

[10] CCDH gloated: "Marked in red next to each of these figures is how many followers that anti-vaxxer and their associated organizations have lost due to having their accounts deplatformed based on our tracking of anti-vaxxer accounts dating back to December 2019."

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 62 of 105

to suppress the Plaintiffs' speech by pressuring social media companies to remove or restrict content associated with the Disinformation Dozen. This suppression, conducted under the guise of combating "misinformation," interfered with the Plaintiffs' right to express their views, particularly on controversial issues such as vaccines and health freedom.

84.    The Social Media Defendants became state actors through their pervasive joint participation with federal officials in the censorship enterprise. This joint action is evidenced by the companies' regular meetings with federal officials; their creation of special communication channels and reporting mechanisms exclusively for government use; their prompt responsiveness to government "flagging" of content; their modification of content policies at government officials' behest; and their provision of detailed reports to government officials about their censorship efforts. These actions transform what might otherwise be private content moderation decisions into state action subject to First Amendment constraints, consistent with the Supreme Court's holdings in *Blum v. Yaretsky*, 457 U.S. 991 (1982) and *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982).

85.    The Social Media Defendants' censorship decisions were and are not merely influenced by government pressure but were and are effectively directed and controlled by government officials through both coercion and voluntary

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 63 of 105

participation in a joint enterprise. Internal communications from the companies acknowledge that they modified their content policies and enforcement decisions in direct response to government demands, with Meta executives explicitly noting they were responding to "policy pressure" from the White House. This level of entwinement between government actors and private entities in suppressing specific viewpoints and speakers creates a "symbiotic relationship" that renders the private conduct attributable to the state, as recognized in *Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961) and subsequent cases.

86.    By targeting Plaintiffs based on their dissenting viewpoints, the government violated the principle of "viewpoint neutrality," which prohibits the government from favoring or suppressing speech based on its content or perspective. The Supreme Court has consistently held that "the government may not prohibit the verbal or nonverbal expression of an idea merely because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 398 (1989).

87.    The text of the Constitution's First Amendment is clear: Any law or policy that "abridges" or reduces the sphere of constitutionally protected speech violates the First Amendment. This principle applies with particular force when, as here, the suppressed speech concerns matters of public importance where

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 64 of 105

"debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co.* v. *Sullivan*, 376 U.S. 254, 270 (1964).

88.    The Government Defendants violated the Free Speech Clause of the First Amendment by (1) systematically and repeatedly using coercive threats to force social-media companies and platforms to censor protected speech and/or (2) entering into collusive partnerships with social-media companies and platforms and working jointly with those private entities to censor protected speech.

89.    Government Defendants circumvented First Amendment prohibitions by employing what the Supreme Court has termed an "unconstitutional condition"—coercing private entities to restrict speech that the government itself could not directly censor. This conduct violates the principle established in *Bantam Books, Inc.*, 372 U.S. at 58, that the government cannot use its power and influence to achieve indirectly what the Constitution forbids it to achieve directly.

90.    The Government Defendants' actions—including explicit threats of adverse regulatory action, repeated demands for censorship, and coordinated pressure campaigns—transformed ostensibly private content moderation decisions into state action subject to First Amendment constraints. This entanglement between government actors and private platforms created a "joint

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 65 of 105

participation" arrangement that the Supreme Court has recognized as sufficient to subject nominally private conduct to constitutional scrutiny. See *Lugar*, 457 U.S. at 941.

91.    Government officials, including Defendant Flaherty, explicitly referenced the Disinformation Dozen Report in communications with social media platforms and demanded specific enforcement actions against Plaintiffs. These communications were not mere suggestions but carried the implicit threat of regulatory consequences for non-compliance, as evidenced by internal platform communications describing "policy pressure" from the White House.

92.    The censorship campaign against Plaintiffs was particularly egregious because it targeted core political speech on matters of public concern — precisely the type of expression that receives the highest level of First Amendment protection. The government's labeling of Plaintiffs' speech as "misinformation" or "disinformation" does not diminish this protection, as "the First Amendment there is no such thing as a false idea." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974).

93.    Plaintiffs have faced and continue to face social media censorship, blacklisting, reputational damage, negative economic consequences including reduced advertising revenue, and reduced circulation of reporting and speech, all

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 66 of 105

as a direct result of the government's unlawful conduct.

94.    The removal and suppression of Plaintiffs' content across multiple platforms following government intervention resulted in a concrete and particularized injury to Plaintiffs' free speech rights. This injury is ongoing, as the censorship infrastructure established by Government Defendants continues to suppress Plaintiffs' ability to reach their audience and communicate their views on matters of public importance.

95.    Plaintiffs suffered and continue to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of the Defendants' conduct.

96.    Plaintiffs have no adequate remedy at law for the violation of their constitutional rights. Money damages alone cannot remedy the ongoing suppression of their speech or restore their ability to participate in public discourse. Only declaratory and injunctive relief from this Court can provide complete relief by ending the Defendants' unconstitutional censorship campaign and preventing similar violations in the future.

