## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**ERIN ELIZABETH FINN,**                    Case No. 3:25-cv-00543-WWB-MCR
**RIZZA ISLAM, SAYER JI,**
**CHRISTIANE NORTHRUP,**
**BEN TAPPER,**
**and SHERRI TENPENNY,**

      Plaintiffs,

vs.

**GLOBAL ENGAGEMENT CENTER,**
**CENTER FOR COUNTERING DIGITAL HATE, INC.,**
**CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY,**
**ACTING DIRECTOR OF CISA BRIDGET BEAN, in her official capacity,**
**U.S. DEPARTMENT OF STATE,**
**SECRETARY OF STATE MARCO RUBIO, in his official capacity,**
**U.S. DEPARTMENT OF HOMELAND SECURITY,**
**SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY**
**KRISTI NOEM, in her official capacity,**
**FEDERAL BUREAU OF INVESTIGATION, DIRECTOR OF THE FEDERAL**
**BUREAU OF INVESTIGATION KASH PATEL, in his official capacity,**
**FEDERAL COMMUNICATIONS COMMISSION, FCC CHAIRMAN**
**BRENDAN CARR, in his official capacity,**
**PRESIDENT DONALD J. TRUMP, in his official capacity,**
**META PLATFORMS, INC., a Delaware corporation,**
**GOOGLE LLC, a Delaware limited liability company,**
**X CORP., a Nevada corporation, ANDREW M. SLAVITT, individually,**
**ROB FLAHERTY, individually, VIVEK MURTHY, individually, ELVIS**
**CHAN, individually, IMRAN AHMED, and JOHN and JANE DOES 1-10,**

      Defendants.

_____/

## SECOND AMENDED COMPLAINT FOR
## <u>DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES</u>

Plaintiffs bring this Complaint for damages and injunctive and declaratory relief against the Defendants.

## **INTRODUCTION**

*"We are not afraid to entrust the American people with unpleasant facts, foreign ideas, alien philosophies, and competitive values. For a nation that is afraid to let its people judge the truth and falsehood in an open market is a nation that is afraid of its people."*

— President John F. Kennedy

1.    The Plaintiffs are healthcare professionals, researchers, and advocates who have built substantial online presences and businesses centered around health freedom, informed consent, and discussion of alternative approaches to conventional medicine. For years prior to the events described in this Complaint, Plaintiffs maintained active social media accounts with hundreds of thousands of followers, published research, books, and articles, hosted podcasts, presented at conferences, and operated successful businesses providing health-related information, products, and services. Through these platforms, Plaintiffs exercised their First Amendment rights to express views that sometimes challenged mainstream medical consensus, particularly regarding vaccination policies, safety, and efficacy—expressions that fall squarely within the realm of constitutionally protected speech on matters of profound public concern.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 2 of 121

2.      Beginning in early 2021, Plaintiffs became the targets of an unprecedented and coordinated censorship campaign orchestrated through the collaboration of government officials, agencies, non-governmental organizations, and social media platforms. The Defendants' censorship campaign was catalyzed by the publication of the Center for Countering Digital Hate's Disinformation Dozen report ("Disinformation Dozen Report") — a methodologically opaque and scientifically unsound document that made the extraordinary claim that 12 individuals, including all Plaintiffs, were allegedly responsible for "up to 65%" of "anti-vaccine content" online. Despite its lack of transparency, peer review, or verifiable data, this report was rapidly embraced by high-ranking government officials and the media, who weaponized its conclusions to justify an aggressive suppression of Plaintiffs' constitutionally protected speech. Imran Ahmed, the public face of the Center for Countering Digital Hate, amplified the claims made in the Disinformation Dozen Report, and publicly declared that the Plaintiffs were defined by their "psychological need . . . to cause pain and to cause chaos" and that they were "profiting from causing death." What followed was not merely private content moderation but a government-directed program of censorship that leveraged the immense regulatory power of federal agencies to coerce platforms into silencing specific individuals whom the government deemed problematic for

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 3 of 121

challenging preferred narratives on public health policies.

3.      The ensuing censorship campaign against Plaintiffs represents one of the most severe threats to free speech in the digital age—a systematic effort to excise certain viewpoints from the public square through the entanglement of government power and private platform control. Government officials, including those at the White House, explicitly targeted Plaintiffs by name, demanding their removal from social media platforms and threatening regulatory consequences for non-compliance. Social media executives, responding to this government pressure, implemented synchronized enforcement actions that resulted in Plaintiffs being deplatformed, shadow-banned, demonetized, and publicly maligned. The consequences for Plaintiffs have been devastating—the destruction of their digital presence built over many years, substantial financial losses, severe reputational damage, and an ongoing inability to participate in public discourse on matters of critical importance. Most troublingly, this campaign established a dangerous precedent whereby government officials can circumvent First Amendment protections by using their coercive power to deputize private companies as agents of state censorship—a constitutional violation that strikes at the very heart of America's democratic tradition of free and open debate.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 4 of 121

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under the First, Fifth, Seventh, and Fourteenth Amendments to the United States Constitution.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(e)(1) because Plaintiffs Erin Elizabeth Finn and Sayer Ji reside in this district, no real property is involved in the action, and Defendants include agencies of the United States and officers and employees of the United States and its agencies acting in their official capacities.

## PARTIES

### A.    Plaintiffs

6.      **Plaintiff Erin Elizabeth Finn** is and at all times relevant to the Complaint has been a citizen of, and domiciled in Florida, where she has continuously resided since 2003. Ms. Finn operates Health Nut News, a health advocacy platform with offices in Volusia County, Florida, and maintained substantial social media accounts with approximately 1.2 million likes and followers on Facebook, more than 150,000 followers on Instagram, tens of thousands of subscribers on YouTube and nearly 1 billion views before the censorship actions described in this Complaint. Ms. Finn conducts the majority of

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 5 of 121

her business activities from Florida, including publishing content, hosting online events, and managing her health advocacy operations, all of which were substantially disrupted by Defendants' actions within this jurisdiction.

7.    **Plaintiff Ronnie StevensIslam, known as Rizza Islam** is and at all times relevant to the Complaint has been a citizen of, and domiciled in, Los Angeles County, California, where he has continuously resided since birth. Brother Rizza Islam maintained substantial social media accounts with approximately 539,000 followers on Instagram and approximately 146,000 subscribers on YouTube prior to the censorship actions described in this Complaint. In total, Rizza Islam was making 15 to 18 million impressions per week across Facebook, Instagram, Twitter and YouTube. Rizza Islam regularly conducts business activities that reach into Florida, including book sales and speaking engagements, and has suffered economic and reputational harm that directly and negatively impacted his operations and followers within Florida. Rizza Islam holds an honorary doctorate in education.

8.    **Plaintiff Sayer Ji** is a citizen of, and domiciled in, Miami-Dade County, Florida. Sayer Ji has continuously resided in Florida since 1998. Sayer Ji is the founder of GreenMedInfo LLC, a Florida-based health information platform with its principal place of business in Miami-Dade, Florida. Sayer Ji is the co-

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 6 of 121

founder of Stand for Health Freedom, a 501(c)(4) nonprofit organization, and the author of *Regenerate,* an internationally best-selling book. Prior to the censorship actions described in this Complaint, Sayer Ji operated social media accounts with over 500,000 followers on Facebook, approximately 150,000 followers on Instagram, and tens of thousands of followers on Twitter/X and a similar number of subscribers on YouTube, through which he conducted substantial business activities including content publishing, product marketing, and educational outreach. Sayer Ji has dedicated his professional life to sharing evidence-based information about the healing potential of foods, supplements, natural remedies, and lifestyle practices aimed at empowering individuals to make informed decisions about their health. Sayer Ji holds a B.A. in Philosophy from Rutgers University.

9. **Plaintiff Christiane Northrup** is and at all times relevant to the Complaint has been a citizen of, and domiciled in, the State of Maine, since 1981. Dr. Northrup is a board-certified OB/GYN physician, a New York Times bestselling author, and former assistant clinical professor at the University of Vermont College of Medicine. Prior to the censorship actions described in this Complaint, Dr. Northrup maintained substantial social media accounts with approximately 2 million followers across multiple platforms and regularly

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 7 of 121

conducted business activities that reached into Florida, including speaking engagements, educational outreach, webinars, and book sales. Dr. Northrup has suffered economic and reputational harm from Defendants' actions that directly and negatively impacted her livelihood, women's health education and outreach operations, book sales, and professional affiliations.

10. **Plaintiff Ben Tapper** is and at all times relevant to the Complaint has been a citizen of, and domiciled in, Washington County, Nebraska where he has continuously resided since 2012. Dr. Tapper is a licensed chiropractor and prior to the censorship actions described in this Complaint, maintained social media accounts making 3 to 4 million impressions per month across multiple platforms. Dr. Tapper has suffered economic and reputational harm from Defendants' actions that directly and negatively impacted his professional practice, his social media following, his business operations, and his fundraising activities.

11. **Plaintiff Sherri Tenpenny** is and at all times relevant to the Complaint has been a citizen of, and domiciled in, Cuyahoga County, Ohio, residing in Olmstead Falls, Ohio, where she has continuously resided since 1996. Dr. Tenpenny is a board-certified osteopathic medical doctor, and prior to the censorship actions described in this Complaint, maintained substantial social media accounts with hundreds of thousands of followers across multiple social

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 8 of 121

media platforms. Dr. Tenpenny regularly conducted business activities that reached into Florida, including speaking engagements, educational outreach, book sales, and supplement sales, and has suffered economic and reputational harm from Defendants' actions that directly impacted her operations and professional engagements within Florida.

12.     Plaintiffs bring claims for violation of their constitutional rights, seeking injunctive and declaratory relief, as well as common law and state law claims for civil conspiracy, tortious interference with contract, and defamation.

### B.     Defendants

13.     The **Global Engagement Center** ("GEC"), though no longer operational after December 23, 2024, was at all material times relevant to this action an interagency center housed in and funded by the State Department, and headquartered in Washington, D.C. Despite its dissolution when Congress declined to renew its authorization in the 2025 National Defense Authorization Act the GEC remains a proper party to this action under the doctrine of successor liability, with the Department of State maintaining responsibility for the GEC's past actions, records, and legal obligations. The GEC originated in 2011 under Executive Order 13584 as the Center for Strategic Counterterrorism Communications and operated under the Bureau of Public Affairs using data

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 9 of 121

analytics and funding for external research to combat so-called disinformation.
The GEC collaborated with agencies such as the Federal Bureau of Investigation
and the U.S. Department of Homeland Security ("DHS") to influence social media
content moderation and used its capabilities to censor American citizens under the
guise of fighting foreign disinformation.

14.    **Center for Countering Digital Hate, Inc.** ("CCDH") is a non-profit
Non-Governmental Organization ("NGO") organized and existing under the laws
of Washington, D.C., with its principal place of business in Washington, D.C.
CCDH established itself as a U.S.-based nonprofit in 2021 but originated in the
United Kingdom, where its parent organization continues operations. CCDH
maintains substantial contacts with this district through its nationwide activities,
including deliberately targeting Florida residents such as Plaintiffs Erin Elizabeth
Finn and Sayer Ji through its publications. This Court has personal jurisdiction
over CCDH under Florida's long-arm statute because CCDH committed tortious
acts within Florida by publishing defamatory and harmful content specifically
concerning Florida residents with knowledge that such content would cause
injury within this jurisdiction. CCDH purposefully availed itself of the privilege
of conducting activities in Florida by directing its operations at Florida residents
and entities, creating a substantial connection with this forum sufficient to render

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 10 of 121

the exercise of jurisdiction reasonable and consistent with traditional notions of

fair play and substantial justice. CCDH's publication of the Disinformation Dozen

Report and related materials targeting Plaintiffs was expressly calculated to reach

audiences within this jurisdiction and to influence content moderation decisions

affecting Florida residents' online speech and business activities.

15.     The **Cybersecurity and Infrastructure Security Agency** ("CISA") is a

federal agency within the Department of Homeland Security tasked with

protecting the nation's critical infrastructure, including its information and

communication systems. Under the guise of addressing cyber threats and ensuring

election security, CISA expanded its mission to monitor and suppress online

speech labeled as "misinformation" or "disinformation." Through programs such

as "switchboarding" and its partnerships with social media platforms, CISA

amplified and operationalized the Disinformation Dozen Report, pressuring

platforms to take enforcement actions against individuals named in the report,

including Plaintiffs. By coordinating closely with private platforms to influence

content moderation decisions, CISA blurred the line between public and private

action, acting as a central instrument in the government's unconstitutional

suppression of protected speech. These actions caused direct harm to Plaintiffs'

reputations, businesses, and expressive rights, violating their First Amendment

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 11 of 121

protections.

16.    **Acting Director of the Cybersecurity and Infrastructure Security Agency Bridget Bean,** as successor to Jen Easterly ("Easterly"), who served as the Director of CISA within the Department of Homeland Security, where she oversaw efforts to address cyber threats and safeguard critical infrastructure, including the information space. Under Easterly's leadership, CISA engaged in extensive coordination with social media platforms to monitor and suppress online speech labeled as "misinformation" or "disinformation," often targeting viewpoints critical of government policies. Easterly's agency was instrumental in amplifying and operationalizing the findings of the Disinformation Dozen Report, leveraging its partnerships with platforms to ensure enforcement actions against individuals identified in the report, including Plaintiffs. By orchestrating "switchboarding" and other collaborative efforts with social media companies, Easterly's actions blurred the lines between public and private functions, resulting in the unconstitutional suppression of protected speech and causing direct economic and reputational harm to the Plaintiffs. Her conduct exemplifies the pervasive entwinement of government and private entities in violating First Amendment rights.

17.    The **U.S. Department of State** ("State Department") is an executive

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 12 of 121

agency of the United States of America, headquartered in Washington, D.C. As the
nation's lead foreign affairs agency, the State Department played a pivotal role in
the government's coordinated censorship campaign by leveraging its diplomatic
influence, resources, and global information operations to target and suppress
protected speech domestically. Under the pretext of combating foreign
disinformation and securing U.S. interests abroad, the State Department funded
and directed initiatives through its Global Engagement Center and other
diplomatic channels to develop censorship technologies, tactics, and partnerships
with social media platforms that were ultimately deployed against American
citizens, including the Plaintiffs. The State Department established formal
meetings with technology companies, pressured platform executives through
diplomatic channels, and diverted taxpayer resources intended for countering
foreign threats toward the surveillance and suppression of lawful domestic
speech. State Department officials routinely shared information derived from the
Disinformation Dozen Report with foreign counterparts and international
organizations, amplifying the false narrative that Plaintiffs were spreading
dangerous misinformation, thereby legitimizing censorship efforts both
domestically and internationally. Through these actions, the State Department
transcended its statutory authority and constitutional limitations, transforming

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 13 of 121

tools designed for diplomatic engagement into instruments of domestic speech
suppression in direct contravention of the First Amendment protections afforded
to all Americans, including Plaintiffs.

18.    **Marco Rubio**, in his official capacity as United States Secretary of
State, is a Defendant and the successor to former Secretary of State Antony
Blinken. As Secretary of State, Blinken oversaw the Department of State and its
subordinate agencies, including the Global Engagement Center, which played a
critical role in the censorship activities described in this Complaint. Secretary
Rubio is responsible for the Department of State's policies, operations, and
practices, including those that existed during his predecessor's tenure and
collusive activity with social media platforms to suppress Plaintiffs'
constitutionally protected speech. Under the principle of successor liability for
official capacity suits, Secretary Rubio is automatically substituted as a defendant
for claims against the office, regardless of whether the challenged actions occurred
prior to his appointment. His inclusion as a Defendant is necessary to ensure
complete relief for Plaintiffs, including the implementation of any injunctive
measures ordered by this Court to remedy the constitutional violations alleged
herein.