WHEREFORE, Plaintiffs respectfully request that this Court:

A)    Issue a declaratory judgment that Defendants' actions to censor, suppress, and deplatform Plaintiffs violated their First Amendment rights;

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 67 of 105

B)    Issue a permanent injunction prohibiting Defendants from continuing to censor, suppress, and deplatform Plaintiffs;

C)    Award compensatory damages against all Defendants, jointly and severally, pursuant to 42 U.S.C. § 1983, in an amount to be determined at trial;

D)    Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

E)    Grant such other and further relief as the Court deems just and proper.

## COUNT II
### 42 USC § 1983 — First Amendment Freedom of Press
### *Against the Government and Social Media Defendants*

97.    Plaintiffs herein reincorporate paragraphs 1 to 81, as well as paragraphs 83 to 85, above.

98.    The First Amendment explicitly protects "freedom of the press" as a fundamental right distinct from yet complementary to freedom of speech. This protection extends to all publishers of information, including Plaintiffs, who disseminate content on matters of public concern through digital platforms.

99.    Plaintiffs, as publishers of information on health-related topics, were effectively silenced through the Government Defendants' coordinated suppression campaigns. The government's actions interfered with their ability to

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 68 of 105

disseminate information, chilling their role as media outlets providing alternative health narratives and inhibiting the public's right to receive diverse viewpoints.

100. The Supreme Court has recognized "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *N.Y. Times*, 376 U.S. at 270. By coercing social media platforms to suppress Plaintiffs' viewpoints, Government Defendants not only targeted Plaintiffs for censorship but also deprived the public of access to their perspectives, thereby undermining the "marketplace of ideas" that the First Amendment is designed to protect and disrupting this essential democratic function.

101. The government's campaign against Plaintiffs was especially pernicious because it targeted publishers based on the content of their messages rather than any demonstrable harm. This content-based restriction strikes at the heart of First Amendment protections for press freedom.

102. By leveraging their regulatory authority and influence to pressure platforms into removing Plaintiffs' content, Government Defendants effectively imposed a prior restraint on publication—the most severe and least tolerable infringement on First Amendment rights. *Near v. Minnesota*, 283 U.S. 697, 713 (1931).

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 69 of 105

103.    The government's censorship campaign has caused Plaintiffs to suffer significant and ongoing injuries, including:

a.    Removal of their publishing channels, effectively eliminating their ability to reach their established audiences;

b.    Dramatic reduction in the circulation of their content due to algorithmic suppression and shadow-banning;

c.    Loss of advertising revenue directly tied to viewership and engagement metrics;

d.    Damage to their credibility as publishers through government-facilitated labeling as purveyors of "misinformation"; and

e.    Ongoing inability to publish freely on matters of public concern without fear of government-induced censorship.

104.    Plaintiffs suffered and continue to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of the Defendants' conduct.

105.    Plaintiffs have no adequate remedy at law for the violation of their constitutional rights. Money damages alone cannot remedy the ongoing violations of their rights to publish content freely. Only declaratory and injunctive relief from this Court can provide complete relief by ending the Defendants' unconstitutional

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 70 of 105

censorship campaign and preventing similar violations in the future.

WHEREFORE, Plaintiffs respectfully request that this Court:

A)     Issue a declaratory judgment that Defendants' actions to censor, suppress, and deplatform Plaintiffs violated their First Amendment rights to freedom of the press;

B)     Issue a permanent injunction prohibiting Defendants from continuing to interfere with Plaintiffs' ability to publish and disseminate content on matters of public concern;

C)     Award compensatory damages against all Defendants, jointly and severally, pursuant to 42 U.S.C. § 1983, in an amount to be determined at trial;

D)     Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

E)     Grant such other and further relief as the Court deems just and proper.

### COUNT III
### 42 USC § 1983 — Fifth Amendment Due Process
*Against the Government and Social Media Defendants*

106.     Plaintiffs reincorporate paragraphs 1 to 81, as well as paragraphs 83 to 85, above.

107.     The Fifth Amendment to the United States Constitution guarantees

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 71 of 105

that no person shall "be deprived of life, liberty, or property, without due process of law." This protection applies to both procedural and substantive due process rights.

108.    Plaintiffs possess constitutionally protected liberty and property interests in:

a.    Their reputations and standing in their professional communities;

b.    Their established social media accounts, which represent significant business assets developed over many years;

c.    Their ability to communicate with their audiences and engage in their chosen professions;

d.    Their access to digital platforms essential for modern speech and commerce; and

e.    Their freedom from being publicly branded as purveyors of "misinformation" or "disinformation" by government officials.

109.    Government Defendants deprived Plaintiffs of these liberty and property interests without providing any form of due process whatsoever. Specifically, Government Defendants:

a.    Never notified Plaintiffs that their speech was being targeted

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 72 of 105

for suppression;

      b.     Provided no opportunity for Plaintiffs to challenge the characterization of their content as "misinformation";

      c.     Established no neutral, objective standards for determining what constitutes "misinformation";

      d.     Created no mechanism for appeal or review of censorship decisions;

      e.     Offered no hearing or other procedural safeguards before pressuring platforms to take adverse actions against Plaintiffs; and

      f.     Implemented no checks and balances to prevent arbitrary and capricious enforcement.