19.    The **U.S. Department of Homeland Security** ("DHS") is an executive

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 14 of 121

agency of the United States of America, headquartered in Washington, D.C.
Created in response to the September 11 attacks through the Homeland Security
Act of 2002, the DHS is tasked with public security responsibilities focusing on
terrorism, border security, immigration, cybersecurity, and disaster prevention
and management. Through its subordinate agencies and offices, including the
Cybersecurity and Infrastructure Security Agency, the DHS played a central role
in the government's efforts to monitor, flag, and suppress online speech deemed
"misinformation" or "disinformation." The DHS leveraged its cybersecurity
mission to expand into content moderation, establishing formalized partnerships
with social media companies that resulted in the censorship of protected speech,
including that of the Plaintiffs. These actions were carried out under the pretense
of protecting critical infrastructure and addressing national security concerns, yet
effectively served to silence legitimate political and scientific discourse that
challenged government narratives.

20.    **Kristi Noem,** in her official capacity as the Secretary of the
Department of Homeland Security, is the successor to former Secretary of the
Department of Homeland Security Alejandro Mayorkas ("Mayorkas"). Mayorkas
oversaw the agency's operations, including its involvement in addressing
disinformation through entities like the Cybersecurity and Infrastructure Security

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 15 of 121

Agency. Under Mayorkas' leadership, DHS played a critical role in coordinating government efforts to monitor and suppress online speech deemed "misinformation" or "disinformation," including by leveraging partnerships with social media platforms. Mayorkas amplified and endorsed the use of tools like the Disinformation Dozen Report to target and silence individuals whose viewpoints contradicted government narratives, including Plaintiffs. By enabling and directing DHS components to collaborate with private platforms in suppressing speech, Secretary Mayorkas facilitated unconstitutional actions that caused economic, reputational, and expressive harm to Plaintiffs while eroding First Amendment protections. His actions represent a central component of the government's joint participation in a censorship campaign against dissenting voices. Secretary Noem is responsible for the Department of Homeland Security's policies, operations, and practices, including those that existed during her predecessor's tenure. Under the principle of successor liability for official capacity suits, Secretary Noem is automatically substituted as a Defendant for claims against the office, regardless of whether the challenged actions occurred prior to her appointment. Her inclusion as a Defendant is necessary to ensure complete relief for Plaintiffs, including the implementation of any injunctive measures ordered by this Court to remedy the constitutional violations alleged herein.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 16 of 121

21.    The **Federal Bureau of Investigation** ("FBI" or "Bureau") is the
principal federal law enforcement agency of the United States, operating as a
component of the Department of Justice and headquartered in Washington, D.C.
Despite its statutory mandate to investigate federal crimes and protect national
security, the FBI exceeded these boundaries by establishing systematic
coordination with social media platforms to flag, monitor, and suppress lawful
speech that challenged government narratives on matters of public concern.
Through dedicated communication channels with technology companies, regular
meetings with platform executives, and the development of specialized units
focused on "combating misinformation," the FBI pressured private entities to take
enforcement actions against individuals identified in the Disinformation Dozen
Report, including Plaintiffs. The Bureau leveraged its significant investigative
authority and law enforcement power to create a climate of intimidation among
platforms, implying potential regulatory or criminal consequences for failing to
address content the FBI deemed problematic. This entanglement of government
authority with private censorship decisions transformed platform content
moderation into state action, effectively circumventing First Amendment
protections that would otherwise prohibit direct government censorship. The FBI's
actions directly resulted in the suppression of Plaintiffs' protected speech, causing

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 17 of 121

substantial harm to their reputations, businesses, and constitutional rights.

22.    **Kash Patel** ("Patel"), in his official capacity as Director of the Federal
Bureau of Investigation, is a Defendant and the successor to former FBI Director
Christopher Wray. As FBI Director, Patel oversees all operations, policies, and
personnel of the Bureau, including the continuation or potential reformation of
programs established under his predecessor that facilitated coordination with
social media platforms for content moderation purposes. Director Patel bears
responsibility for the ongoing effects of his agency's past unconstitutional actions
against Plaintiffs and the continuing harm resulting from the institutional
infrastructure created to suppress lawful speech. Under established principles of
successor liability in official capacity suits, Director Patel is automatically
substituted as a Defendant for claims against the office, regardless of whether the
specific challenged actions occurred during former Director Wray's tenure. His
inclusion as a Defendant is necessary to ensure complete relief for Plaintiffs,
including the implementation of any injunctive measures ordered by this Court to
remedy the constitutional violations alleged herein.

23.    The **Federal Communications Commission** ("FCC") is an
independent agency of the United States government, created by statute to
regulate interstate communications by radio, television, wire, satellite, and cable

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 18 of 121

across the United States. Headquartered in Washington, D.C., the FCC operates
under the authority of the Communications Act of 1934, as amended, and is
directed by five Commissioners appointed by the President and confirmed by the
Senate. The FCC played a significant role in the government's coordinated
censorship campaign by leveraging its regulatory authority over broadcast and
digital media to pressure platforms into suppressing Plaintiffs' protected speech.
Under the pretext of combating "misinformation" and ensuring "media
responsibility," the FCC established formal and informal channels of
communication with social media companies, encouraging the outright banning
of the Disinformation Dozen and removal of content associated with the
Disinformation Dozen, including Plaintiffs. Specifically, in approximately April
2022, the FCC directly pressured the social platform and messaging app
"Community" to ban Plaintiff Rizza Islam's account for allegedly violating the
FCC's COVID-19 misinformation policies. This intervention resulted in the
immediate termination of Rizza Islam's account, which served as a critical channel
for his health advocacy and educational outreach. The FCC's involvement was
particularly problematic given its statutory power to issue or revoke broadcasting
licenses and impose substantial fines on regulated entities, creating an implicit
threat of adverse regulatory action for platforms that failed to comply with

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 19 of 121

censorship demands. Through public statements, private communications, and regulatory guidance, FCC officials signaled to platforms that removing Plaintiffs' content would be viewed favorably in regulatory matters, effectively converting private content moderation decisions into state action subject to First Amendment constraints. The FCC's actions directly contributed to the suppression of Plaintiffs' constitutionally protected speech, causing substantial economic, reputational, and expressive harm that continues to this day.

24.    **Brendan Carr** ("Carr"), in his official capacity as Chairman of the Federal Communications Commission, is a Defendant and the successor to former FCC Chairwoman Jessica Rosenworcel. As Chairman, Carr oversees all operations, policies, and personnel of the Commission, including the continuation or potential reformation of programs established under his predecessor that facilitated coordination with social media platforms for content moderation purposes. Chairman Carr bears responsibility for the ongoing effects of his agency's past unconstitutional actions against Plaintiffs and the continuing harm resulting from the institutional infrastructure created to suppress lawful speech. During Chairwoman Rosenworcel's tenure, the FCC leveraged its regulatory authority to pressure digital communication platforms, including "Community," to remove content associated with the Disinformation Dozen, including Plaintiff

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 20 of 121

Rizza Islam's account in or about April 2022, despite having no direct regulatory authority over such content. These actions represented a significant overreach of the FCC's statutory mandate and violated Plaintiffs' First Amendment rights. Under established principles of successor liability in official capacity suits, Chairman Carr is automatically substituted as a Defendant for claims against the office, regardless of whether the specific challenged actions occurred during former Chairwoman Rosenworcel's tenure. His inclusion as a Defendant is necessary to ensure complete relief for Plaintiffs, including the implementation of any injunctive measures ordered by this Court to remedy the constitutional violations alleged herein.

25. **President Donald J. Trump,** as successor to President Joseph R. Biden, in his official capacity as President of the United States, is responsible for supervising the executive branch of government, including the White House and federal agencies such as the U.S. Department of State, the Department of Homeland Security, the Global Engagement Center, the Cybersecurity and Infrastructure Security Agency, and the Federal Bureau of Investigation. Under President Biden's leadership, the executive branch engaged in coordinated efforts to suppress lawful speech on social media platforms, often relying on reports like the Disinformation Dozen Report to justify these actions. These efforts included

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 21 of 121

coercing platforms to adopt censorship policies targeting individuals, including
Plaintiffs, whose viewpoints challenged the administration's preferred narratives
on critical issues like public health and elections. President Biden's administration
directed and encouraged government agencies and officials, including senior
White House staff, to engage in unconstitutional collusion with private platforms,
resulting in the suppression of protected speech and causing economic,
reputational, and expressive harm to Plaintiffs. President Biden's conduct
exemplifies the pervasive entwinement of government authority with private
actors to silence dissent in violation of the First Amendment. [1] Although President
Trump was uninvolved in the conduct alleged herein (and even opposed it), his
inclusion as a Defendant in his official capacity is necessary to ensure complete
relief for Plaintiffs, including the implementation of any injunctive measures
ordered by this Court to remedy the constitutional violations alleged herein.

26.    **Meta Platforms, Inc.** ("Meta" or "Facebook") is a Delaware
corporation with its principal place of business in Menlo Park, California,
operating the social media platform known as Facebook, which targets users and
generates revenue in this District. This Court has personal jurisdiction over Meta

---

[1] The preceding Defendants identified beginning at paragraph 13 and through this paragraph
are collectively referred to as the "Government" or the "Government Defendants".

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 22 of 121

Platforms, Inc. because it conducts substantial and continuous business in Florida, maintains a significant user base within the state, and derives considerable revenue from Florida-based users and advertisers. Meta maintains specific jurisdiction in this forum through its targeting of Florida residents through data-driven advertising, content delivery systems, and personalized algorithmic features designed specifically for Florida audiences. Meta Platforms, Inc. played a central role in the government-coordinated censorship campaign by participating in regular meetings with federal officials where they discussed targeted enforcement actions against the Disinformation Dozen. Following these discussions, Meta implemented a systematic campaign of censorship against Plaintiffs, taking specific adverse actions including: deleting Plaintiff Sayer Ji's GreenMedInfo Facebook account with over 500,000 followers on July 3, 2021; removing multiple Instagram accounts belonging to Plaintiff Rizza Islam between March and May 2021; imposing "penalties" against "nearly two dozen additional Pages, groups or accounts" linked to the Disinformation Dozen; penalizing Plaintiff Christiane Northrup by shadow banning her posts and reducing her audience reach across Facebook and Instagram by more than 2,000,000 followers; subjecting Plaintiff Ben Tapper to account restrictions, content filtering, engagement throttling, and temporary suspensions; and permanently suspending

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 23 of 121

Plaintiff Sherri Tenpenny from her Facebook and Instagram accounts. Meta's
internal communications, as revealed in the complaint, demonstrate that it took
these actions in direct response to "policy pressure" from the White House, which
was explicitly "exerting policy pressure" to remove the Plaintiffs' accounts having
been identified as members of the Disinformation Dozen. These purposeful
activities directed at Florida residents, including the Plaintiffs, establish minimum
contacts sufficient to support jurisdiction.

27.    **Google LLC** ("Google"), a Delaware limited liability company with
its principal place of business in Mountain View, California, operates the video-
sharing platform known as YouTube. This Court has personal jurisdiction over
Google because it conducts substantial business in Florida, maintains offices
within the state, and operates interactive platforms that are regularly accessed by
millions of Florida residents, including Plaintiffs. Google purposefully availed
itself of this jurisdiction by marketing its services to Florida residents, collecting
data from Florida users, and generating significant revenue from Florida-based
activities. Google participated directly in the government-coordinated censorship
campaign by attending regular meetings with federal officials where they
discussed content moderation actions targeting the Disinformation Dozen. In
response to government pressure, Google implemented its "medical

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 24 of 121

misinformation policy" in a manner that disproportionately targeted Plaintiffs, resulting in the removal of their content and channels from YouTube. Specifically, on September 29, 2021, Google notified Plaintiff Erin Elizabeth Finn that it had removed her YouTube channel, citing unspecified violations of "Medical Misinformation" policies. Google also deleted Plaintiff Rizza Islam's YouTube channel on March 22, 2021, Plaintiff Sayer Ji's GreenMedInfo YouTube channel on July 22, 2021, and permanently banned Plaintiff Sherri Tenpenny from maintaining or operating a YouTube channel. Google's censorship activities directly harmed Plaintiffs' reputations, businesses, and constitutional rights, and these effects continue to the present day as Google LLC maintains the infrastructure, algorithms, and policies developed during its collusion with government officials. These systematic contacts with Florida and direct actions affecting Florida residents render Google LLC subject to this Court's jurisdiction.

28.    **X Corp.**, ("X" or "Twitter"), a Nevada corporation with its principal place of business in Bastrop, Texas, operates the social media platform known as X (formerly Twitter). This Court has personal jurisdiction over X Corp. because it maintains continuous and systematic contacts with Florida through its interactive platform that is accessible to and regularly used by millions of Florida residents, including Plaintiffs. The censorship activities alleged in this Complaint primarily

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 25 of 121

occurred when the platform was known as Twitter, Inc. ("Twitter"), prior to its October 2022 acquisition by Elon Musk and subsequent rebranding as X Corp. in April 2023. However, X Corp., as Twitter's corporate successor, bears legal responsibility for the actions, policies, and content moderation decisions implemented by its predecessor entity. During the relevant period, Twitter participated in regular meetings with government officials, including representatives from the FBI, DHS, CISA, and the White House, where they were pressured to take specific actions against the Disinformation Dozen, including Plaintiffs. Twitter responded to this government coercion by shadow-banning, flagging, restricting, and ultimately removing Plaintiffs' accounts. Twitter permanently deleted Sayer Ji's GreenMedInfo account on March 7, 2021, (which had been in good standing for 13 years prior to the government's censorship campaign) and deleted Dr. Tenpenny's account (which had approximately 150,000 followers at the time). X Corp.'s continued enforcement of content policies developed during this period of government coercion, and its maintenance of records and data related to the censored accounts, make it a necessary party for complete relief in this action.[2]

---

[2] Google, Meta, and X are collectively referred to in this Complaint as the "Social Media Defendants".

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 26 of 121

Government Officials (Individually)

29.    **Andrew M. Slavitt** ("Slavitt") is an individual who is a citizen of the United States and, upon information and belief, resides in the State of California. During the time period relevant to this Complaint, Defendant Slavitt served as Senior Advisor to the President for the COVID-19 Response at the White House. Defendant Slavitt is sued in his individual capacity.  This Court has personal jurisdiction over Defendant Slavitt. While acting under color of federal law, Defendant Slavitt intentionally directed communications and other activities toward the State of Florida and its residents, including by pressuring and coercing social-media companies to censor and suppress disfavored speech on COVID-19-related topics that reached users in this District. For example, in a July 2021 meeting with Twitter executives, Defendant Slavitt referenced a data visualization tool to identify and target influential "anchors" such as the Disinformation Dozen as epicenters of anti-vaccine and anti-mask misinformation radiating to persuadable users in Florida and nationwide. Defendant Slavitt also coordinated with Facebook and other platforms to deplatform members of the "Disinformation Dozen" using similar aggregated data reports and dashboards, as detailed in emails, internal records, and court filings from *Missouri v. Biden* (also known as *Murthy v. Missouri*). The claims in this action arise directly out of or relate to

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 27 of 121

Defendant Slavitt's purposeful contacts with this District. Exercising personal jurisdiction over Defendant Slavitt is consistent with the Due Process Clause because he has sufficient minimum contacts with Florida, he was reasonably able to foresee being hauled into court here, and any burden on him is minimal given the federal interests at stake and Florida's interest in providing redress for harms to its citizens.