110.    The Supreme Court has recognized that "where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him," due process requires that the government provide notice and an opportunity to be heard. *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). By publicly branding Plaintiffs as dangerous "misinformation spreaders" and pressuring platforms to censor them, Government Defendants imposed a "stigma-plus" injury triggering due process protections.

111.    The Defendants' censorship regime and the Social Media Defendants

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 73 of 105

perpetuation of the censorship scheme operates without any procedural protections typically required for restricting First Amendment freedoms. Plaintiffs have continuously been denied notice when their speech is targeted through 'shadow banning' and algorithmic suppression, depriving them of any opportunity to know their rights are being violated or to challenge such violations. By outsourcing censorship to social media companies while maintaining control through threats and coordination, Defendants have circumvented constitutional guardrails including clear standards, neutral application, and judicial review.

112.    The Supreme Court has recognized that 'rigorous procedural safeguards are necessary' for prior restraints, yet Defendants have implemented censorship without any such safeguards. Their system provides no notice of censorship criteria, no explanation when content is suppressed, no opportunity to present contrary evidence, no neutral arbiter, and no avenue for appeal. Defendants have further concealed their activities by conducting coordination through private communications, deliberately avoiding transparency and accountability.

113.    These due process violations have concretely harmed Plaintiffs. When their content has been removed or suppressed, they've been denied any opportunity to contest the action, present evidence their speech was truthful, or

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 74 of 105

appeal to a neutral decision-maker. In many cases, they haven't even been informed censorship occurred. This denial of procedural rights compounds the First Amendment harms and independently violates the Due Process Clause, which requires adequate safeguards before depriving individuals of constitutional rights.

114.    Government Defendants' actions also violated substantive due process by arbitrarily and capriciously targeting Plaintiffs for punishment without any rational connection to a legitimate government interest. The government has no legitimate interest in suppressing protected speech simply because it contradicts preferred government narratives.

115.    The government's censorship campaign was particularly egregious because it established what amounts to a secret, extrajudicial process for determining which citizens' speech would be allowed in the digital public square. This shadow system of censorship operated without any of the procedural protections that would be required if the government sought to directly regulate speech.

116.    Government Defendants' covert pressure campaign against platforms hosting Plaintiffs' content constitutes precisely the type of arbitrary government action that the Due Process Clause was designed to prevent. As the Supreme Court

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 75 of 105

noted in *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965), "A fundamental requirement of due process is 'the opportunity to be heard' at a meaningful time and in a meaningful manner" (internal citation omitted).

117.    The collusion between the Government and Social Media Defendants created a system through which government officials could achieve indirectly what they are forbidden to do directly—censor disfavored speech without providing any due process. The Supreme Court has consistently recognized that the government cannot evade constitutional obligations by working through private parties. See *Norwood v. Harrison*, 413 U.S. 455, 465 (1973).

118.    The government's actions fall within the "state action" doctrine because:

    a.    The government coerced or significantly encouraged the specific censorship decisions targeting Plaintiffs;

    b.    Private platforms acted as willful participants in joint activity with government officials;

    c.    The government's involvement was so pervasive as to transform seemingly private censorship into state action; and

    d.    The private entities were performing a traditional and exclusive government function in identifying and restricting speech deemed

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 76 of 105

harmful to the public.

119.    As a direct result of Defendants' due process violations, Plaintiffs have suffered substantial and ongoing harm, including:

      a.    Inability to access or utilize their established social media accounts;

      b.    Significant financial losses from reduced audience reach and engagement;

      c.    Reputational damage from being publicly labeled as sources of "misinformation";

      d.    Exclusion from digital platforms essential to their professional activities; and

      e.    The chilling of their speech on matters of public concern due to fear of further censorship.

120.    Plaintiffs suffered and continue to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of the Defendants' conduct.

121.    Plaintiffs have no adequate remedy at law for the violation of their constitutional rights. Money damages alone cannot remedy the ongoing violations of their rights to due process. Only declaratory and injunctive relief from this

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 77 of 105

Court can provide complete relief by ending the Defendants' unconstitutional censorship campaign and preventing similar violations in the future.

WHEREFORE, Plaintiffs respectfully request that this Court:

A)    Issue a declaratory judgment that Defendants' actions deprived Plaintiffs of liberty and property interests without due process of law in violation of the Fifth Amendment;

B)    Issue a permanent injunction requiring Defendants to establish and implement clear, neutral, and transparent procedures before taking any action that could adversely affect Plaintiffs' speech, social media platform access, or reputations;

C)    Award compensatory damages against all Defendants, jointly and severally, pursuant to 42 U.S.C. § 1983, in an amount to be determined at trial;

D)    Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

E)    Grant such other and further relief as the Court deems just and proper.