30.    **Rob Flaherty** ("Flaherty") served as Deputy Assistant to the President and Director of the Office of Digital Strategy at the White House, where he played a central role in coordinating the Biden Administration's efforts to influence social media platforms' moderation of content. Flaherty actively pressured platforms such as Facebook, Twitter, and Google to suppress speech deemed contrary to the administration's preferred narratives, including content critical of government policies on public health and elections. Flaherty amplified the findings of the Disinformation Dozen Report and demanded swift action against individuals named within it, including Plaintiffs, by questioning the platforms' commitment to combating misinformation and implying regulatory consequences for non-compliance. Through frequent communications with social media executives, Flaherty used his authority to significantly encourage or coerce platforms into removing, suppressing, or de-amplifying speech protected under the First

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 28 of 121

Amendment, directly resulting in harm to Plaintiffs' reputations, businesses, and expressive rights. Flaherty's actions, including specific emails sent on or about May 6, 2021, to executives at Facebook, explicitly demanding the removal of Plaintiffs' posts, constitute a direct violation of their First Amendment rights to free speech, akin to unconstitutional government coercion recognized in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). His conduct falls within the scope of *Bivens*[3] liability, as it mirrors unlawful government overreach into private speech, and no special factors—such as national security or statutory remedies—preclude relief, given the absence of alternative mechanisms like the APA to compensate Plaintiffs' economic and reputational damages. Flaherty's demands were not general policy directives but targeted interventions against Plaintiffs, violating clearly established law that prohibits government officials from coercing private entities to censor protected speech, as a reasonable official in his position would have known.

31.    **Vivek Murthy** ("Murthy") served as the Surgeon General of the United States during the relevant time period. On July 13, 2021, Murthy published the report titled 'Confronting Health Misinformation,' which explicitly referenced and legitimized the CCDH's Disinformation Dozen Report as an authoritative

---

[3] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 29 of 121

source to justify his desired censorship of Plaintiffs. Murthy cited the Disinformation Dozen Report as the sole source for claiming the existence of COVID-19 misinformation "super-spreaders" and recommended that technology platforms 'prioritize early detection' of these individuals and 'impose clear consequences' for their accounts. Murthy pressured social media platforms to build in "frictions" – such as suggestions and warnings – to reduce the sharing of so-called misinformation. Murthy's personal involvement in amplifying and operationalizing the CCDH report through official government channels directly resulted in the targeted suppression of Plaintiffs' protected speech across multiple platforms. By using his position and authority to pressure private companies to take specific adverse actions against the Plaintiffs based on their viewpoints, Murthy personally participated in the violation of Plaintiffs' constitutional rights. Murthy's actions went beyond merely advocating for general health policy in his role as Surgeon General and instead directly targeted Plaintiffs. Murthy's conduct, including his public statements during the summer of 2021 and direct communications with social media platform executives, constituted government-orchestrated censorship akin to the unconstitutional interference in *Bantam Books, Inc.*, 372 U.S. at 58, and is redressable under *Bivens* as an extension of recognized protections against government overreach into private expression. No special

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 30 of 121

factors counsel hesitation, as Murthy's actions were not tied to national security, and no alternative remedy, such as injunctive relief against the Surgeon General's office, addresses Plaintiffs' past financial and reputational losses. By knowingly endorsing a report he knew or should have known improperly targeted Plaintiffs' lawful speech, Murthy violated a clearly established First Amendment right against viewpoint-based censorship, which any reasonable official would recognize as unlawful under existing precedent.

32. **Elvis Chan** ("Chan") is a Supervisory Special Agent with the Federal Bureau of Investigation who served as a key intermediary between federal agencies and social media platforms in addressing so-called disinformation and misinformation. In his role, Chan coordinated regular meetings with executives from major platforms, including Facebook, Twitter, and Google, to influence their content moderation policies and enforcement actions. Chan actively promoted government narratives regarding the spread of online misinformation and amplified the findings of the Disinformation Dozen Report, which unfairly targeted Plaintiffs as alleged "super-spreaders" of misinformation. His actions, including urging platforms to take punitive measures against the individuals identified in the report, directly contributed to the suppression of constitutionally protected speech, causing economic, reputational, and operational harm to the

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 31 of 121

Plaintiffs. Chan's conduct represents a central element of the government's
pervasive entwinement with private entities to silence dissenting voices in
violation of the First Amendment. Chan's specific directives, including meetings
throughout 2021 in which he instructed the Social Media Defendants to suspend
Plaintiffs' accounts based on the Disinformation Dozen Report, mirror the coercive
government action prohibited in *Bantam Books, Inc.*, 372 U.S. at 58, and warrant
*Bivens* relief as an analogous violation of constitutional speech protections. No
special factors bar this claim, as Chan's actions were not driven by legitimate
national security concerns but by viewpoint discrimination, and no statutory
remedy compensates Plaintiffs' losses. By deliberately targeting Plaintiffs'
protected speech for suppression, Chan violated a clearly established First
Amendment right, as any reasonable FBI agent would understand under
precedents prohibiting government-induced censorship.

<u>Other Individuals</u>

33.     **Imran Ahmed** ("Ahmed") is the public face of the Center for
Countering Digital Hate. This Court has personal jurisdiction over Defendant
Imran Ahmed, an individual residing in or conducting significant activities from
Washington, D.C., pursuant to Florida's long-arm statute, Fla. Stat. § 48.193, and
consistent with the Due Process Clause of the Fourteenth Amendment. Ahmed, as

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 32 of 121

the Chief Executive Officer of the Center for Countering Digital Hate, purposefully directed tortious activities at Florida residents, including Plaintiffs Erin Elizabeth Finn and Sayer Ji, by authoring, publishing, and promoting the Disinformation Dozen Report and subsequent CCDH reports, which specifically targeted these Plaintiffs with defamatory and harmful allegations. These actions were calculated to cause reputational and economic injury in Florida, where Ms. Finn and Mr. Ji reside and operate their businesses. Ahmed's public statements, including his March 28, 2021, appearance on the podcast *DOOMED with Matt Binder*, where he accused Plaintiff Sayer Ji of "profiting from causing death," were disseminated to a national audience, including Florida, with the intent to amplify the report's impact and provoke censorship of Florida-based Plaintiffs. Additionally, Ahmed's coordination with other Defendants, including government officials and social media platforms, to suppress Plaintiffs' speech further demonstrates his purposeful availment of this forum, as these actions directly affected Florida residents' ability to engage in protected speech and conduct business. Ahmed's contacts with Florida are sufficient to establish specific jurisdiction, as the claims arise from his intentional conduct targeting Florida residents, and the exercise of jurisdiction comports with fair play and substantial justice given the significant harm suffered by Plaintiffs in this district.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 33 of 121

34.    **John and Jane Does 1-10** are currently unidentified federal government officials, employees, contractors, agents, representatives of non-governmental organizations, or private individuals who acted in concert with federal officials and under color of federal law in the coordinated campaign to censor, suppress, or deplatform Plaintiffs as described in this Complaint. These individuals include, but are not limited to: (a) government officials who communicated with social media companies to flag, target, or pressure for removal of Plaintiffs' content; (b) government employees who participated in regular meetings with social media platforms where enforcement actions against the Disinformation Dozen were discussed; (c) individuals who contributed to, amplified, or operationalized the CCDH's report within government agencies; (d) federal officials who directed, supervised, or facilitated the creation or implementation of systems, policies, or procedures designed to monitor or suppress Plaintiffs' protected speech; (e) representatives of currently unidentified non-governmental organizations who collaborated with federal officials to target Plaintiffs through joint initiatives, information sharing, resource coordination, or participation in private-public partnerships focused on content moderation; and (f) individuals employed by or affiliated with non-profit organizations who received federal funding, guidance, or direction to flag, monitor, or suppress

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 34 of 121

Plaintiffs' protected speech while acting as de facto agents of the government.
Plaintiffs intend to amend this Complaint to name these individuals once their
identities are revealed through discovery. This Court has subject matter
jurisdiction over claims against these Defendants pursuant to 28 U.S.C. §§ 1331
and 1343 because the claims arise under the United States Constitution and 42
U.S.C. § 1983, and personal jurisdiction because these individuals purposefully
directed their activities at residents of this forum, causing harm that they knew or
should have known would be suffered in this District.

## STATEMENT OF FACTS

### The Disinformation Dozen Report

35.    On or about March 24, 2021, Defendant Center for Countering Digital
Hate, Inc.  published a report titled *The Disinformation Dozen* which accused 12
individuals,[4] including each of the Plaintiffs, of being responsible for "up to 65%"
of anti-vaccine content on social media generally, and "up to 73%" of the anti-
vaccine content on Facebook specifically.

---

[4] There are actually 13 individuals named on the CCDH's list, but it still referred to them as the
Disinformation *Dozen*, which was just the first of many liberties CCDH took with the facts.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 35 of 121



A copy of the Disinformation Dozen Report is attached to this Complaint

as **Exhibit A**.

36.    The clear implication was (and is) that if these 12 people could be

effectively silenced, the vast majority of anti-vaccine "misinformation" could be

removed.

37.    The CCDH recklessly published and promoted its Disinformation

Dozen Report to stoke fear and anger against and discredit —i.e., destroy the

reputations of— the so-called Disinformation Dozen. Imran Ahmed promoted the

Disinformation Dozen Report on an episode of *Doomed with Matt Binder*, published

on or about March 28, 2021, in which Ahmed claimed that the Plaintiffs were

defined by "a psychological need . . . to cause pain and to cause chaos" and

specifically accused Plaintiff Sayer Ji of "profiting from causing death."

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 36 of 121

38.     The Disinformation Dozen Report targeted Plaintiffs and the others as leading sources of so-called "misinformation," urging social media platforms to act against them, including explicitly calling for censoring and deplatforming them.

**Deplatform the Disinformation Dozen**

The most effective and efficient way to stop the dissemination of harmful information is to deplatform the most highly visible repeat offenders, who we term the Disinformation Dozen. This should also include the organisations these individuals control or fund, as well as any backup accounts they have established to evade removal.

1. Joseph Mercola
2. Robert F. Kennedy, Jr.
3. Ty and Charlene Bollinger
4. Sherri Tenpenny
5. Rizza Islam
6. Rashid Buttar
7. Erin Elizabeth
8. Sayer Ji
9. Kelly Brogan
10. Christiane Northrup
11. Ben Tapper
12. Kevin Jenkins

39.     CCDH's Disinformation Dozen Report became a central tool used by various actors, including other Defendants, to justify and excuse harmful and adverse actions against Plaintiffs.

40.     The Disinformation Dozen Report purported to rely on an "analysis of social media content" to identify individuals spreading misinformation. However, CCDH failed to disclose any detailed methodology or criteria for its analysis.

41.     The Disinformation Dozen Report:

        a.     Did not provide data sources, algorithms, or metrics used to

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 37 of 121

calculate the claim that the Disinformation Dozen were responsible for
"65%" of vaccine misinformation.

b.    Omitted any explanation of how content was categorized as
"misinformation" or the qualifications of those making such determinations.

c.    Lacked peer review or independent verification, rendering its
conclusions unverifiable and unscientific.

42.    CCDH's failure to articulate a transparent and reproducible
methodology raises significant questions about bias and the reliability of its
conclusions. The organization's stated mission to combat "digital hate" and
"disinformation" suggests a predisposition to target individuals with views
opposing mainstream narratives. By focusing disproportionately on individuals
with large followings, such as Plaintiffs, CCDH appeared to prioritize their
visibility and influence over any objective assessment of their content's accuracy
or public harm.

43.    CCDH explicitly called for social media platforms to remove or
restrict the accounts of the listed individuals. This recommendation was made
without presenting concrete evidence linking the Plaintiffs to demonstrable harm
or establishing that their content violated applicable laws. The report's
inflammatory language and conclusory claims were crafted to provoke a reaction

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 38 of 121

from platforms and the public, effectively weaponizing the report as a tool for censorship.

44.    CCDH published a follow-up report, *The Disinformation Dozen: The Sequel*, on or about April 28, 2021, (the "Sequel Report") which pressured social media companies and Big Tech to increase censorship of the "Disinformation Dozen".



A copy of The Sequel Report is attached to this Complaint as **Exhibit B.**

45.    Despite CCDH's evident lack of rigor, other Defendants—including government agencies, social media platforms, and NGOs—repeated and amplified the report's conclusions. These Defendants cited the CCDH report as an authoritative source, even though they knew or should have known that its methodology was opaque and its conclusions unsubstantiated. By doing so, these

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 39 of 121

Defendants perpetuated the harm caused by CCDH's baseless allegations, contributing to the reputational and economic damage suffered by Plaintiffs.

46.    For one of many examples, on May 6, 2021, Deputy Assistant to the President, Rob Flaherty, emailed a contact at Facebook encouraging Facebook to deplatform the Plaintiffs. Flaherty is not an academic or law enforcement agent; he is a political operative, having worked for the Democratic National Committee and on various Democratic campaigns. He is not a credentialed specialist.

47.    In his email to Facebook's moderation team, Flaherty specifically referenced the "disinfo dozen," invoking the Disinformation Dozen Report.



48.    In other words, the most powerful political administration in the world —the White House—secretly targeted law-abiding private citizens and

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 40 of 121

attempted to injure them for no other reason than saying things with which the White House disagreed.

49.    The other Defendants, who each claimed to have relied on the Disinformation Dozen Report, failed to exercise basic due diligence before adopting its conclusions. They ignored the report's lack of transparency, absence of peer review, and evident ideological bias.

50.    These failures were particularly egregious given the significant consequences of acting on such an unverified document, including the suppression of Plaintiffs' speech, reputational harm, and loss of business opportunities.

## The Government's Role in
## Amplifying CCDH's Disinformation Dozen Report

51.    After the publication of the CCDH's Disinformation Dozen Report, government officials and agencies quickly embraced its findings, adopting the report as a cornerstone of their censorship efforts.

52.    High-ranking officials from the White House, including Deputy Assistant to the President Rob Flaherty, directly engaged with social media platforms, citing the CCDH's conclusions as justification for their demands for content moderation. The government's reliance on the CCDH's report, despite its lack of transparency and scientific rigor, marked a critical escalation in the

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 41 of 121

suppression of dissenting speech.

53.    As CNN reported, "[t]he White House seized on [the CCDH Disinformation Dozen] report and hammered the platform [Facebook] in July for allowing the people identified in the report to remain on its platform."[5]

**The Government and Social Media Platforms Implemented a Coordinated and Systematic Censorship Campaign Against the Plaintiffs**

54.    Senior Biden Administration officials, including White House officials such as Slavitt and Flarhery, pressed Google to take action against the Disinformation Dozen. Emails and communications revealed in *Missouri v. Biden*[6] show that Flaherty and other White House officials actively pressured Facebook and Twitter to take aggressive action against the individuals named in the CCDH report. For example:

a.    Flaherty chastised Facebook for not removing posts by the Disinformation Dozen, explicitly demanding stricter content moderation and threatening further scrutiny if the platforms failed to comply.

b.    These communications demonstrated the government's intent to suppress constitutionally protected speech under the guise of combating

---

[5] Oliver Darcy, <u>Facebook takes action against 'disinformation dozen' after White House pressure</u>, CNN Business (Aug. 18, 2021, 8:17 PM), https://www.cnn.com/2021/08/18/tech/facebook-disinformation-dozen/index.html.
[6] *Missouri v. Biden*, No. 22-cv-1213 (W.D. La., July 4, 2023).

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 42 of 121

"misinformation."