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 78 of 105

## COUNT IV
## <u>42 USC § 1983 — Fourteenth Amendment Equal Protection</u>
### *Against All Government and Social Media Defendants*

122.    Plaintiffs reincorporate paragraphs 1 to 81 above.

123.    The Fourteenth Amendment to the United States Constitution guarantees equal protection of the laws, prohibiting the government from treating similarly situated individuals differently without sufficient justification. Concurrently, the Fourth Amendment protects citizens against unreasonable searches and seizures, including the collection and use of private data without proper legal authority.

### Equal Protection Violations

124.    Defendants violated Plaintiffs' equal protection rights by selectively targeting them for censorship based on the content and viewpoint of their speech, particularly their dissenting opinions on vaccines and public health policies.

125.    The Disinformation Dozen framework created by CCDH and adopted by the Defendants established an arbitrary and discriminatory classification that singled out Plaintiffs for disfavored treatment without any rational basis, much less the compelling interest and narrow tailoring required for content-based speech restrictions.

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 79 of 105

126.    Defendants treated Plaintiffs differently from similarly situated individuals who expressed viewpoints aligned with government narratives on identical topics. While Plaintiffs faced systematic censorship, account removal, and suppression, those expressing government-approved perspectives on the same platforms were permitted to speak freely and often received algorithmic amplification.

127.    This discriminatory treatment cannot survive even rational basis review, as the government has no legitimate interest in suppressing lawful speech based solely on its content or viewpoint. As the Supreme Court held in *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972), "[a]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."

128.    Defendants' targeted suppression campaign was particularly egregious because it classified Plaintiffs as dangerous "misinformation spreaders" without any objective criteria, scientific validation, or procedural safeguards. This arbitrary classification bears all the hallmarks of impermissible viewpoint discrimination.

129.    The selective enforcement against Plaintiffs reflects a pattern of unconstitutional government conduct designed to silence specific perspectives in

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 80 of 105

public discourse, violating core equal protection principles that prohibit the government from selecting "which issues are worth discussing or debating." *Reed v. Town of Gilbert*, 576 U.S. 155, 182 (2015).

**Fourth Amendment Violations**

130.    Defendants violated Plaintiffs' Fourth Amendment rights by obtaining, using, and sharing detailed information about their social media activities, engagement metrics, and private communications without any legal process, warrant, or statutory authorization.

131.    Through their "switchboarding" operations and regular meetings with social media companies, agencies including the FBI, CISA, and the State Department systematically collected and analyzed data about Plaintiffs' online activities, effectively conducting digital surveillance of American citizens engaged in constitutionally protected speech.

132.    The Supreme Court has recognized that the Fourth Amendment protects electronic data and digital communications. As the Court noted in *Carpenter v. United States*, 138 S. Ct. 2206, 2219 (2018), the Fourth Amendment must adapt to the "seismic shifts in digital technology" that have made possible the tracking of not just Plaintiffs' public posts but also private data about their reach, engagement, and audience.

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 81 of 105

133.    Defendants' surveillance activities extended beyond monitoring publicly available posts to include:

    a.    Obtaining non-public analytics data about Plaintiffs' account reach and engagement;

    b.    Tracking changes in Plaintiffs' follower counts and post performance;

    c.    Monitoring Plaintiffs' private messages when flagged by platform algorithms;

    d.    Creating databases of Plaintiffs' content for ongoing surveillance; and

    e.    Developing detailed profiles of Plaintiffs' online activities and networks.

134.    These surveillance activities constituted unreasonable searches under the Fourth Amendment because they were conducted without any judicial oversight, probable cause, or connection to legitimate law enforcement purposes. Instead, they targeted constitutionally protected speech on matters of public concern.

135.    The joint participation between the Government Defendants and Social Media Defendants in monitoring Plaintiffs' online activities transformed

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 82 of 105

what might otherwise be private content moderation into state action subject to Fourth Amendment constraints. By deputizing private companies to conduct surveillance they could not legally perform directly, Government Defendants circumvented constitutional protections.

136.    As a direct result of these constitutional violations, Plaintiffs have suffered substantial and continuing harm, including:

      a.    Violation of their reasonable expectation of privacy in their online communications;

      b.    Creation of databases maintained jointly by the Government and Social Media Defendants containing their protected speech and personal information;

      c.    Discriminatory treatment based on the content and viewpoint of their expression;

      d.    Chilling of their willingness to express controversial opinions online; and

      e.    Stigmatization as targets of government surveillance and censorship efforts.

137.    Plaintiffs suffered and continue to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of the Defendants'

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 83 of 105

conduct.

138.    Plaintiffs have no adequate remedy at law for the violation of their constitutional rights. Money damages alone cannot remedy the ongoing violations of their rights as guaranteed by the Fourteenth and Fourth Amendments. Only declaratory and injunctive relief from this Court can provide complete relief by ending the Defendants' unconstitutional censorship campaign and preventing similar violations in the future.

WHEREFORE, Plaintiffs request immediate injunctive relief mandating the cessation of the government's constitutionally repugnant conduct and declaratory relief as set forth in the Prayer for Relief below.