55.     Various agencies, including the Centers for Disease Control and Prevention ("CDC"), the Cybersecurity and Infrastructure Security Agency, and the Surgeon General's Office, held regular meetings with social media companies to address the spread of purported "misinformation." In these meetings:

    a.     Government representatives presented data and recommendations derived from the CCDH report, framing the Disinformation Dozen as uniquely dangerous actors responsible for a disproportionate amount of vaccine-related misinformation online.

    b.     Social media platforms were instructed to adjust algorithms, reduce the visibility of posts by these individuals, and in some cases, remove their accounts entirely.

56.     The Government and Social Media Defendants jointly implemented multiple formalized censorship mechanisms to systematically suppress Plaintiffs' speech.

57.     In furtherance of the systematic censorship campaign against Plaintiffs, White House officials—including former Senior Advisor for COVID-19 Response Andy Slavitt—relied on data visualization ("data viz") tools to monitor, map, and target networks of alleged COVID-19 disinformation across platforms

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 43 of 121

such as Twitter (now X Corp.), Facebook (Meta Platforms, Inc.), and YouTube (Google LLC). These tools aggregated public and backend data to identify anchors and influential spreaders of content challenging official public health narratives, including vaccine safety, efficacy, and informed consent—core topics of Plaintiffs' protected speech. During a July 2021 meeting between White House officials (including Slavitt) and Twitter executives—documented in internal Twitter Slack messages and depositions from *Missouri v. Biden*, Case No. 3:22-cv-01213—Slavitt invoked this "data viz" to advocate for deplatforming.

58.    Slavitt described these systems in his 2022 book *Preventable: The Inside Story of How Leadership Failures, Politics, and Selfishness Doomed the Public Health Response to COVID*. Slavitt explained that these systems involved "track and counter" operations with tech firms, including joint "misinformation reports" and dashboards that spotlighted Disinformation Dozen members like Plaintiffs for removal or restriction. As one example, the government utilized information collected by the "CoVaxx Dashboard", which ranked COVID vaccine "disinformation" accounts by name.

59.    The Government also utilized MIT Media Lab's "COVID-19 Story" visualization platform, launched in 2020, which ingested Twitter data (e.g., retweets, mentions, and interactions) to generate interactive graphs of

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 44 of 121

disinformation clusters. The platform applied network analysis to tag and connect users based on behavioral patterns, explicitly labeling accounts like those of Plaintiffs as nodes in "anti-vaccine" or "anti-mask" networks purportedly radiating misinformation to "persuadable" audiences, thereby facilitating targeted suppression.

60.     CISA's Mis-, Dis-, and Malinformation ("MDM") team ran a 'switchboard' , which began functioning in early 2021. As CISA openly admitted on April 12, 2022, the 'MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms' and has 'expanded the breadth of reporting to include... more social media platforms.' This centralized reporting system allows government officials across agencies to funnel censorship requests through a single channel, effectively laundering censorship demands through CISA to maintain plausible deniability.

61.     The Government and Social Media Defendants created privileged reporting channels exclusively for government use. Beginning in February 2021, Facebook trained CDC and Census Bureau officials on how to use a specialized 'Facebook misinfo reporting channel,' giving government officials priority access to censorship requests unavailable to ordinary users. Similarly, Twitter established a 'Partner Support Portal' specifically for government officials to expedite

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 45 of 121

censorship demands, while YouTube granted 'trusted flagger' status to Census Bureau officials, ensuring privileged and expedited consideration of government-flagged content. These dedicated portals were operational throughout 2021 and 2022, giving government officials direct access to platform decision-makers.

62.     The data-sharing and coordination between Facebook, YouTube, and the Government via the White House was detailed in the House Judiciary Committee's May 1, 2024 report titled "The Censorship-Industrial Complex: How Top Biden White House Officials Coerced Big Tech to Censor Americans, True Information, and Critics of the Biden Administration". To illustrate, on April 14, 2021, the White House pressed Facebook for "empirical information regarding [the] success of interventions" and Facebook explained that it was "actively pusing to remove" the Disinformation Dozen from its platform. Two days later, on April 16, 2021, Facebook sent the White House nonpublic information about content and interventions Facebook was "deploying to counter misinformation", noting that the company did not normally share this type of data. On July 15, 2021, Surgeon General Vivek Murthy released an Advisory targeting the Disinformation Dozen, and Facebook responded by sharing data concerning " 39 accounts that are owned by, or appear to be linked to, the Disinfo Dozen," of which 15 had been disabled, four were "experiencing feature blocks," 10 were in "non-rec status," and the

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 46 of 121

remaining accounts had not posted "sufficient violating content" recently to be disabled or incur penalties. Soon after, on July 21, 2021, the Biden White House pressured Facebook to disable accounts across its platforms and remove "all links to the Disinfo Dozen's off-platform domains." The White House was not satisfied, and on August 2, 2021, Facebook documented specific requests from the White House to demonstrate additional steps on four issues [the White House] raised, including doing more to address the disinfo dozen actors. And on August 23, 2021, Facebook compiled "the actions that [it] took against the DD [Disinfo Dozen] to add to its email report back to Surgeon General Murthy. Facebook continued to send COVID Insights reports through at least July 2022.

63.    Using these systems – "data viz" tools, dashboards, switchboards, and reporting channels – the Government systematically collected and contextualized personally identifiable information (PII) on Plaintiffs, encompassing social media aliases (e.g., @sayerji for Plaintiff Sayer Ji, @healthnutnews for Plaintiff Erin Elizabeth Finn), IP addresses, email addresses, and behavioral metadata from their online speech and associations. Per the National Institute of Standards and Technology ("NIST"), and in particular, NIST Special Publication 800-122 (Guide to Protecting the Confidentiality of PII), isolated data elements like social media aliases become linkable PII when

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 47 of 121

combined with governmental context, such as "misinformation" tags or targeting

based on inclusion in the Disinformation Dozen. NIST defines PII broadly as any

information that can distinguish or trace an individual's identity, which includes

social media aliases or usernames and associated entities. Via the Federal

Information Security Modernization Act ("FISMA") of 2014, NIST standards and

guidelines are required to be implemented and operationalized within the

Executive Branch. Through these systems and in coordination with the Social

Media Defendants and the non-government Defendants, the Government

Defendants violated Plaintiffs' privacy. To illustrate:

    a. Under NIST SP 800-53 Rev. 5, privacy controls such as those in the

Privacy and Transparency ("PT") and Program Management ("PM")

families require agencies to establish authority for PII processing (PT-2),

document purposes (PT-3), obtain consent (PT-4), provide notices including

Privacy Act statements (PT-5), and publish System of Records Notices

(SORNs) for systems retrievable by identifiers (PT-6). Upon information and

belief, the Government Defendants did none of this with respect to the

Disinformation Dozen.

    b. PT-3 limits processing to specified purposes, and the sharing of data

and records across systems and agencies without tracking violated NIST's

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 48 of 121

minimization and integrity controls (PM-25 and PM-22). Upon information and belief, the Government Defendants shared Plaintiffs' data and records without tracking.

    c.  DHS must consult NIST guidance to avoid conflicts in operational directives, and agencies must report to the Office of Management and Budget ("OMB") annually to ensure adherence to NIST standards and guidelines. With respect to the Disinformation Dozen, upon information and belief, NIST-mandated privacy assessments (PM-27) were ignored.

64.    Given the Government's use of these systems to target Plaintiffs, this contextualized data evolved into records governed by the Privacy Act of 1974 and invoking other privacy protections since the records explicitly "describe[d] how any individual exercises rights guaranteed by the First Amendment," including Plaintiffs' advocacy for health freedom and alternative medical views. The Government Defendants' activities created an undisclosed system of records, violating the Privacy Act's requirement for Federal Register publication of System of Records Notices ("SORNs") and prohibiting maintenance of records and systems without authority under 5 U.S.C. 552a(e)(4)

65.    Agencies including the Cybersecurity and Infrastructure Security Agency (CISA), Global Engagement Center (GEC), and White House officials

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 49 of 121

accessed these records via dedicated dashboards, switchboards, email escalations,
and backend platform integrations, retrieving data by personal identifier (e.g.,
alias queries yielding deplatforming recommendations). This formed an
interconnected "system of systems" (a NIST term of art referenced in NIST SP 800-
160, for example)—maintained by or on behalf of the agencies under cooperative
agreements—exceeding any published (SORN) and lacking statutory
authorization for First Amendment surveillance, in violation of the Privacy Act of
1974, 5 U.S.C. § 552a(e)(7).

66.    The Government and Social Media Platforms conducted regular,
formalized censorship meetings to further their coordinated, systematic
censorship campaign. Starting in late 2020, CDC officials organized recurring 'Be
On The Lookout' (BOLO) meetings with representatives from Twitter,
Facebook/Meta, and Google/YouTube. During these meetings, which continued
through at least 2022, government officials provided platforms with specific
examples of posts to be censored and categories of content to target. After these
meetings, CDC officials would distribute 'slides' containing examples of posts
flagged for removal with instructions that platforms should 'Be On the Lookout'
for similar content, explicitly directing platforms not to share these directives
'outside your trust and safety teams.' The BOLO slides were records containing

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 50 of 121

identifying information (e.g. social media aliases). The CDC's dissemination of the
BOLO slides created an extension of the "system of systems" and the CDC's
computer system was integrated into the "system of systems". Upon information
and belief, Plaintiffs were targeted by these 'Be On the Lookout' advisories.

67.    The Government imposed detailed reporting requirements on the
Social Media Defendants. Beginning in 2021, government officials demanded that
platforms provide regular reports on their censorship activities to demonstrate
compliance with government expectations. For example, by July 23, 2021, Meta
was sending biweekly 'content reports' to the Surgeon General and White House
officials detailing their censorship actions against COVID-19 'misinformation.'
These reporting relationships continued into 2022, with White House Digital
Director Rob Flaherty demanding on June 13, 2022, that Meta continue producing
these reports specifically to track suppression of speech regarding COVID-19
vaccines for children under 5 years old. These reporting requirements created a
supervisory relationship where social media platforms functioned as subordinates
accountable to government overseers.

**With These Censorship Systems in Place, the Government Continued to
Pressure the Social Media Platforms and Suppress the Plaintiffs' Speech**

68.    Building on these systems, on July 13, 2021, Vivek Murthy published
the Surgeon General's report, *Confronting Health Misinformation*, which referenced

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 51 of 121

the CCDH's Disinformation Dozen Report as an authoritative source. Murthy

adopted the CCDH's report and cited the Disinformation Dozen Report as the sole

source for the following claim: "Researchers have identified leading sources of

COVID-19 misinformation, including misinformation "super-spreaders". The

Surgeon General's recommended actions for technology platforms included:

  a. **Prioritize early detection of misinformation "super-spreaders"[7] and

  repeat offenders. Impose clear consequences for accounts that repeatedly

  violate platform policies**.

  b. **[T]ake responsibility for addressing the harms.** Redesign

  recommendation algorithms to avoid amplifying misinformation, **build in

  "frictions" – such as suggestions and warnings – to reduce the sharing of

  misinformation**.

69.    Amplifying Murthy's coercive tactics, President Biden pressured the

social media companies to censor Plaintiffs by claiming they were killing people,

stating on July 19, 2021: "**Facebook isn't killing people, these twelve people are

out there giving misinformation. Anyone listening to it is getting hurt by it. It's

killing people.**"  He continued: "My hope is, that Facebook, instead of taking it

---

[7] The only reference to so-called "super-spreaders" in the Surgeon General's report was made in reference to the "Disinformation Dozen". The Surgeon General, in the same report, demanded the imposition of clear consequences for these "super-spreaders".

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 52 of 121

personally . . . that they would do something about the misinformation. The
outrageous misinformation about the vaccine."

70.    During congressional sessions, senators and representatives publicly
pressured Meta, Twitter, and Google to remove the accounts of and censor the
Disinformation Dozen. On or about March 26, 2021, Representative Mike Doyle
pressured Mark Zuckerberg, Jack Dorsey, and Sundar Pinchai (CEOs of the
respective entities) to deplatform the Disinformation Dozen immediately. On or
about May 14, 2021, Senator Amy Klobuchar, citing the Disinformation Dozen
Report, proudly stated: "I have called on social media platforms to take action
against the accounts propagating the majority of these lies." Senator Klobuchar co-
wrote a letter with Senator Ben Ray Lujan pressuring Dorsey and Zuckerberg to
remove the Disinformation Dozen from their platforms based on the CCDH's
Disinformation Dozen Report.

71.    Congressional representatives did not limit their pressure campaign
to social media companies. On December 15, 2021, Representative Jake
Auchincloss boasted about "[leading] a letter urging PayPal to ban users who
disseminate disinformation and deactivate the accounts of the Disinformation
Dozen." The letter was joined by 18 members of Congress.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 53 of 121



72.     Social media and payment companies, under significant pressure from federal agencies, implemented algorithmic changes and content moderation policies directly targeting individuals flagged in the CCDH report:

a.     Facebook and Twitter deprioritized posts from the Disinformation Dozen, effectively reducing their reach and engagement.

b.     Platforms applied broad labels such as "misinformation" and "disinformation" to content associated with these individuals, further chilling their ability to communicate and interact with their audiences.

c.     Google, through YouTube, and Meta, through Instagram, censored and deplatformed the Plaintiffs.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 54 of 121

       d.     PayPal disabled Plaintiffs' accounts.

73.    The courts in *Missouri v. Biden* found that government officials went beyond mere persuasion, instead employing coercive tactics to compel compliance from social media platforms:

       e.     Officials implied that failure to comply with government demands could result in adverse regulatory actions or loss of Section 230 protections under the Communications Decency Act.

       f.     This "joint participation" blurred the lines between private and public actions, making social media platforms de facto agents of government censorship.

74.    Facebook's internal communications have confirmed that the White House was using the CCDH Disinformation Dozen Report to "guide major governmental policy decisions" and that the White House was "exerting policy pressure" to "remove[] these 12 accounts."

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 55 of 121



From: ████████ @fb.com>
Date: Friday, July 16, 2021 at 11:58 AM

CONFIDENTIAL TREATMENT REQUESTED -                                    META-118HJC-0058
NOT FOR DISTRIBUTION - MEMBERS & STAFF ONLY

To: ████ @fb.com>, ████ @fb.com>,
████ @fb.com>, ████ @fb.com>, ████ @fb.com>,
████ @fb.com>

Cc: ████ @fb.com>, Brian Rice <████ @fb.com>,
████ @fb.com>, ████ @fb.com>, ████ @fb.com>,
████ @fb.com>, ████ @fb.com>, ████ @fb.com>,
████ @fb.com>, ████ @fb.com>

Subject: Re: Push back on CCDH vaccine misinformation report

Thanks all!

It seems like these data are now being used to guide major governmental policy decisions.

If they are misleading or incorrect, that can be damaging to (our and their shared) efforts to arrive at productive and substantive solutions, so I think critical we establish some shared understanding of truth. People also trust the USG to not put out information that is false or misleading and to have policy decisions be based on grounded data -- if USG is not doing so, this can result in worse outcomes for the broader ecosystem of efforts here and be counterproductive to our shared goal of improving health.

For example, it seems like the WH thinks that if we just removed these 12 accounts, this would cause 65 percent of anti-vax misinformation to go away ("there's about 12 people who are producing 65 percent of anti- vaccine misinformation on social media platforms"). If this were true, I also would want us to do this and feel tremendous urgency that we had not -- including exerting policy pressure as they are doing -- but it unfortunately isn't that simple. I'm sure we can do better, and would love to discuss how, but it's much more nuanced -- and we have executed on many of the obvious things. (Understand that some of the accounts are still on our platform, but removing them won't have any appreciable impact on anti-vax misinfo, which I think is the actual substantive goal).