WHEREFORE, Plaintiffs respectfully request that this Court:

A)    Issue a declaratory judgment that Defendants' actions in selectively targeting Plaintiffs for adverse treatment based on the content and viewpoint of their speech violated their Fourteenth Amendment rights to equal protection of the laws and Fourth Amendment protections against unreasonable searches;

B)    Issue a permanent injunction prohibiting Defendants from engaging in viewpoint-based discrimination against Plaintiffs and from conducting surveillance of Plaintiffs' protected speech without proper legal authority;

C)    Order Defendants to destroy all databases, collections, and profiles of

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 84 of 105

Plaintiffs' online activities created without proper legal process;

      D)    Award compensatory damages against all Defendants, jointly and severally, pursuant to 42 U.S.C. § 1983, in an amount to be determined at trial;

      E)    Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

      F)    Grant such other and further relief as the Court deems just and proper.

### COUNT V
### Bivens First Amendment Claim for Damages
*Against Defendants Flaherty, Murthy, and Chan in their individual capacities*

139.   Plaintiffs reincorporate paragraphs 1 to 81 above.

140.  Defendants Flaherty, Murthy, and Chan (the "Individual Defendants"), acting under color of federal law, deliberately violated Plaintiffs' clearly established First Amendment rights by orchestrating a targeted campaign to suppress Plaintiffs' protected speech through coercion of private social media platforms.

141.   The Individual Defendants' actions to silence Plaintiffs' viewpoints constitute precisely the type of government censorship that the First Amendment was designed to prevent. The Supreme Court has repeatedly recognized that

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 85 of 105

government officials violate the First Amendment when they use threats or coercion to suppress protected speech, as in *Bantam Books, Inc.*, 372 U.S. at 58.

142.    Defendant Flaherty, as Deputy Assistant to the President and Director of Digital Strategy at the White House, repeatedly and directly pressured social media platforms to take adverse actions against Plaintiffs. On or about May 6, 2021, Flaherty sent specific communications to Facebook executives demanding increased censorship of the Disinformation Dozen, including Plaintiffs, and questioning the platform's commitment to content moderation while implying potential regulatory consequences. These communications were not general policy advocacy but targeted demands to suppress specific speakers based on their viewpoints.

143.    Defendant Murthy, as Surgeon General, weaponized his office to target Plaintiffs by explicitly endorsing the CCDH Disinformation Dozen Report in his July 13, 2021, advisory on health misinformation. Murthy used this official publication to urge platforms to impose "clear consequences" on the named individuals, including Plaintiffs, effectively using government authority to orchestrate viewpoint-based censorship of private citizens.

144.    Defendant Chan, as an FBI Supervisory Special Agent, served as a key intermediary between federal agencies and social media platforms, organizing

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 86 of 105

regular meetings with platform executives where he pressured them to take enforcement actions against individuals identified in the Disinformation Dozen Report, including Plaintiffs. Chan's actions leveraged the authority of federal law enforcement to suppress constitutionally protected speech.

145.    The Individual Defendants knew, or should have known, that their actions violated Plaintiffs' clearly established First Amendment rights. Any reasonable official would understand that using government authority to coerce private entities into suppressing specific viewpoints violates the Constitution.

146.    As a direct and proximate result of the Individual Defendants' unconstitutional actions, Plaintiffs suffered significant damages, including:

a.    Loss of access to their social media accounts and audiences, some of which included hundreds of thousands of followers built over many years;

b.    Substantial economic harm through lost business opportunities, reduced income from content creation, canceled speaking engagements, and termination of financial service accounts;

c.    Reputational damage resulting from being publicly branded as dangerous "misinformation spreaders";

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 87 of 105

     d.    Emotional distress from being targeted by powerful government officials; and

     e.    Ongoing harm to their ability to participate in public discourse on matters of significant public interest.

147.   No special factors counsel hesitation in recognizing a damages remedy in this case. The Individual Defendants' actions do not implicate national security, foreign policy, or military affairs. Their conduct did not occur in a new context but represents a classic First Amendment violation—government officials using their authority to suppress disfavored speech.

148.   Plaintiffs have no adequate alternative remedy for the constitutional violation and resulting damages. The Administrative Procedure Act does not provide monetary relief, and prospective injunctive relief cannot remedy the substantial past harms Plaintiffs have suffered.

WHEREFORE, Plaintiffs respectfully request that this Court:

A)    Issue a declaratory judgment that the Individual Defendants' actions violated Plaintiffs' clearly established First Amendment rights;

B)    Award compensatory damages against Defendants Flaherty, Murthy, and Chan in their individual capacities in an amount to be determined at trial;

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 88 of 105

C)      Award punitive damages against Defendants Flaherty, Murthy, and Chan in their individual capacities in an amount sufficient to deter similar misconduct in the future;

D)      Award Plaintiffs their reasonable attorneys' fees and costs pursuant to applicable law; and

E)      Grant such other and further relief as the Court deems just and proper.