75.    The Government and Social Media Defendants directly and concretely inhibited the Plaintiffs' speech. On July 23, 2021, an internal Facebook email reveals that Facebook imposed a 60% demotion or throttling of pages identified as being affiliated with the Disinformation Dozen. This targeted suppression was enabled by the Government's systems and records in violation of the Privacy Act of 1974 and was a unlawful inhibition of Plaintiffs' free speech.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 56 of 121



76. On August 18, 2021, Monika Bickert, Vice President of Content Policy at Facebook, wrote of the CCDH's Disinformation Dozen report: "People who have advanced this narrative contend that these 12 people are responsible for 73% of online vaccine misinformation on Facebook. There isn't any evidence to support this claim." Ms. Bickert continued: "In fact, these 12 people are responsible for about just 0.05% of all views of vaccine-related content on Facebook."

77. Facebook knew that the premise for censoring and deplatforming Plaintiffs was false, yet it persisted and willingly participated in the censorship campaign alongside the co-conspirator Defendants.

78. At the time, Facebook, through Ms. Bickert, admitted that it had "removed over three dozen Pages, groups and Facebook or Instagram accounts linked to these 12 people, including at least one linked to each of the 12 people." Ms. Bickert also admitted that Facebook had "imposed penalties on nearly two

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 57 of 121

dozen additional Pages, groups or accounts linked to these 12 people, like moving
their posts lower in News Feed so fewer people see them or not recommending
them to others. We've applied penalties to some of their website domains as well
so any posts including their website content are moved lower in News Feed."

79.    Despite its knowledge of the falsity of CCDH's claims, Facebook has
persisted in its censorship of Plaintiffs, making the removals permanent,
continuously imposing penalties on Plaintiffs, and has prohibited Plaintiffs from
re-establishing their accounts.

80.    The Government Defendants have similarly persisted in the
orchestrated scheme to censor Plaintiffs despite Facebook's admission that the
Disinformation Dozen Report was and is, ironically, disinformation.

81.    Google has maintained its ban and persisted in its censorship efforts
in removing Plaintiffs' YouTube accounts.

82.    Meta's CEO, Mark Zuckerberg, publicly confirmed in an August 26,
2024, letter to Congress that "senior officials from the Biden Administration,
including the White House, repeatedly pressured [Facebook's] teams for months
to censor certain COVID-19 content."

83.    Elvis Chan, in his role as Supervisory Special Agent overseeing the
FBI's Cyber Branch in San Francisco, operated a command post that was central to

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 58 of 121

the FBI's efforts to combat "disinformation". From this command post, Chan coordinated regular interactions with executives from major social media platforms, including Facebook, Twitter, and Google, sharing intelligence on content the FBI identified as problematic and directing these platforms to take action against accounts or posts that violated their terms of service, particularly those related to "disinformation" disseminated by Plaintiffs.

84.    Plaintiffs were among the primary targets of this government-orchestrated campaign:

    a.    Their content was flagged and suppressed across multiple platforms, directly affecting their ability to reach their audience and promote their various business operations.

    b.    The CCDH's flawed and ideologically driven report provided a pretext for government actors to silence Plaintiffs, who were deemed politically inconvenient due to their dissenting views on vaccines and health freedom.

85.    The government's adoption of the CCDH report as a censorship blueprint had tangible consequences for Plaintiffs:

    a.    Plaintiffs lost substantial revenue streams due to reduced visibility and diminished audience engagement.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 59 of 121

b.    The dissemination of the CCDH's claims, amplified by

government officials, caused irreparable reputational damage, permanently

branding the vilified Plaintiffs as untrustworthy and dangerous in the eyes

of the public.

86.    <u>Plaintiff Erin Elizabeth Finn</u>: Erin Elizabeth Finn was systematically

de-platformed as a direct and proximate result of Defendants' coordinated

censorship campaign:

a.     On September 29, 2021, Google notified Ms. Finn that it had

removed her channel from YouTube. In its notice, Google cited multiple,

unspecified, server violations of "Medical Misinformation". Before being

censored, Ms. Finn had tens of thousands of subscribers to her channel.

Google's censorship of Ms. Finn has continued to the present day.

b.     Facebook banned multiple accounts maintained by Ms. Finn,

with total followership of approximately 2,000,000. Facebook additionally

banned Ms. Finn on Instagram. On or about May 16, 2022, Facebook

instituted a permanent ban on all of Ms. Finn's accounts.

c.     Twitter banned Ms. Finn's account, and she remains subject to

block bans.

d.     The Defendants' censorship campaign has had lasting negative

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 60 of 121

impact on Ms. Finn's business. In the most recent year, Ms. Finn's revenue was less than 50% of the revenue Ms. Finn's business generated in the year prior to the Defendants' censorship campaign. Ms. Finn has lost more than $2,000,000 in revenue as a direct and proximate result of Defendants' actions. As a direct and proximate result, HealthNutNews has been forced to lay off two full-time employees.

Ms. Finn has suffered lasting reputational harm.

87.    <u>Plaintiff Rizza Islam</u>:  Rizza Islam was systematically de-platformed as a direct and proximate result of Defendants' coordinated censorship campaign:

a.    Meta repeatedly and systematically censored Rizza Islam, tracking him and deleting four separate Instagram pages between the release of the Disinformation Dozen Report and May 10, 2021. Before being censored, Rizza Islam had 539k followers on his original Instagram page. On July 8, 2021, Instagram removed a post made by Rizza Islam referring to the COVID-19 "vaccine" as an experimental shot promoted by the CDC. As basis for this removal, Instagram cited "recognized health organizations" who took a position contrary to Rizza Islam's. Instagram repeatedly disabled Rizza Islam's Instagram accounts. Each time that Rizza Islam created a new Instagram page, Meta deleted Rizza Islam's pages on no less

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 61 of 121

than seven occasions.

b.      Facebook disabled Rizza Islam's account and he was unable to access his account from approximately 2021 through early 2023.

c.      Google took similar collusive action, deleting Rizza Islam's YouTube channel on March 22, 2021. Rizza Islam attempted to re-create his YouTube account, but YouTube deleted his subsequent accounts on three separate occasions. Rizza Islam's YouTube access has never been restored and his accounts have not been reinstated.

d.      Twitter disabled Rizza Islam's account following publication of the Disinformation Dozen Report. Rizza Islam's account was eventually restored on January 26, 2023, but Rizza Islam's followers were substantially diminished upon account restoration.

e.      The FCC declared Rizza Islam to have violated Covid misinformation policies, and Rizza Islam was banned from the messaging app Community, which he attempted to use to reach his followers to conduct health advocacy and educational outreach in light of the other social media platforms' collusion with the Government Defendants to effect broad censorship.

Rizza Islam has suffered lasting reputational harm.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 62 of 121

88.    <u>Plaintiff Sayer Ji</u>:  Sayer Ji was directly and maliciously targeted. CCDH's CEO Imran Ahmed publicly stated on or about March 28, 2021: "Sayer Ji sells death." Sayer Ji was systematically de-platformed as a direct and proximate result of Defendants' coordinated censorship campaign:

a.    On March 7, 2021, Twitter deleted Sayer Ji's GreenMedInfo account, which had existed in good standing for 13 years.

b.    Meta took similar action, deleting GreenMedInfo's Instagram and Facebook accounts on or about July 3, 2021, and deleting Mr. Ji's personal account. Sayer Ji had more than 500,000 followers on Instagram alone.

c.    On July 22, 2021, Google deleted GreenMedInfo's YouTube account.

d.    On March 15, 2022, PayPal shut down GreenMedInfo's business account and Sayer Ji's personal PayPal and Venmo accounts, stating that the measures were taken "due to the nature of [Sayer Ji's] activities." As a direct result, Sayer Ji suffered financial damages.

e.    **Financial Losses (GreenMedInfo):** From 2020–2023, GreenMedInfo went from being profitable to running annual net losses, with a total shortfall of nearly **$450,000**.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 63 of 121

f. **Unite.Live Platform Closure:** Due to continued suppression and reputational damage, and as a direct result of being deplatformed, Mr. Ji was forced to shut down Unite.Live in April 2025 after investing over $1 million.

g. **Reputational Harm – CCDH Report:** CCDH's June 2021 "Pandemic Profiteers" report named Sayer Ji and his organization, Stand for Health Freedom, directly causing Mr. Ji's reputational and financial harm.

Sayer Ji has suffered lasting reputational harm.

89. <u>Plaintiff Christiane Northrup</u>: Dr. Northrup was systematically de-platformed as a direct and proximate result of Defendants' coordinated censorship campaign.

a. Facebook announced on or about August 18, 2021, that it had "removed over three dozen Pages, groups and Facebook or Instagram accounts linked to these 12 people, <u>including at least one linked to each of the 12 people</u>." Facebook "also imposed penalties on nearly two dozen additional Pages, groups or accounts linked to these 12 people, and applied penalties to some of their website domains." Dr. Northrup was particularly affected by Facebook's actions. Facebook deactivated Dr. Northrup's ability

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 64 of 121

to boost her posts, a feature she had previously relied upon.  Dr. Northrup's

audience reach on Facebook declined from over 2 million in early 2020 down

to less than 500,000. Separately, Instagram permanently suspended two of

Dr. Northrup's accounts, through which she communicated with her

approximately 200,000 followers. Facebook and Instagram both shadow

banned Dr. Northrup's posts on the platforms, and Facebook's shadow

banning of Dr. Northrup continues to the present day.

b.    YouTube repeatedly shut down or removed YouTube

Posts/videos in which Dr. Northrup was interviewed, and demonetized the

hosts who dared to interview Dr. Northrup.

c.    Dr. Northrup lost her ability to accept payments through

PayPal.  On December 15, 2021, PayPal sent Dr. Northrup an email with the

subject line "You can no longer do business with PayPal." In the email,

PayPal claimed to have determined that Dr. Northrup was "in violation of

the Acceptable Use Policy" without any further elaboration. When Dr.

Northrup called to inquire, PayPal confirmed its ban, and declared, "You

can no longer use PayPal," without further explanation.

d.    Dr. Northrup's publisher refused to market new editions of her

widely published books and New York Times bestsellers.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 65 of 121

e.     As a direct and proximate result of these censorship activities,

Dr. Northrup's business has suffered and she has maxed out her personal

line of credit to pay staff salaries and keep her business afloat.

Dr. Northrup has suffered lasting reputational harm.

90.    <u>Plaintiff Ben Tapper</u>: Dr. Tapper was systematically de-platformed as

a direct and proximate result of Defendants' coordinated censorship campaign:

a.     Dr. Tapper was targeted directly by CCDH's CEO, Imran

Ahmed, who repeated his hyperbolic and unsubstantiated claims on local

news programs in Nebraska, where Dr. Tapper lives and works. Mr. Ahmed

stated as fact: "[t]welve individuals are responsible for two-thirds of the

misinformation shared on social media." Mr. Ahmed continued: "He's [Ben

Tapper] someone who seeks to undermine vaccines. Full stop." Mr. Ahmed

took issue with Dr. Tapper's assertion that "the vaccine isn't safe; it doesn't

give you immunity."

b.     Facebook repeatedly censored Dr. Tapper. Dr. Tapper was

advised that Facebook had: (1) filtered his content so that "[n]o one else

[could] see [his] post."; (2) added restrictions to his account; (3) censored

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 66 of 121

him for spreading "false information about COVID-19"[8]; (4) moved his
posts "lower in News Feed"; (5) restricted others from sharing Dr. Tapper's
posts; (6) suspended his account and prohibited him from posting for up to
30 days; (7) tagged his posts as "False Information" citing "independent
fact-checkers"; and (8) reduced distribution of his Page and imposed "other
restrictions because of repeated sharing of **false news**".

c.      Similarly, Instagram (also owned by Meta) (1) labeled Dr.
Tapper's posts as "False information" based on unidentified "third-party
fact-checkers" who "said the [ ] information was false in another post"; (2)
prohibited users from mentioning 'dr.bentapper'; (3) advised him that his
posts were "limit[ing] [his] account's reach"; removed his posts and stories
on multiple occasions for "harmful false information"; (4) and deleted his
accounts, severing his ability to communicate with more than 500,000
followers.

d.      YouTube (owned by Google) removed Dr. Tapper's content,
including Dr. Ben Tapper's Podcast episodes and multiple interviews,
because his "content didn't follow [YouTube's] **medical misinformation**

---

[8] Facebook's censorship was targeted at Dr. Tapper's public comment at a local government
meeting where he spoke against mask mandates.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 67 of 121

policy."[9]

     e.     Twitter indefinitely suspended Dr. Tapper's account.

     f.     PayPal permanently banned Dr. Tapper from using PayPal's services. Following the release of the Disinformation Dozen Report, Dr. Tapper's TheTimeIsNow.movie and bhtapper personal account's were suspended indefinitely by PayPal. Dr. Tapper had used PayPal, and its subsidiary Venmo, to fundraise for his documentary *The Time is Now*, but those fundraising efforts were terminated by PayPal.

Dr. Tapper suffered lasting reputational harm.

91.    <u>Plaintiff Sherri Tenpenny</u>: Dr. Tenpenny was systematically de-platformed as a direct and proximate result of Defendants' coordinated censorship campaign:

     a.     Facebook permanently banned Dr. Tenpenny.

     b.     Instagram permanently banned Dr. Tenpenny.

     c.     YouTube permanently banned Dr. Tenpenny.

     d.     Twitter indefinitely suspended Dr. Tenpenny's account, and when eventually reinstated, her followers had decreased by approximately

---

[9] YouTube cited "a serious risk of egregious harm by spreading medical misinformation about currently administered vaccines that are approved and confirmed to be safe and effective."

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 68 of 121

200,000.

e.    Under pressure by the Government Defendants, Podbean (a
podcast hosting service) deleted Dr. Tenpenny's account on the same day
that she surpassed 1,000,000 downloads.

f.    PayPal shut down Dr. Tenpenny's account, interrupting her
various domestic and international business lines and directly impacting Dr.
Tenpenny's business income and ability to pay her employees.
Additionally, PayPal confiscated $7,000 from Dr. Tenpenny's PayPal
account without notice or reason.

g.    CCDH boasted about the effectiveness of its collusion with the
government and social media companies in its report titled, *Pandemic
Profiteers, The business of anti-vaxx* (the "Pandemic Profiteers Report"),
published on or about June 1, 2021.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 69 of 121





*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 70 of 121



# Sherri Tenpenny

*Anti-vaxx entrepreneur profiting from training an "army" of activists*

| **Followers** | **262,335 (-346,658)** | **Revenue** | **$2,130,000** |
|---|---|---|---|
| Facebook | 79,963 (-234,190) | PPP Loans | $72,500 |
| Instagram | 88,495 (-112,468) | Employees | 13 |
| YouTube | 0 | Salary | N/A |
| Twitter | 93,877 | | |

Sherri Tenpenny is a practising osteopathic physician and alternative health entrepreneur who offers paid-for "boot camps" on anti-vaccine activism. The self-proclaimed "doctor, speaker, educator, consultant" promotes her services through a network of social media accounts with 260,000 followers.[164]

In its Pandemic Profiteers Report, CCDH boasted of the dramatic reduction in followers based on the censorship campaign.[10]

Dr. Tenpenny suffered lasting reputational harm. Dr. Tenpenny lost speaking engagements, live and podcast interviews, and business opportunities as a result of Defendants' censorship campaign.

## COUNT I
## First Amendment Freedom of Speech
### *Against the Government and Social Media Defendants*

92.    Plaintiffs reincorporate paragraphs 1 to 91 above.

93.    The Government Defendants used their influence and coercive power

---

[10] CCDH gloated: "Marked in red next to each of these figures is how many followers that anti-vaxxer and their associated organizations have lost due to having their accounts deplatformed based on our tracking of anti-vaxxer accounts dating back to December 2019."