## COUNT VI
## Civil Conspiracy
### *Against All Defendants*

149.    Plaintiffs reincorporate paragraphs 1 to 81 above.

150.    A civil conspiracy exists where there is (1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) an overt act in furtherance of the conspiracy; and (4) damage to the plaintiff as a result of acts done under the conspiracy.

151.    Defendants entered into an agreement to target, censor, deplatform, and suppress Plaintiffs' constitutionally protected speech. This agreement is evidenced by numerous communications, coordinated actions, and joint participation between government officials, agencies, NGOs, and social media platforms, including but not limited to:

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 89 of 105

a.    The systematic adoption and operationalization of CCDH's Disinformation Dozen Report by multiple government agencies;

b.    The White House's communications with social media platforms explicitly pressuring them to remove the Disinformation Dozen, as demonstrated by Defendant Flaherty's May 6, 2021, email demanding action against Plaintiffs;

c.    The Surgeon General's official health advisory that specifically cited the Disinformation Dozen Report and called for platforms to impose "clear consequences" on the named individuals;

d.    Regular meetings between government officials and social media executives where enforcement actions against Plaintiffs were discussed and coordinated;

e.    Contemporaneous and nearly identical enforcement actions taken by multiple platforms against Plaintiffs following government pressure; and

f.    Internal communications from Meta confirming that the White House was "exerting policy pressure" to remove the Disinformation Dozen accounts.

152.   Defendants agreed to commit unlawful acts and to use unlawful

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 90 of 105

means to implement their censorship campaign against Plaintiffs, including:

      a.    Coercing private entities to suppress constitutionally protected speech in violation of the First Amendment;

      b.    Depriving Plaintiffs of their liberty and property interests without due process in violation of the Fifth Amendment;

      c.    Selectively targeting Plaintiffs for adverse treatment based on their viewpoints in violation of equal protection principles;

      d.    Conducting warrantless surveillance of Plaintiffs' online activities through collusion with private platforms in violation of the Fourth Amendment;

      e.    Publishing false and defamatory statements about Plaintiffs with knowledge of, or reckless disregard for, their falsity; and

      f.    Interfering with Plaintiffs' contractual relationships with social media platforms, payment processors, and other business partners without justification or privilege.

153.    Defendants took numerous overt acts in furtherance of their conspiracy, including but not limited to:

      a.    CCDH publishing the Disinformation Dozen Report with methodologically unsound and defamatory claims about Plaintiffs, with the

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 91 of 105

express purpose of provoking censorship;

b.    Defendant Flaherty sending explicit demands to Facebook executives to remove Plaintiffs' content, referencing the "disinfo dozen" as justification;

c.    Defendant Murthy publishing an official advisory citing the Disinformation Dozen Report and calling for platforms to impose "clear consequences" on Plaintiffs;

d.    Defendant Chan coordinating regular meetings between government officials and social media executives where enforcement actions against Plaintiffs were orchestrated;

e.    Meta, Google, and X (formerly Twitter) implementing systematic censorship measures against Plaintiffs' accounts in direct response to government pressure, as evidenced by internal communications acknowledging this "policy pressure";

f.    Congressional representatives publicly pressuring social media and payment processing companies to take action against the Disinformation Dozen, including a letter to PayPal joined by 18 members of Congress; and

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 92 of 105

g.      Defendant agencies including the FBI, DHS, CISA, and the Global Engagement Center developing and implementing formalized systems for flagging, monitoring, and suppressing Plaintiffs' speech across digital platforms.

154.   The conspiracy was characterized by significant coordination and entwinement among ostensibly separate entities. Government Defendants transformed private content moderation into state action by:

a.      Threatening adverse regulatory consequences for platforms that failed to comply with censorship demands;

b.      Establishing regular meetings and dedicated communication channels between government officials and platform executives;

c.      Using NGOs like CCDH as intermediaries to launder government censorship through seemingly private organizations;

d.      Leveraging governmental authority to pressure platforms into adopting specific content moderation policies targeting Plaintiffs; and

e.      Creating a pervasive system of public-private partnership that effectively circumvented constitutional constraints on government censorship.

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 93 of 105

155.    As a direct and proximate result of Defendants' conspiracy, Plaintiffs suffered substantial and ongoing damages, including:

a.    Removal of their accounts from major social media platforms, severing their connection to audiences built over many years;

b.    Algorithmic suppression and shadow-banning of their content, dramatically reducing their reach and engagement;

c.    Significant financial losses from reduced audience reach, canceled business opportunities, and termination of payment processing services;

d.    Reputational harm from being publicly branded as dangerous "misinformation spreaders";

e.    Emotional distress from being targeted by a coordinated campaign involving the highest levels of government; and

f.    Ongoing inability to participate fully in public discourse on matters of significant public concern.

156.    The harm suffered by Plaintiffs was the direct, foreseeable, and intended consequence of Defendants' conspiratorial actions. Each Defendant played a unique but essential role in the conspiracy:

a.    CCDH and provided the pretext and justification for

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 94 of 105

censorship through methodologically unsound reports;

b.    Government officials and agencies leveraged their regulatory authority to pressure platforms into taking action against Plaintiffs;

c.    Individual Defendants including Flaherty, Murthy, and Chan served as key intermediaries coordinating the censorship campaign; and

d.    Social media platforms and payment processors implemented the actual censorship, knowing they were acting at the government's behest.