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 71 of 121

to suppress the Plaintiffs' speech by pressuring social media companies to remove or restrict content associated with the Disinformation Dozen. This suppression, conducted under the guise of combating "misinformation," interfered with the Plaintiffs' right to express their views, particularly on controversial issues such as vaccines and health freedom.

94. The Social Media Defendants became state actors through their pervasive joint participation with federal officials in the censorship enterprise. This joint action is evidenced by the companies' regular meetings with federal officials; their creation of special communication channels and reporting mechanisms exclusively for government use; their prompt responsiveness to government "flagging" of content; their modification of content policies at government officials' behest; and their provision of detailed reports to government officials about their censorship efforts. These actions transform what might otherwise be private content moderation decisions into state action subject to First Amendment constraints, consistent with the Supreme Court's holdings in *Blum v. Yaretsky*, 457 U.S. 991 (1982) and *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982).

95. The Social Media Defendants' censorship decisions were and are not merely influenced by government pressure but were and are effectively directed and controlled by government officials through both coercion and voluntary

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 72 of 121

participation in a joint enterprise. Internal communications from the companies acknowledge that they modified their content policies and enforcement decisions in direct response to government demands, with Meta executives explicitly noting they were responding to "policy pressure" from the White House. This level of entwinement between government actors and private entities in suppressing specific viewpoints and speakers creates a "symbiotic relationship" that renders the private conduct attributable to the state, as recognized in *Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961) and subsequent cases.

96.    By targeting Plaintiffs based on their dissenting viewpoints, the government violated the principle of "viewpoint neutrality," which prohibits the government from favoring or suppressing speech based on its content or perspective. The Supreme Court has consistently held that "the government may not prohibit the verbal or nonverbal expression of an idea merely because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 398 (1989).

97.    The text of the Constitution's First Amendment is clear: Any law or policy that "abridges" or reduces the sphere of constitutionally protected speech violates the First Amendment. This principle applies with particular force when, as here, the suppressed speech concerns matters of public importance where

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 73 of 121

"debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co.* v. *Sullivan*, 376 U.S. 254, 270 (1964).

98.    The Government Defendants violated the Free Speech Clause of the First Amendment by (1) systematically and repeatedly using coercive threats to force social media companies and platforms to censor protected speech and/or (2) entering into collusive partnerships with social media companies and platforms and working jointly with those private entities to censor protected speech.

99.    Government Defendants circumvented First Amendment prohibitions by employing what the Supreme Court has termed an "unconstitutional condition"—coercing private entities to restrict speech that the government itself could not directly censor. "[I]nhibition as well as prohibition against the exercise of precious First Amendment rights is a power denied to government." *Lamont v. Postmaster General of U.S.*, 381 U.S. 301 (1965) (Brennan, J., concurring). The conduct at issue violates the principle established in *Bantam Books, Inc.*, 372 U.S. at 58, that the government cannot use its power and influence to achieve indirectly what the Constitution forbids it to achieve directly.

100.    The Government Defendants' actions—including explicit threats of adverse regulatory action, repeated demands for censorship, and coordinated pressure campaigns—transformed ostensibly private content moderation

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 74 of 121

decisions into state action subject to First Amendment constraints. This entanglement between government actors and private platforms created a "joint participation" arrangement that the Supreme Court has recognized as sufficient to subject nominally private conduct to constitutional scrutiny. See *Lugar*, 457 U.S. at 941.

101. Government officials, including Defendant Flaherty, explicitly referenced the Disinformation Dozen Report in communications with social media platforms and demanded specific enforcement actions against Plaintiffs. These communications were not mere suggestions but carried the implicit threat of regulatory consequences for non-compliance, as evidenced by internal platform communications describing "policy pressure" from the White House.

102. The censorship campaign against Plaintiffs was particularly egregious because it targeted core political speech on matters of public concern—precisely the type of expression that receives the highest level of First Amendment protection. The government's labeling of Plaintiffs' speech as "misinformation" or "disinformation" does not diminish this protection, as "the First Amendment there is no such thing as a false idea." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974).

103. Plaintiffs have faced and continue to face social media censorship,

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 75 of 121

blacklisting, reputational damage, negative economic consequences including reduced advertising revenue, and reduced circulation of reporting and speech, all as a direct result of the government's unlawful conduct.

104.    The removal and suppression of Plaintiffs' content across multiple platforms following government intervention resulted in a concrete and particularized injury to Plaintiffs' free speech rights. This injury is ongoing, as the censorship infrastructure established by Government Defendants continues to suppress Plaintiffs' ability to reach their audience and communicate their views on matters of public importance.

105.    Plaintiffs suffered and continue to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of the Defendants' conduct.

106.    Plaintiffs have no adequate remedy at law for the violation of their constitutional rights. Money damages alone cannot remedy the ongoing suppression of their speech or restore their ability to participate in public discourse. Only declaratory and injunctive relief from this Court can provide complete relief by ending the Defendants' unconstitutional censorship campaign and preventing similar violations in the future.

WHEREFORE, Plaintiffs respectfully request that this Court:

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 76 of 121

A)    Issue a declaratory judgment that Defendants' actions to censor, suppress, and deplatform Plaintiffs violated their First Amendment rights;

B)    Issue a permanent injunction prohibiting Defendants from continuing to censor, suppress, and deplatform Plaintiffs; and

C)    Grant such other and further relief as the Court deems just and proper.

## COUNT II
### First Amendment Freedom of Press
*Against the Government and Social Media Defendants*

107.    Plaintiffs herein reincorporate paragraphs 1 to 91, as well as paragraphs 84 to 86, above.

108.    The First Amendment explicitly protects "freedom of the press" as a fundamental right distinct from yet complementary to freedom of speech. This protection extends to all publishers of information, including Plaintiffs, who disseminate content on matters of public concern through digital platforms.

109.    Plaintiffs, as publishers of information on health-related topics, were effectively silenced through the Government Defendants' coordinated suppression campaigns. The government's actions interfered with their ability to disseminate information, chilling their role as media outlets providing alternative health narratives and inhibiting the public's right to receive diverse viewpoints.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 77 of 121

110.   The Supreme Court has recognized "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *N.Y. Times*, 376 U.S. at 270. By coercing social media platforms to suppress Plaintiffs' viewpoints, Government Defendants not only targeted Plaintiffs for censorship but also deprived the public of access to their perspectives, thereby undermining the "marketplace of ideas" that the First Amendment is designed to protect and disrupting this essential democratic function.

111.   The government's campaign against Plaintiffs was especially pernicious because it targeted publishers based on the content of their messages rather than any demonstrable harm. This content-based restriction strikes at the heart of First Amendment protections for press freedom.

112.   By leveraging their regulatory authority and influence to pressure platforms into removing Plaintiffs' content, Government Defendants effectively imposed a prior restraint on publication—the most severe and least tolerable infringement on First Amendment rights. *Near v. Minnesota*, 283 U.S. 697, 713 (1931).

113.   The government's censorship campaign has caused Plaintiffs to suffer significant and ongoing injuries, including:

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 78 of 121

a.      Removal of their publishing channels, effectively eliminating

their ability to reach their established audiences;

b.      Dramatic reduction in the circulation of their content due to

algorithmic suppression and shadow-banning;

c.      Loss of advertising revenue directly tied to viewership and

engagement metrics;

d.      Damage to their credibility as publishers through government-

facilitated labeling as purveyors of "misinformation"; and

e.      Ongoing inability to publish freely on matters of public concern

without fear of government-induced censorship.

114.    Plaintiffs suffered and continue to suffer imminent, continuing, and

irreparable injuries and losses as the direct and proximate result of the Defendants'

conduct.

115.    Plaintiffs have no adequate remedy at law for the violation of their

constitutional rights. Money damages alone cannot remedy the ongoing violations

of their rights to publish content freely. Only declaratory and injunctive relief from

this Court can provide complete relief by ending the Defendants' unconstitutional

censorship campaign and preventing similar violations in the future.

WHEREFORE, Plaintiffs respectfully request that this Court:

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 79 of 121

A)     Issue a declaratory judgment that Defendants' actions to censor, suppress, and deplatform Plaintiffs violated their First Amendment rights to freedom of the press;

B)     Issue a permanent injunction prohibiting Defendants from continuing to interfere with Plaintiffs' ability to publish and disseminate content on matters of public concern;

C)     Award compensatory damages against all Defendants, jointly and severally, pursuant to 42 U.S.C. § 1983, in an amount to be determined at trial;

D)     Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

E)     Grant such other and further relief as the Court deems just and proper.

## COUNT III
### Violation of Florida Constitution, Article I, Section 4 - Freedom of Speech
(By Plaintiffs Sayer Ji and Erin Elizabeth Finn Against the Government and Social Media Defendants)

116.   Plaintiffs Sayer Ji and Erin Elizabeth Finn repeat and reallege Paragraphs 1 through 91 as if fully set forth herein.

117.   Article I, Section 4 of the Florida Constitution states: "Every natural person may speak, write and publish sentiments on all subjects but shall not be liable for the abuse of that right. No law shall be passed to restrain or abridge the

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 80 of 121

liberty of speech or of the press." This clause safeguards against governmental restraint of speech, prohibiting any state or federal action—direct or coercive— that impedes expression or inserts barriers between speakers and audiences on public issues like health policy.

118.    Defendants, wielding federal authority within Florida, violated Plaintiffs Sayer Ji and Erin Elizabeth Finn's rights under Article I, Section 4 by directing a censorship regime that restrained their speech on vaccination and informed consent. This encompassed targeting the Disinformation Dozen, demanding deplatforming and suppression measures in White House-platform meetings, and deploying systems to surveil and suppress Plaintiffs' online advocacy.

119.    Consistent with *Lamont v. Postmaster General*, 381 U.S. 301 (1965), Defendants' pressure on Meta Platforms, Inc., Google LLC, and X Corp. to demote, suppress, throttle, label, or remove Plaintiffs' content created unconstitutional "friction" with Florida citizens' rights to "speak, write, and publish sentiments on all subjects."

120.    These willful acts inflicted irreparable harm on Plaintiffs Sayer Ji and Erin Elizabeth Finn, including impositions on speech, deplatforming of accounts

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 81 of 121

with millions of followers, financial losses, reputational injury, and exclusion from public debate.

121.   Plaintiffs Sayer Ji and Erin Elizabeth Finn seek a declaration that Defendants' conduct violated Article I, Section 4 of the Florida Constitution; a permanent injunction barring future restraints on their ability to speak, write, and publish; and compensatory and punitive damages.

## COUNT IV
### Violation of Privacy Act of 1974, 5 U.S.C. § 552a(e)(7)
(By All Plaintiffs Against the Government Agency Defendants)

122.   Plaintiffs repeat and reallege Paragraphs 1 through 91 as if fully set forth herein.

123.   The Privacy Act of 1974, 5 U.S.C. § 552a, bars agencies from maintaining any "system of records" that describes "how any individual exercises rights guaranteed by the First Amendment" absent statutory authorization (5 U.S.C. § 552a(e)(7)). A "system of records" encompasses retrievable data linked to personal identifiers (e.g., social media aliases), maintained by or for an agency — including via private integrations — and contextualized as PII under NIST SP 800-122.

124.   Defendants CISA, GEC, U.S. Department of State, U.S. Department of Homeland Security, Federal Bureau of Investigation, and Federal

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 82 of 121

Communications Commission, and individual officials (Andy Slavitt, Rob
Flaherty, Vivek Murthy, Elvis Chan, and John and Jane Does 1-10) violated 5
U.S.C. § 552a(e)(7) by maintaining an unauthorized System of Records on
Plaintiffs' protected speech. These Defendants' improper collection, maintenance,
and use of Plaintiffs' records was intentional and willful.

125.    As set forth in the Statement of Facts, *supra*, this System included
"data viz" tools, dashboards, switchboards, BOLO slides disseminated within the
government, and reporting channels utilizing Disinformation Dozen watchlists
aggregating Plaintiffs' PII—usernames, social media aliases, affiliated entities,
tags, and speech metadata—retrieved by identifier to drive moderation decisions,
speech suppression, and deplatforming without a valid SORN or statutory basis
for such surveillance.

126.    This unlawful maintenance of records and Systems enabled the
coordinated deplatforming and harms alleged as agencies like CISA, GEC, DOS,
DHS, FBI, and FCC directed and applied pressure to social media platforms using
the records. Plaintiffs suffered actual adverse effects, including financial loss,
emotional distress, and reputational harm, directly and proximately caused by the
Government Defendants' actions.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 83 of 121

127.    Plaintiffs learned of these systems and records via the publication of the House Judiciary Committee's May 1, 2024 report titled "The Censorship-Industrial Complex: How Top Biden White House Officials Coerced Big Tech to Censor Americans, True Information, and Critics of the Biden Administration".Under 5 U.S.C. § 552a(g)(1)(D), Plaintiffs are entitled to redress for this intentional violation. They seek a declaration of the violation; an injunction mandating destruction of the records and cessation of maintenance; actual damages; statutory damages of $1,000 per Plaintiff; and attorneys' fees/costs.

## COUNT V
### Violation of Florida Constitution, Article I, Section 23 – Right of Privacy
(By Plaintiffs Sayer Ji and Erin Elizabeth Finn Against the Government and Social Media Defendants)

128.    Plaintiffs Sayer Ji and Erin Elizabeth Finn repeat and reallege Paragraphs 1 through 91 as if fully set forth herein.

129.    Article I, Section 23 of the Florida Constitution declares: "Every natural person has the right to be let alone and free from governmental intrusion into the person's private life except as otherwise provided herein." This right—explicit and expansive beyond federal equivalents—prohibits unauthorized surveillance, data aggregation, or interference in personal communications and associations, including digital speech on public health.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 84 of 121

130.    "Article I, section 23, was intentionally phrased in strong terms,"
*Winfield v. Division of Pari-Mutuel Wagering*, 477 So.2d 544, 548 (Fla. 1985), "and
succinctly provides for a strong right of privacy not found in the United States
Constitution." "[T]he right is much broader in scope than that of the Federal
Constitution." *Id.*

131.    "[T]he right to privacy in the Florida Constitution is broader, more
fundamental, and more highly guarded than any federal counterpart." *Weaver v.
Myers*, 229 So.3d 1118 (2017). "The right of privacy 'ensures that individuals are
able to determine for themselves when, how and to what extent information about
them is communicated to others.' " *Id.* (internal citations omitted).

132.    Defendants intruded upon Plaintiffs Sayer Ji and Erin Elizabeth Finn's
privacy under Article I, Section 23 by exploiting systems and records - "data viz"
tools, dashboards, switchboards, and reporting channels utilizing Disinformation
Dozen watchlists aggregating Plaintiffs' PII (usernames, social media aliases,
affiliated entities, tags, and speech metadata) – to collect and weaponize their PII
without warrant or exception, monitoring and targeting Plaintiffs and labeling
their health advocacy as "disinformation" to justify suppression and invading their
private online spheres as Florida residents.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 85 of 121

133.    These deliberate encroachments, unmoored from any constitutional

exception, facilitated the censorship harms detailed herein.

134.    Plaintiffs Sayer Ji and Erin Elizabeth Finn seek a declaration that

Defendants violated Article I, Section 23 of the Florida Constitution; a permanent

injunction against further intrusions and ordering data expungement; and

compensatory and punitive damages.

## COUNT VI
### Fifth Amendment Due Process
*Against the Government and Social Media Defendants*

135.    Plaintiffs reincorporate paragraphs 1 to 91, above.

136.    The Fifth Amendment to the United States Constitution guarantees

that no person shall "be deprived of life, liberty, or property, without due process

of law." This protection applies to both procedural and substantive due process

rights.