157.    The conspiracy between Defendants was not the result of independent parallel conduct but reflected a conscious commitment to a common scheme designed to achieve an unlawful objective—the suppression of constitutionally protected speech based on its viewpoint and content.

WHEREFORE, Plaintiffs request that this Court:

A)    Award compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial;

B)    Award punitive damages against all Defendants in an amount sufficient to deter similar misconduct in the future;

C)    Award Plaintiffs their reasonable attorneys' fees and costs; and

D)    Grant such other and further relief as the Court deems just and proper.

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 95 of 105

## COUNT VII
## <u>Tortious Interference with Contract</u>
### *Against all Defendants*

158.    Plaintiffs reincorporate paragraphs 1 to 81 above.

159.    Plaintiffs each had valid and enforceable contractual relationships with payment processing companies, including PayPal, which were essential to their business operations. These contracts allowed Plaintiffs to receive payments for products, services, and donations from supporters, customers, and business partners. Specifically:

a.    Plaintiff Sayer Ji had contractual relationships with PayPal for processing payments for GreenMedInfo LLC, which had been in good standing for years prior to the interference.

b.    Plaintiff Christiane Northrup had contractual relationships with PayPal that allowed her to process payments for her health-related products, books, and services.

c.    Plaintiff Ben Tapper had contractual relationships with PayPal for both his personal account and for processing payments related to his documentary project "TheTimeIsNow.movie."

d.    Plaintiff Sherri Tenpenny had contractual relationships with PayPal that facilitated both domestic and international business

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 96 of 105

transactions.

e.    Plaintiff Rizza Islam had contractual relationships with PayPal that enabled him to sell health supplements and products to his followers.

160.   Defendants knew of these contractual relationships. Specifically:

a.    On December 15, 2021, Representative Jake Auchincloss, along with 18 other members of Congress, sent a letter to PayPal specifically targeting Plaintiffs' payment processing accounts, demonstrating their knowledge of these contractual relationships.

b.    CCDH's "Pandemic Profiteers" Report explicitly identified and targeted Plaintiffs' business relationships with payment processors, demonstrating CCDH's knowledge of these contractual relationships.

161.   Defendants intentionally and unjustifiably interfered with these contracts, inducing their breach or termination:

a.    Representative Auchincloss explicitly "urged PayPal to ban users who disseminate disinformation and deactivate the accounts of the Disinformation Dozen," directly pressuring PayPal to breach its contracts with Plaintiffs.

b.    CCDH's reports, including the Disinformation Dozen Report and the Pandemic Profiteers Report, urged payment processors to "stop

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 97 of 105

processing payments for those who profit from COVID-19 and vaccine misinformation."

c.      As a direct result of this pressure campaign, on March 15, 2022, PayPal shut down Plaintiff Sayer Ji's GreenMedInfo business account and his personal PayPal and Venmo accounts, stating that the measures were taken "due to the nature of [Dr. Ji's] activities."

d.      PayPal permanently banned Plaintiff Ben Tapper from using its services, suspending both his personal account and the account for his documentary project "TheTimeIsNow.movie" indefinitely.

e.      Plaintiff Christiane Northrup lost her ability to accept payments through PayPal, and when she called to inquire, she was simply told "you can no longer use PayPal" without further explanation.

f.      PayPal shut down Plaintiff Sherri Tenpenny's account, disrupting her various domestic and international business operations.

162.  Defendants' interference was without justification or privilege:

a.      Defendants' actions were not based on legitimate business competition or the protection of any legally recognized interest.

b.      Defendants targeted Plaintiffs based on their protected speech, not because of any unlawful conduct or contractual violations.

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 98 of 105

c.      Defendants were not parties to the contracts between Plaintiffs and PayPal, nor did they have any legitimate authority to interfere with these private contractual relationships.

d.      Defendants' pressure campaign was designed to financially damage Plaintiffs by cutting off their payment processing capabilities, not to advance any legitimate regulatory or public interest objective.

e.      Defendants acted with malice and the specific intent to harm Plaintiffs' economic interests based on their viewpoints regarding health-related matters.

163.    As a direct and proximate result of Defendants' tortious interference, Plaintiffs suffered substantial damages:

a.      Plaintiff Sayer Ji experienced significant financial losses from being unable to process payments through PayPal and Venmo for GreenMedInfo's products and services.

b.      Plaintiff Ben Tapper's fundraising efforts for his documentary "The Time is Now" were terminated, causing substantial financial harm and preventing the completion of his project.

c.      Plaintiff Christiane Northrup has been forced to max out her personal line of credit to pay staff salaries and keep her business operational

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 99 of 105

after losing her payment processing capabilities.

  d. Plaintiff Sherri Tenpenny suffered direct business income losses from the interruption of her various business lines that relied on PayPal for payment processing.

  e. Plaintiff Rizza Islam experienced substantial financial harm from reduced sales of health supplements and products after losing access to payment processing services.

  f. All Plaintiffs suffered ongoing financial damages, including lost revenue and additional operational costs to establish alternative payment processing methods.