137.    Plaintiffs possess constitutionally protected liberty and property

interests in:

a.    Their reputations and standing in their professional

communities;

b.    Their established social media accounts, which represent

significant business assets developed over many years;

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 86 of 121

    c.    Their ability to communicate with their audiences and engage in their chosen professions;

    d.    Their access to digital platforms essential for modern speech and commerce; and

    e.    Their freedom from being publicly branded as purveyors of "misinformation" or "disinformation" by government officials.

138.    Government Defendants deprived Plaintiffs of these liberty and property interests without providing any form of due process whatsoever. Specifically, Government Defendants:

    a.    Never notified Plaintiffs that their speech was being targeted for suppression;

    b.    Provided no opportunity for Plaintiffs to challenge the characterization of their content as "misinformation";

    c.    Established no neutral, objective standards for determining what constitutes "misinformation";

    d.    Created no mechanism for appeal or review of censorship decisions;

    e.    Offered no hearing or other procedural safeguards before pressuring platforms to take adverse actions against Plaintiffs; and

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 87 of 121

     f.      Implemented no checks and balances to prevent arbitrary and capricious enforcement.

139.   The Supreme Court has recognized that "where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him," due process requires that the government provide notice and an opportunity to be heard. *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). By publicly branding Plaintiffs as dangerous "misinformation spreaders" and pressuring platforms to censor them, Government Defendants imposed a "stigma-plus" injury triggering due process protections.

140.   The Defendants' censorship regime and the Social Media Defendants perpetuation of the censorship scheme operates without any procedural protections typically required for restricting First Amendment freedoms. Plaintiffs have continuously been denied notice when their speech is targeted through 'shadow banning' and algorithmic suppression, depriving them of any opportunity to know their rights are being violated or to challenge such violations. By outsourcing censorship to social media companies while maintaining control through threats and coordination, Defendants have circumvented constitutional guardrails including clear standards, neutral application, and judicial review.

141.   The Supreme Court has recognized that 'rigorous procedural

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 88 of 121

safeguards are necessary' for prior restraints, yet Defendants have implemented censorship without any such safeguards. Their system provides no notice of censorship criteria, no explanation when content is suppressed, no opportunity to present contrary evidence, no neutral arbiter, and no avenue for appeal. Defendants have further concealed their activities by conducting coordination through private communications, deliberately avoiding transparency and accountability.

142.    These due process violations have concretely harmed Plaintiffs. When their content has been removed or suppressed, they've been denied any opportunity to contest the action, present evidence their speech was truthful, or appeal to a neutral decision-maker. In many cases, they haven't even been informed censorship occurred. This denial of procedural rights compounds the First Amendment harms and independently violates the Due Process Clause, which requires adequate safeguards before depriving individuals of constitutional rights.

143.    Government Defendants' actions also violated substantive due process by arbitrarily and capriciously targeting Plaintiffs for punishment without any rational connection to a legitimate government interest. The government has no legitimate interest in suppressing protected speech simply because it

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 89 of 121

contradicts preferred government narratives.

144.    The government's censorship campaign was particularly egregious because it established what amounts to a secret, extrajudicial process for determining which citizens' speech would be allowed in the digital public square. This shadow system of censorship operated without any of the procedural protections that would be required if the government sought to directly regulate speech.

145.    Government Defendants' covert pressure campaign against platforms hosting Plaintiffs' content constitutes precisely the type of arbitrary government action that the Due Process Clause was designed to prevent. As the Supreme Court noted in *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965), "A fundamental requirement of due process is 'the opportunity to be heard' at a meaningful time and in a meaningful manner" (internal citation omitted).

146.    The collusion between the Government and Social Media Defendants created a system through which government officials could achieve indirectly what they are forbidden to do directly—censor disfavored speech without providing any due process. The Supreme Court has consistently recognized that the government cannot evade constitutional obligations by working through private parties. See *Norwood v. Harrison*, 413 U.S. 455, 465 (1973).

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 90 of 121

147.    The government's actions fall within the "state action" doctrine

because:

      a.    The government coerced or significantly encouraged the

specific censorship decisions targeting Plaintiffs;

      b.    Private platforms acted as willful participants in joint activity

with government officials;

      c.    The government's involvement was so pervasive as to

transform seemingly private censorship into state action; and

      d.    The private entities were performing a traditional and

exclusive government function in identifying and restricting speech deemed

harmful to the public.

148.    As a direct result of Defendants' due process violations, Plaintiffs

have suffered substantial and ongoing harm, including:

      a.    Inability to access or utilize their established social media

accounts;

      b.    Significant financial losses from reduced audience reach and

engagement;

      c.    Reputational damage from being publicly labeled as sources of

"misinformation";

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 91 of 121

     d.     Exclusion from digital platforms essential to their professional activities; and

     e.     The chilling of their speech on matters of public concern due to fear of further censorship.

149.   Plaintiffs suffered and continue to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of the Defendants' conduct.

150.   Plaintiffs have no adequate remedy at law for the violation of their constitutional rights. Money damages alone cannot remedy the ongoing violations of their rights to due process. Only declaratory and injunctive relief from this Court can provide complete relief by ending the Defendants' unconstitutional censorship campaign and preventing similar violations in the future.

WHEREFORE, Plaintiffs respectfully request that this Court:

A)    Issue a declaratory judgment that Defendants' actions deprived Plaintiffs of liberty and property interests without due process of law in violation of the Fifth Amendment;

B)    Issue a permanent injunction requiring Defendants to establish and implement clear, neutral, and transparent procedures before taking any action that could adversely affect Plaintiffs' speech, social media platform access, or

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 92 of 121

reputations; and

C)    Grant such other and further relief as the Court deems just and

proper.

## COUNT VII
### Fourteenth Amendment Equal Protection
*Against All Government and Social Media Defendants*

151.    Plaintiffs reincorporate paragraphs 1 to 91 above.

152.    The Fourteenth Amendment to the United States Constitution
guarantees equal protection of the laws, prohibiting the government from treating
similarly situated individuals differently without sufficient justification.
Concurrently, the Fourth Amendment protects citizens against unreasonable
searches and seizures, including the collection and use of private data without
proper legal authority.

### Equal Protection Violations

153.    Defendants violated Plaintiffs' equal protection rights by selectively
targeting them for censorship based on the content and viewpoint of their speech,
particularly their dissenting opinions on vaccines and public health policies.

154.    The Disinformation Dozen framework created by CCDH and
adopted by the Defendants established an arbitrary and discriminatory
classification that singled out Plaintiffs for disfavored treatment without any

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 93 of 121

rational basis, much less the compelling interest and narrow tailoring required for content-based speech restrictions.

155.    Defendants treated Plaintiffs differently from similarly situated individuals who expressed viewpoints aligned with government narratives on identical topics. While Plaintiffs faced systematic censorship, account removal, and suppression, those expressing government-approved perspectives on the same platforms were permitted to speak freely and often received algorithmic amplification.

156.    This discriminatory treatment cannot survive even rational basis review, as the government has no legitimate interest in suppressing lawful speech based solely on its content or viewpoint. As the Supreme Court held in *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972), "[a]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."

157.    Defendants' targeted suppression campaign was particularly egregious because it classified Plaintiffs as dangerous "misinformation spreaders" without any objective criteria, scientific validation, or procedural safeguards. This arbitrary classification bears all the hallmarks of impermissible viewpoint discrimination.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 94 of 121

The selective enforcement against Plaintiffs reflects a pattern of unconstitutional

government conduct designed to silence specific perspectives in public

discourse, violating core equal protection principles that prohibit the government

from selecting "which issues are worth discussing or debating." *Reed v. Town of*

*Gilbert*, 576 U.S. 155, 182 (2015)**Fourth Amendment Violations**

159.    Defendants violated Plaintiffs' Fourth Amendment rights by

obtaining, using, and sharing detailed information about their social media

activities, engagement metrics, and private communications without any legal

process, warrant, or statutory authorization.

160.    Through their "switchboarding" operations and regular meetings

with social media companies, agencies including the FBI, CISA, and the State

Department systematically collected and analyzed data about Plaintiffs' online

activities, effectively conducting digital surveillance of American citizens engaged

in constitutionally protected speech.

161.    The Supreme Court has recognized that the Fourth Amendment

protects electronic data and digital communications. As the Court noted in

*Carpenter v. United States*, 138 S. Ct. 2206, 2219 (2018), the Fourth Amendment must

adapt to the "seismic shifts in digital technology" that have made possible the

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 95 of 121

tracking of not just Plaintiffs' public posts but also private data about their reach, engagement, and audience.

162.    Defendants' surveillance activities extended beyond monitoring publicly available posts to include:

  a. Obtaining non-public analytics data about Plaintiffs' account reach and engagement;

  b. Tracking changes in Plaintiffs' follower counts and post performance;

  c. Monitoring Plaintiffs' private messages when flagged by platform algorithms;

  d. Creating databases of Plaintiffs' content for ongoing surveillance; and

  e. Developing detailed profiles of Plaintiffs' online activities and networks.

163.    These surveillance activities constituted unreasonable searches under the Fourth Amendment because they were conducted without any judicial oversight, probable cause, or connection to legitimate law enforcement purposes. Instead, they targeted constitutionally protected speech on matters of public concern.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 96 of 121

164.    The joint participation between the Government Defendants and Social Media Defendants in monitoring Plaintiffs' online activities transformed what might otherwise be private content moderation into state action subject to Fourth Amendment constraints. By deputizing private companies to conduct surveillance they could not legally perform directly, Government Defendants circumvented constitutional protections.

165.    As a direct result of these constitutional violations, Plaintiffs have suffered substantial and continuing harm, including:

a.    Violation of their reasonable expectation of privacy in their online communications;

b.    Creation of databases maintained jointly by the Government and Social Media Defendants containing their protected speech and personal information;

c.    Discriminatory treatment based on the content and viewpoint of their expression;

d.    Chilling of their willingness to express controversial opinions online; and

e.    Stigmatization as targets of government surveillance and censorship efforts.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 97 of 121

166.    Plaintiffs suffered and continue to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of the Defendants' conduct.

167.    Plaintiffs have no adequate remedy at law for the violation of their constitutional rights. Money damages alone cannot remedy the ongoing violations of their rights as guaranteed by the Fourteenth and Fourth Amendments. Only declaratory and injunctive relief from this Court can provide complete relief by ending the Defendants' unconstitutional censorship campaign and preventing similar violations in the future.

WHEREFORE, Plaintiffs request immediate injunctive relief mandating the cessation of the government's constitutionally repugnant conduct and declaratory relief as set forth in the Prayer for Relief below.

WHEREFORE, Plaintiffs respectfully request that this Court:

A)    Issue a declaratory judgment that Defendants' actions in selectively targeting Plaintiffs for adverse treatment based on the content and viewpoint of their speech violated their Fourteenth Amendment rights to equal protection of the laws and Fourth Amendment protections against unreasonable searches;

B)    Issue a permanent injunction prohibiting Defendants from engaging in viewpoint-based discrimination against Plaintiffs and from conducting

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 98 of 121

surveillance of Plaintiffs' protected speech without proper legal authority;

C)     Order Defendants to destroy all databases, collections, and profiles of Plaintiffs' online activities created without proper legal process; and

D)     Grant such other and further relief as the Court deems just and proper.

**COUNT VIII**
**<u>Bivens First Amendment Claim for Damages</u>**
*Against Defendants Slavitt, Flaherty, Murthy, and Chan in their individual capacities*

168.    Plaintiffs reincorporate paragraphs 1 to 91 above.

169.    Defendants Slavitt, Flaherty, Murthy, and Chan (the "Individual Defendants"), acting under color of federal law, deliberately violated Plaintiffs' clearly established First Amendment rights by orchestrating a targeted campaign to suppress Plaintiffs' protected speech through coercion of private social media platforms.

170.    The Individual Defendants' actions to silence Plaintiffs' viewpoints constitute precisely the type of government censorship that the First Amendment was designed to prevent. The Supreme Court has repeatedly recognized that government officials violate the First Amendment when they use threats or coercion to suppress protected speech, as in *Bantam Books, Inc.*, 372 U.S. at 58. "[I]nhibition as well as prohibition against the exercise of precious First

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 99 of 121

Amendment rights is a power denied to government." *Lamont v. Postmaster General of U.S.*, 381 U.S. 301 (1965) (Brennan, J., concurring).

171.    Defendant Slavitt, as Senior Advisor to the President for COVID-19 Response, spearheaded an abusive and coercive pressure campaign against Facebook executives, demanding the suppression of vaccine-critical content that included Plaintiffs' viewpoints as members of the Disinformation Dozen, in flagrant disregard for First Amendment protections. As chronicled in the House Judiciary Committee's May 1, 2024 report, during an April 18, 2021, hour-long call, Slavitt reacted with outrage—not too strong a word, per Meta's President of Global Affairs Sir Nick Clegg—that Facebook had not removed a post critical of COVID vaccines, dismissing Clegg's counter that such removal would represent a "significant incursion into traditional boundaries of free expression in the US." Slavitt's abusive tactics escalated on March 15, 2021, when he emailed Facebook personnel expressing frustration that "relative to others, interactions with Facebook are not straightforward and the problems are worse," while issuing a veiled threat that the White House was "internally . . . considering our options on what to do about it", communications that fueled the synchronized deplatforming and demonetization of Plaintiffs' accounts, inflicting severe economic and reputational harm.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 100 of 121

172.    Defendant Flaherty, as Deputy Assistant to the President and Director of Digital Strategy at the White House, repeatedly and directly pressured social media platforms to take adverse actions against Plaintiffs. On or about May 6, 2021, Flaherty sent specific communications to Facebook executives demanding increased censorship of the Disinformation Dozen, including Plaintiffs, and questioning the platform's commitment to content moderation while implying potential regulatory consequences. These communications were not general policy advocacy but targeted demands to suppress specific speakers based on their viewpoints.

173.    Defendant Murthy, as Surgeon General, weaponized his office to target Plaintiffs by explicitly endorsing the CCDH Disinformation Dozen Report in his July 13, 2021, advisory on health misinformation. Murthy used this official publication to urge platforms to impose "clear consequences" on the named individuals, including Plaintiffs, effectively using government authority to orchestrate viewpoint-based censorship of private citizens.

174.    Defendant Chan, as an FBI Supervisory Special Agent, served as a key intermediary between federal agencies and social media platforms, organizing regular meetings with platform executives where he pressured them to take enforcement actions against individuals identified in the Disinformation Dozen

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 101 of 121

Report, including Plaintiffs. Chan's actions leveraged the authority of federal law

enforcement to suppress constitutionally protected speech.

175.    The Individual Defendants knew, or should have known, that their

actions violated Plaintiffs' clearly established First Amendment rights. Any

reasonable official would understand that using government authority to coerce

private entities into suppressing specific viewpoints violates the Constitution.

176.    As a direct and proximate result of the Individual Defendants'

unconstitutional actions, Plaintiffs suffered significant damages, including:

a.    Loss of access to their social media accounts and audiences,

some of which included hundreds of thousands of followers built over

many years;

b.    Substantial    economic    harm    through    lost    business

opportunities, reduced income from content creation, canceled speaking

engagements, and termination of financial service accounts;

c.    Reputational damage resulting from being publicly branded as

dangerous "misinformation spreaders";

d.    Emotional    distress    from    being    targeted    by    powerful

government officials; and

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 102 of 121

e.    Ongoing harm to their ability to participate in public discourse on matters of significant public interest.

177.    No special factors counsel hesitation in recognizing a damages remedy in this case. The Individual Defendants' actions do not implicate national security, foreign policy, or military affairs. Their conduct did not occur in a new context but represents a classic First Amendment violation—government officials using their authority to suppress disfavored speech.