164. Defendants' actions constituted intentional misconduct as defined by Florida Statute § 768.72(2)(a), as they had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage to Plaintiffs would result, and despite this knowledge, deliberately pursued a course of conduct that caused harm to Plaintiffs. Defendants explicitly discussed targeting Plaintiffs' financial relationships as a strategy to silence their speech, demonstrating conscious and specific intent to harm Plaintiffs' business interests. Defendants acted purposefully to cause financial harm to Plaintiffs to punish them for their protected speech.

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 100 of 105

WHEREFORE, Plaintiffs request that this Court:

A)    Award compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial;

B)    Award punitive damages against the Defendants in an amount sufficient to deter similar misconduct in the future;

C)    Award Plaintiffs their reasonable attorneys' fees and costs; and

D)    Grant such other and further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request this Court enter judgment in Plaintiffs' favor and:

A)    With respect to Counts I through IV, Plaintiffs respectfully request that this Court provide injunctive and declaratory relief as follows:

i.    Declare that Defendants' censorship activities violate the First Amendment of the U.S. Constitution, notwithstanding the issuance of Executive Order 14149, "Restoring Freedom of Speech and Ending Federal Censorship," as a judicial declaration is necessary to establish clear constitutional boundaries that cannot be altered by changing executive policies;

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 101 of 105

ii.      Declare that Defendants' censorship activities were ultra vires
and exceeded their statutory authority, and that no federal statute
authorizes government officials to coerce, pressure, or collude with social
media companies to suppress constitutionally protected speech;

iii.     Order  Defendants  to  publicly  disclose  all  past
communications, meetings, and coordination efforts with social media
companies related to content moderation, including the identification of all
specific posts to any social media platform by any Plaintiff flagged for
removal or suppression and the government officials involved in such
actions;

iv.      Enjoin Defendants, their officers, officials, agents, servants,
employees, attorneys, and all persons acting in concert with them, from
taking any future actions to demand, urge, pressure, or otherwise induce
any social media platform to censor, suppress, de-platform, suspend,
shadow-ban, de-boost, restrict access to content, or take any other adverse
action against any speaker, content, or viewpoint expressed on social
media;

v.       Order Defendants to establish a notification system to inform
all members of the Disinformation Dozen whose content was suppressed,
removed, de-boosted, shadow-banned, or otherwise adversely affected as

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 102 of 105

a result of government-induced censorship about such actions taken against their speech;

vi.     Require Defendants to implement mandatory First Amendment training for all federal employees who interact with social media companies regarding content moderation, with court approval of the training materials and verification of completion;

vii.     Establish a judicial oversight mechanism requiring Defendants to report to the Court on a quarterly basis for a period of five years regarding any communications with social media companies concerning content moderation, to ensure compliance with constitutional requirements regardless of any changes to executive orders or policies;

viii.     Order Defendants to work with affected social media platforms to restore, where technologically feasible, all content that was improperly removed or suppressed due to government-induced censorship, and to remove any penalties, strikes, or account restrictions imposed as a result of such censorship;

ix.     Establish a remedial framework to address ongoing harms caused by past censorship activities, including the creation of an independent review process for individuals who believe their speech was suppressed due to government action, with the authority to recommend

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 103 of 105

appropriate remedies;

x.        Grant such other and further relief as the Court may deem just and proper to ensure that similar violations of First Amendment rights do not recur in the future, regardless of changes in executive policy, including the appointment of a Special Master to oversee compliance with the Court's orders.

B)        Award compensatory damages and attorney's fees and costs in Counts I through IV pursuant to 42 U.S.C. §§ 1983 and 1988;

C)        Award the relief requested in Counts V through VII;

D)        Award attorney's fees and costs pursuant to 28 U.S.C. § 2412 and any other applicable authority; and

E)        Order any further relief this Court deems just and proper.

## <u>JURY TRIAL DEMAND</u>

Plaintiffs demand a trial by jury on all issues so triable.

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 104 of 105

Dated: May 15, 2025.



**CHILDERS LAW, LLC**

2135 NW 40th Terrace, Suite B
Gainesville, Florida 32605
tel. 866-996-6104
fax 407-209-3870

*/s/ Seldon J. Childers*
Seldon J. Childers
Florida Bar No. 61112
jchilders@smartbizlaw.com
Nicholas P. Whitney
Florida Bar No. 119450
nwhitney@smartbizlaw.com
notice@smartbizlaw.com

CH LAW FIRM, PLLC

*/s/ Charles H. Hardage*
Charles H. Hardage
Florida Bar No. 76917
5204 Highlands Lakeview Loop
Lakeland, FL 33812
Phone: (904) 426-7257
hardagelaw@gmail.com
servicehardagelaw@gmail.com

*Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 105 of 105