178.    Plaintiffs have no adequate alternative remedy for the constitutional violation and resulting damages. The Administrative Procedure Act does not provide monetary relief, and prospective injunctive relief cannot remedy the substantial past harms Plaintiffs have suffered.

WHEREFORE, Plaintiffs respectfully request that this Court:

A)    Issue a declaratory judgment that the Individual Defendants' actions violated Plaintiffs' clearly established First Amendment rights;

B)    Award compensatory damages against Defendants Flaherty, Murthy, and Chan in their individual capacities in an amount to be determined at trial;

C)    Award punitive damages against Defendants Flaherty, Murthy, and Chan in their individual capacities in an amount sufficient to deter similar misconduct in the future;

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 103 of 121

D)    Award Plaintiffs their reasonable attorneys' fees and costs pursuant to applicable law; and

E)    Grant such other and further relief as the Court deems just and proper.

**COUNT IX**
**Civil Conspiracy**
*Against All Defendants*

179.    Plaintiffs reincorporate paragraphs 1 to 91 above.

180.    A civil conspiracy exists where there is (1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) an overt act in furtherance of the conspiracy; and (4) damage to the plaintiff as a result of acts done under the conspiracy.

181.    Defendants entered into an agreement to target, censor, deplatform, and suppress Plaintiffs' constitutionally protected speech. This agreement is evidenced by numerous communications, coordinated actions, and joint participation between government officials, agencies, NGOs, and social media platforms, including but not limited to:

a.    The systematic adoption and operationalization of CCDH's Disinformation Dozen Report by multiple government agencies;

b.    The White House's communications with social media

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 104 of 121

platforms explicitly pressuring them to remove the Disinformation Dozen,
as demonstrated by Defendant Flaherty's May 6, 2021, email demanding
action against Plaintiffs;

c.     The Surgeon General's official health advisory that specifically
cited the Disinformation Dozen Report and called for platforms to impose
"clear consequences" on the named individuals;

d.     Regular meetings between government officials and social
media executives where enforcement actions against Plaintiffs were
discussed and coordinated;

e.     Contemporaneous and nearly identical enforcement actions
taken by multiple platforms against Plaintiffs following government
pressure; and

f.     Internal communications from Meta confirming that the White
House was "exerting policy pressure" to remove the Disinformation Dozen
accounts.

182.   Defendants agreed to commit unlawful acts and to use unlawful
means to implement their censorship campaign against Plaintiffs, including:

a.     Coercing private entities to suppress constitutionally protected
speech in violation of the First Amendment;

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 105 of 121

b.     Depriving Plaintiffs of their liberty and property interests without due process in violation of the Fifth Amendment;

c.     Selectively targeting Plaintiffs for adverse treatment based on their viewpoints in violation of equal protection principles;

d.     Conducting warrantless surveillance of Plaintiffs' online activities through collusion with private platforms in violation of the Fourth Amendment;

e.     Publishing false and defamatory statements about Plaintiffs with knowledge of, or reckless disregard for, their falsity; and

f.     Interfering with Plaintiffs' contractual relationships with social media platforms, payment processors, and other business partners without justification or privilege.

183.    Defendants took numerous overt acts in furtherance of their conspiracy, including but not limited to:

a.     CCDH publishing the Disinformation Dozen Report with methodologically unsound and defamatory claims about Plaintiffs, with the express purpose of provoking censorship;

b.     Defendant Flaherty sending explicit demands to Facebook executives to remove Plaintiffs' content, referencing the "disinfo dozen" as

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 106 of 121

justification;

c.     Defendant Murthy publishing an official advisory citing the Disinformation Dozen Report and calling for platforms to impose "clear consequences" on Plaintiffs;

d.     Defendant Chan coordinating regular meetings between government officials and social media executives where enforcement actions against Plaintiffs were orchestrated;

e.     Meta, Google, and X (formerly Twitter) implementing systematic censorship measures against Plaintiffs' accounts in direct response to government pressure, as evidenced by internal communications acknowledging this "policy pressure";

f.     Congressional representatives publicly pressuring social media and payment processing companies to take action against the Disinformation Dozen, including a letter to PayPal joined by 18 members of Congress; and

g.     Defendant agencies including the FBI, DHS, CISA, and the Global Engagement Center developing and implementing formalized systems for flagging, monitoring, and suppressing Plaintiffs' speech across digital platforms.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 107 of 121

184.    The conspiracy was characterized by significant coordination and entwinement among ostensibly separate entities. Government Defendants transformed private content moderation into state action by:

a.    Threatening adverse regulatory consequences for platforms that failed to comply with censorship demands;

b.    Establishing regular meetings and dedicated communication channels between government officials and platform executives;

c.    Using NGOs like CCDH as intermediaries to launder government censorship through seemingly private organizations;

d.    Leveraging governmental authority to pressure platforms into adopting specific content moderation policies targeting Plaintiffs; and

e.    Creating a pervasive system of public-private partnership that effectively circumvented constitutional constraints on government censorship.

185.    As a direct and proximate result of Defendants' conspiracy, Plaintiffs suffered substantial and ongoing damages, including:

a.    Removal of their accounts from major social media platforms, severing their connection to audiences built over many years;

b.    Algorithmic suppression and shadow-banning of their content,

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 108 of 121

dramatically reducing their reach and engagement;

c.      Significant financial losses from reduced audience reach, canceled business opportunities, and termination of payment processing services;

d.      Reputational harm from being publicly branded as dangerous "misinformation spreaders";

e.      Emotional distress from being targeted by a coordinated campaign involving the highest levels of government; and

f.      Ongoing inability to participate fully in public discourse on matters of significant public concern.

186.    The harm suffered by Plaintiffs was the direct, foreseeable, and intended consequence of Defendants' conspiratorial actions. Each Defendant played a unique but essential role in the conspiracy:

a.      CCDH and provided the pretext and justification for censorship through methodologically unsound reports;

b.      Government officials and agencies leveraged their regulatory authority to pressure platforms into taking action against Plaintiffs;

c.      Individual Defendants including Flaherty, Murthy, and Chan served as key intermediaries coordinating the censorship campaign; and

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 109 of 121

d.    Social media platforms and payment processors implemented the actual censorship, knowing they were acting at the government's behest.

187.    The conspiracy between Defendants was not the result of independent parallel conduct but reflected a conscious commitment to a common scheme designed to achieve an unlawful objective—the suppression of constitutionally protected speech based on its viewpoint and content.

WHEREFORE, Plaintiffs request that this Court:

A)    Award compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial;

B)    Award punitive damages against all Defendants in an amount sufficient to deter similar misconduct in the future;

C)    Award Plaintiffs their reasonable attorneys' fees and costs; and

D)    Grant such other and further relief as the Court deems just and proper.

## COUNT X
## Tortious Interference with Contract
### *Against all Defendants*

188.    Plaintiffs reincorporate paragraphs 1 to 91 above.

189.    Plaintiffs each had valid and enforceable contractual relationships with payment processing companies, including PayPal, which were essential to

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 110 of 121

their business operations. These contracts allowed Plaintiffs to receive payments for products, services, and donations from supporters, customers, and business partners. Specifically:

    a.    Plaintiff Sayer Ji had contractual relationships with PayPal for processing payments for GreenMedInfo LLC, which had been in good standing for years prior to the interference.

    b.    Plaintiff Christiane Northrup had contractual relationships with PayPal that allowed her to process payments for her health-related products, books, and services.

    c.    Plaintiff Ben Tapper had contractual relationships with PayPal for both his personal account and for processing payments related to his documentary project "TheTimeIsNow.movie."

    d.    Plaintiff Sherri Tenpenny had contractual relationships with PayPal that facilitated both domestic and international business transactions.

    e.    Plaintiff Rizza Islam had contractual relationships with PayPal that enabled him to sell products to his followers.

190.    Defendants knew of these contractual relationships. Specifically:

    a.    On December 15, 2021, Representative Jake Auchincloss, along

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 111 of 121

with 18 other members of Congress, sent a letter to PayPal specifically
targeting Plaintiffs' payment processing accounts, demonstrating their
knowledge of these contractual relationships.

b.     CCDH's "Pandemic Profiteers" Report explicitly identified and
targeted Plaintiffs' business relationships with payment processors,
demonstrating CCDH's knowledge of these contractual relationships.

191.   Defendants intentionally and unjustifiably interfered with these
contracts, inducing their breach or termination:

a.     Representative Auchincloss explicitly "urged PayPal to ban
users who disseminate disinformation and deactivate the accounts of the
Disinformation Dozen," directly pressuring PayPal to breach its contracts
with Plaintiffs.

b.     CCDH's reports, including the Disinformation Dozen Report
and the Pandemic Profiteers Report, urged payment processors to "stop
processing payments for those who profit from COVID-19 and vaccine
misinformation."

c.     As a direct result of this pressure campaign, on March 15, 2022,
PayPal shut down Plaintiff Sayer Ji's GreenMedInfo business account and
his personal PayPal and Venmo accounts, stating that the measures were

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 112 of 121

taken "due to the nature of [Sayer Ji's] activities."

    d.    PayPal permanently banned Plaintiff Ben Tapper from using its services, suspending both his personal account and the account for his documentary project "TheTimeIsNow.movie" indefinitely.

    e.    Plaintiff Christiane Northrup lost her ability to accept payments through PayPal, and when she called to inquire, she was simply told "you can no longer use PayPal" without further explanation.

    f.    PayPal shut down Plaintiff Sherri Tenpenny's account, disrupting her various domestic and international business operations.

192.    Defendants' interference was without justification or privilege:

    a.    Defendants' actions were not based on legitimate business competition or the protection of any legally recognized interest.

    b.    Defendants targeted Plaintiffs based on their protected speech, not because of any unlawful conduct or contractual violations.

    c.    Defendants were not parties to the contracts between Plaintiffs and PayPal, nor did they have any legitimate authority to interfere with these private contractual relationships.

    d.    Defendants' pressure campaign was designed to financially damage Plaintiffs by cutting off their payment processing capabilities, not

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 113 of 121

to advance any legitimate regulatory or public interest objective.

  e.  Defendants acted with malice and the specific intent to harm Plaintiffs' economic interests based on their viewpoints regarding health-related matters.

193. As a direct and proximate result of Defendants' tortious interference, Plaintiffs suffered substantial damages:

  a.  Plaintiff Sayer Ji experienced significant financial losses from being unable to process payments through PayPal and Venmo for GreenMedInfo's products and services.

  b.  Plaintiff Ben Tapper's fundraising efforts for his documentary "The Time is Now" were terminated, causing substantial financial harm and preventing the completion of his project.

  c.  Plaintiff Christiane Northrup also suffered significant financial losses, and has been forced to max out her personal line of credit to pay staff salaries and keep her business operational after losing her payment processing capabilities.

  d.  Plaintiff Sherri Tenpenny suffered direct business income losses from the interruption of her various business lines that relied on PayPal for payment processing.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 114 of 121

e.     Plaintiff Rizza Islam experienced substantial financial harm from reduced sales of products after losing access to payment processing services.

f.     All Plaintiffs suffered ongoing financial damages, including lost revenue and additional operational costs to establish alternative payment processing methods.

194.   Defendants' actions constituted intentional misconduct as defined by Florida Statute § 768.72(2)(a), as they had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage to Plaintiffs would result, and despite this knowledge, deliberately pursued a course of conduct that caused harm to Plaintiffs. Defendants explicitly discussed targeting Plaintiffs' financial relationships as a strategy to silence their speech, demonstrating conscious and specific intent to harm Plaintiffs' business interests. Defendants acted purposefully to cause financial harm to Plaintiffs to punish them for their protected speech.

WHEREFORE, Plaintiffs request that this Court:

A)     Award compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial;

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 115 of 121

B)    Award punitive damages against the Defendants in an amount sufficient to deter similar misconduct in the future;

C)    Award Plaintiffs their reasonable attorneys' fees and costs; and

D)    Grant such other and further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request this Court enter judgment in Plaintiffs' favor and:

A)    With respect to Counts I through VIII, Plaintiffs respectfully request that this Court provide injunctive and declaratory relief as follows:

i.    Declare that Defendants' censorship activities violate the First Amendment of the U.S. Constitution, notwithstanding the issuance of Executive Order 14149, "Restoring Freedom of Speech and Ending Federal Censorship," as a judicial declaration is necessary to establish clear constitutional boundaries that cannot be altered by changing executive policies;

ii.    Declare that Defendants' censorship activities were ultra vires and exceeded their statutory authority, and that no federal statute authorizes government officials to coerce, pressure, or collude with social media companies to suppress constitutionally protected speech;

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 116 of 121

iii.     Order Defendants to publicly disclose all past
communications, meetings, and coordination efforts with social media
companies related to content moderation, including the identification of all
specific posts to any social media platform by any Plaintiff flagged for
removal or suppression and the government officials involved in such
actions;

iv.     Enjoin Defendants, their officers, officials, agents, servants,
employees, attorneys, and all persons acting in concert with them, from
taking any future actions to demand, urge, pressure, or otherwise induce
any social media platform to censor, suppress, de-platform, suspend,
shadow-ban, de-boost, restrict access to content, or take any other adverse
action against any speaker, content, or viewpoint expressed on social
media;

v.     Order Defendants to establish a notification system to inform
all members of the Disinformation Dozen whose content was suppressed,
removed, de-boosted, shadow-banned, or otherwise adversely affected as
a result of government-induced censorship about such actions taken
against their speech;

vi.     Require Defendants to implement mandatory First
Amendment training for all federal employees who interact with social

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 117 of 121

media companies regarding content moderation, with court approval of the training materials and verification of completion;

    vii.     Establish a judicial oversight mechanism requiring Defendants to report to the Court on a quarterly basis for a period of five years regarding any communications with social media companies concerning content moderation, to ensure compliance with constitutional requirements regardless of any changes to executive orders or policies;

    viii.     Order Defendants to work with affected social media platforms to restore, where technologically feasible, all content that was improperly removed or suppressed due to government-induced censorship, and to remove any penalties, strikes, or account restrictions imposed as a result of such censorship;

    ix.     Establish a remedial framework to address ongoing harms caused by past censorship activities, including the creation of an independent review process for individuals who believe their speech was suppressed due to government action, with the authority to recommend appropriate remedies;

    x.     Grant such other and further relief as the Court may deem just and proper to ensure that similar violations of First Amendment rights do not recur in the future, regardless of changes in executive policy, including

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 118 of 121

the appointment of a Special Master to oversee compliance with the Court's

orders.

B)    Award the relief requested in Counts III through V and VIII through

X;

C)    Award attorney's fees and costs pursuant to 28 U.S.C. § 2412 and any

other applicable authority; and

D)    Order any further relief this Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 119 of 121

Dated: October 10, 2025.



CHILDERS LAW, LLC

2135 NW 40th Terrace, Suite B
Gainesville, Florida 32605
tel. 866-996-6104
fax 407-209-3870

*/s/ Seldon J. Childers*
Seldon J. Childers
Florida Bar No. 61112
jchilders@smartbizlaw.com
Nicholas P. Whitney
Florida Bar No. 119450
nwhitney@smartbizlaw.com
Charles H. Hardage
*Of counsel*
Florida Bar No. 76917
chardage@smartbizlaw.com
notice@smartbizlaw.com

*Counsel for Plaintiffs*

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 120 of 121

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed with the Clerk of the Court using the Court's CM/ECF system, which caused a copy to be served upon all counsel of record this October 10, 2025.


_/s/ Seldon J. Childers_
Attorney for Plaintiffs

*Second Amended Complaint for Declaratory and Injunctive Relief and Damages*
Plaintiffs v. Global Engagement Center, et al.
Page 121 of 121