**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**ERIN ELIZABETH FINN,**
**RIZZA ISLAM, SAYER JI,**
**CHRISTIANE NORTHRUP,**
**BEN TAPPER,**
**and SHERRI TENPENNY,**

Case No. 3:25-cv-00543-WWB-MCR

Plaintiffs,

vs.

**GLOBAL ENGAGEMENT CENTER,**
**CENTER FOR COUNTERING DIGITAL HATE, INC.,**
**CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY,**
**ACTING DIRECTOR OF CISA BRIDGET BEAN, in her official capacity,**
**U.S. DEPARTMENT OF STATE,**
**SECRETARY OF STATE MARCO RUBIO, in his official capacity,**
**U.S. DEPARTMENT OF HOMELAND SECURITY,**
**SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY MARKWAYNE MULLIN, in his official capacity,**
**FEDERAL BUREAU OF INVESTIGATION, DIRECTOR OF THE FEDERAL BUREAU OF INVESTIGATION KASH PATEL, in his official capacity,**
**FEDERAL COMMUNICATIONS COMMISSION, FCC CHAIRMAN BRENDAN CARR, in his official capacity,**
**IMRAN AHMED, and JOHN and JANE DOES 1-10,**

Defendants.
_______________________________________/

# THIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES, AND JURY TRIAL DEMANDED

Plaintiffs bring this Complaint for damages and injunctive and declaratory relief against the Defendants.

## INTRODUCTION

*"We are not afraid to entrust the American people with unpleasant facts, foreign ideas, alien philosophies, and competitive values. For a nation that is afraid to let its people judge the truth and falsehood in an open market is a nation that is afraid of its people."*

– President John F. Kennedy

1. The Plaintiffs are healthcare professionals, researchers, and advocates who have built substantial online presences and businesses centered around health freedom, informed consent, and discussion of alternative approaches to conventional medicine. For years prior to the events described in this Complaint, Plaintiffs maintained active social media accounts with hundreds of thousands of followers, published research, books, and articles, hosted podcasts, presented at conferences, and operated successful businesses providing health-related information, products, and services. Through these platforms, Plaintiffs exercised their First Amendment rights to express views that sometimes challenged mainstream medical consensus, particularly regarding vaccination policies, safety, and efficacy—expressions that fall squarely within the realm of constitutionally protected speech on matters of profound public concern.

2. Beginning in early 2021, Plaintiffs became the targets of an unprecedented and coordinated censorship campaign orchestrated through the collaboration of government officials, agencies, non-governmental organizations, and social media platforms. This censorship campaign was catalyzed, intended, and coordinated, by the publication of the Center for Countering Digital Hate's Disinformation Dozen report ("Disinformation Dozen Report") — a methodologically opaque and scientifically unsound

document that made the extraordinary claim that 12 individuals, including all Plaintiffs, were allegedly responsible for "up to 65%" of "anti-vaccine content" online. Despite its lack of transparency, peer review, or verifiable data, this report was rapidly embraced by high-ranking government officials and the media, who weaponized its conclusions to justify an aggressive suppression of Plaintiffs' constitutionally protected speech. Imran Ahmed, the public face of the Center for Countering Digital Hate, amplified the claims made in the Disinformation Dozen Report, and publicly declared that the Plaintiffs were defined by their "psychological need . . . to cause pain and to cause chaos" and that they were "profiting from causing death." What followed was not merely private content moderation but a government-directed program of censorship that leveraged the regulatory power of federal agencies to coerce platforms into silencing specific individuals whom the government deemed problematic for challenging preferred narratives on public health policies.

3. The ensuing censorship campaign against Plaintiffs represents one of the most severe threats to free speech in the digital age—a systematic effort to excise certain viewpoints from the public square through the entanglement of government power and private platform control. Government officials, including those at the White House, explicitly targeted Plaintiffs by name, demanding their removal from social media platforms and threatening regulatory consequences for non-compliance. Federal agencies, having developed an infrastructure to intervene in online speech, implemented White House direction to pressure social media platforms. Social media executives, responding to this government pressure, implemented synchronized enforcement actions

that resulted in Plaintiffs being deplatformed, shadow-banned, demonetized, and publicly maligned. The consequences for Plaintiffs have been devastating—the destruction of their digital presence built over many years, substantial financial losses, severe reputational damage, and an ongoing inability to participate in public discourse on matters of critical importance. Most troublingly, this campaign established a dangerous precedent whereby government officials can circumvent First Amendment protections by using their coercive power to deputize private companies as agents of state censorship—a constitutional violation that strikes at the very heart of America's democratic tradition of free and open debate.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under the First Amendment to the United States Constitution.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(e)(1) because Plaintiffs Erin Elizabeth Finn and Sayer Ji reside in this district, no real property is involved in the action, and Defendants include agencies of the United States and officers and employees of the United States and its agencies acting in their official capacities.

## PARTIES

### A. Plaintiffs

6. **Plaintiff Erin Elizabeth Finn** is and at all times relevant to this proceeding has been a citizen of and domiciled in the Middle District of Florida. Ms. Finn operates

Health Nut News, a health advocacy platform with offices in Volusia County, Florida, and maintained substantial social media accounts with approximately 1.2 million likes and followers on Facebook, more than 150,000 followers on Instagram, tens of thousands of subscribers on YouTube and nearly 1 billion views before the censorship actions described in this Complaint. Ms. Finn conducts the majority of her business activities from Florida, including publishing content, hosting online events, and managing her health advocacy operations, all of which were substantially disrupted by Defendants' actions within this jurisdiction.

7. **Plaintiff Ronnie Stevens Islam, known as Rizza Islam,** is and at all times relevant to this proceeding has been a citizen of, and domiciled in, Los Angeles County, California, where he has continuously resided since birth. Brother Rizza Islam maintained substantial social media accounts with approximately 539,000 followers on Instagram and approximately 146,000 subscribers on YouTube prior to the censorship actions described in this Complaint. In total, Rizza Islam was making 15 to 18 million impressions per week across Facebook, Instagram, Twitter and YouTube. Rizza Islam regularly conducts business activities that reach into Florida, including book sales and speaking engagements, and has suffered economic and reputational harm that directly and negatively impacted his operations and followers within Florida. Rizza Islam holds an honorary doctorate in education.

8. **Plaintiff Sayer Ji** is a citizen of, and domiciled in, Miami-Dade County, Florida. Sayer Ji has continuously resided in Florida since 1998. Sayer Ji is the founder of GreenMedInfo LLC, a Florida-based health information platform with its principal place

of business in Miami-Dade, Florida. Sayer Ji is the co-founder of Stand for Health Freedom, a 501(c)(4) nonprofit organization, and the author of *Regenerate,* an internationally best-selling book. Prior to the censorship actions described in this Complaint, Sayer Ji operated social media accounts with over 500,000 followers on Facebook, approximately 150,000 followers on Instagram, and tens of thousands of followers on Twitter/X and a similar number of subscribers on YouTube, through which he conducted substantial business activities including content publishing, product marketing, and educational outreach. Sayer Ji has dedicated his professional life to sharing evidence-based information about the healing potential of foods, supplements, natural remedies, and lifestyle practices aimed at empowering individuals to make informed decisions about their health. Sayer Ji holds a B.A. in Philosophy from Rutgers University.

9. **Plaintiff Christiane Northrup** is and at all times relevant to this proceeding has been a citizen of, and domiciled in, the State of Maine, where she has continually resided since 2012. Dr. Northrup is a board-certified OB/GYN physician, a New York Times bestselling author, and former assistant clinical professor at the University of Vermont College of Medicine. Prior to the censorship actions described in this Complaint, Dr. Northrup maintained substantial social media accounts with approximately 2 million followers across multiple platforms and regularly conducted business activities that reached into Florida, including speaking engagements, educational outreach, webinars, and book sales. Dr. Northrup has suffered economic and reputational harm from Defendants' actions that directly and negatively impacted her livelihood, women’s health

education and outreach operations, book sales, and professional affiliations.

10. **Plaintiff Ben Tapper** is and at all times relevant to this proceeding has been a citizen of, and domiciled in, Washington County, Nebraska where he has continuously resided since 2012. Dr. Tapper is a licensed chiropractor and prior to the censorship actions described in this Complaint, maintained social media accounts making 3 to 4 million impressions per month across multiple platforms. Dr. Tapper has suffered economic and reputational harm from Defendants' actions that directly and negatively impacted his professional practice, his social media following, his business operations, and his fundraising activities.

11. **Plaintiff Sherri Tenpenny** is and at all times relevant to this proceeding has been a citizen of, and domiciled in, Cuyahoga County, Ohio, residing in Olmstead Falls, Ohio, where she has continuously resided since 1996. Dr. Tenpenny is a board-certified osteopathic medical doctor, and prior to the censorship actions described in this Complaint, maintained substantial social media accounts with hundreds of thousands of followers across multiple social media platforms. Dr. Tenpenny regularly conducted business activities that reach into Florida, including speaking engagements, educational outreach, book sales, and supplement sales, and has suffered economic and reputational harm from Defendants' actions that directly impacted her operations and professional engagements within Florida.

12. Plaintiffs bring claims for violation of their constitutional rights, seeking injunctive and declaratory relief, as well as common law claims for civil conspiracy, and tortious interference with contract and advantageous business .

**B. Defendants**

13. The **Global Engagement Center** ("GEC"), though no longer operational after December 23, 2024, was at all material times relevant to this action an interagency center housed in and funded by the U.S. Department of State, and headquartered in Washington, D.C. Despite its dissolution when Congress declined to renew its authorization in the 2025 National Defense Authorization Act the GEC remains a proper party to this action under the doctrine of successor liability, with the Department of State maintaining responsibility for the GEC's past actions, records, and legal obligations.

14. **Center for Countering Digital Hate, Inc.** ("CCDH") is a non-profit Non-Governmental Organization organized and existing under the laws of Washington, D.C., with its principal place of business in Washington, D.C. CCDH established itself as a U.S.-based nonprofit in 2021 but originated in the United Kingdom, where its parent organization continues operations. CCDH maintains substantial contacts with this district through its nationwide activities, including deliberately targeting Florida residents such as Plaintiffs Erin Elizabeth Finn and Sayer Ji through its publications. This Court has personal jurisdiction over CCDH under Florida's long-arm statute because CCDH committed tortious acts within Florida by publishing defamatory and harmful content specifically concerning Florida residents with knowledge that such content would cause injury within this jurisdiction, tortiously interfering with Plaintiffs' contracts and advantageous business relationships in Florida with knowledge that doing so would cause injury within this jurisdiction, and conspiring to infringe Plaintiffs' First Amendment rights and interfere with their advantageous business relationships in Florida with knowledge

that doing so would cause injury within this jurisdiction. CCDH purposefully availed itself of the privilege of conducting activities in Florida by directing its operations at Florida residents and entities, creating a substantial connection with this forum sufficient to render the exercise of jurisdiction reasonable and consistent with traditional notions of fair play and substantial justice. CCDH's publication of the Disinformation Dozen Report and related materials targeting Plaintiffs was expressly calculated to reach audiences within this jurisdiction and to influence content moderation decisions affecting Florida residents' online speech and business activities. On information and belief, CCDH does a substantial portion of its fundraising in Florida. For example, in 2025, it received a $130,000 grant from the Miami Foundation, a Florida non-profit. Additionally, The Elevate Prize Foundation is another Florida non-profit corporation that in 2025 awarded CCDH $250,000 in unrestricted funding and an additional $50,000 in unrestricted funding to Imran Ahmed himself.

15. The **Cybersecurity and Infrastructure Security Agency** ("CISA") is a federal agency within the Department of Homeland Security tasked with protecting the nation's critical infrastructure, including its information and communication systems.

16. **Acting Director of the Cybersecurity and Infrastructure Security Agency Bridget Bean,** as successor to Jen Easterly ("Easterly"), is the Director of CISA within the Department of Homeland Security.

17. The **U.S. Department of State** ("State Department") is an executive agency of the United States of America, headquartered in Washington, D.C.

18. **Marco Rubio**, in his official capacity as United States Secretary of State, is

a Defendant and the successor to former Secretary of State Antony Blinken.

19. The **U.S. Department of Homeland Security** (“DHS”) is an executive agency of the United States of America, headquartered in Washington, D.C. Created in response to the September 11 attacks through the Homeland Security Act of 2002, the DHS is tasked with public security responsibilities focusing on terrorism, border security, immigration, cybersecurity, and disaster prevention and management.

20. **Markwayne Mullin[1],** in his official capacity as the Secretary of the Department of Homeland Security, is the successor to former Secretary of the Department of Homeland Security Krisi Noem, who was the successor to former Secretary of the Department of Homeland Security Alejandro Mayorkas (“Mayorkas”).

21. The **Federal Bureau of Investigation** (“FBI”) is the principal federal law enforcement agency of the United States, operating as a component of the Department of Justice and headquartered in Washington, D.C.

22. **Kash Patel**, in his official capacity as Director of the Federal Bureau of Investigation, is a Defendant and the successor to former FBI Director Christopher Wray.

23. The **Federal Communications Commission** ("FCC") is an independent agency of the United States government, created by statute to regulate interstate communications by radio, television, wire, satellite, and cable across the United States.

[1] Kristi Noem, previously named as a defendant in this case in her official capacity as the Secretary of the Department of Homeland Security has been replaced in that role by Secretary Markwayne Mullin as of March 24, 2026. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Secretary Mullin has been automatically substituted as a party for former Secretary Noem.

Headquartered in Washington, D.C., the FCC operates under the authority of the Communications Act of 1934, as amended, and is directed by five Commissioners appointed by the President and confirmed by the Senate.

24. **Brendan Carr**, in his official capacity as Chairman of the Federal Communications Commission, is a Defendant and the successor to former FCC Chairwoman Jessica Rosenworcel. [2]

25. **Imran Ahmed** ("Ahmed") is the Chief Executive Officer of the CCDH, an organization that he founded in 2018. He also serves as CCDH's public face. This Court has personal jurisdiction over Defendant Imran Ahmed, an individual residing in or conducting significant activities from Washington, D.C., pursuant to Florida's long-arm statute, Fla. Stat. § 48.193, and consistent with the Due Process Clause of the Fourteenth Amendment. Ahmed, as the Chief Executive Officer of the Center for Countering Digital Hate, purposefully directed tortious activities at Florida residents, including Plaintiffs Erin Elizabeth Finn and Sayer Ji, by authoring, publishing, and promoting the Disinformation Dozen Report and subsequent CCDH reports, thereby committing tortious acts within Florida by publishing defamatory and harmful content specifically concerning Florida residents with knowledge that such content would cause injury within this jurisdiction, tortiously interfering with Plaintiffs' contracts and advantageous business relationships in Florida with knowledge that doing so would cause injury within this jurisdiction, and

[2] The "**Government Defendants**" are the GEC, CISA, HHS, the FBI, and the FCC. The Government Defendants together with CCDH and Imran Ahmed are the "**Defendants**". The Government Defendants have waived sovereign immunity as to Plaintiffs' requests for declaratory or injunctive relief against them under 5 U.S.C. § 702.

conspiring to infringe Plaintiffs' First Amendment rights and interfere with their advantageous business relationships in Florida with knowledge that doing so would cause injury within this jurisdiction. These actions were calculated to cause reputational and economic injury in Florida, where Ms. Finn and Mr. Ji reside and operate their businesses. Ahmed's public statements, including his March 28, 2021, appearance on the podcast *DOOMED with Matt Binder*, where he accused Plaintiff Sayer Ji of "profiting from causing death," were disseminated to a national audience, including Florida, with the intent to amplify the report's impact and provoke censorship of Florida-based Plaintiffs. Additionally, Ahmed's coordination with other defendants and others, including government officials and social media platforms, to suppress Plaintiffs' speech further demonstrates his purposeful availment of this forum, as these actions directly affected Florida residents' ability to engage in protected speech and conduct business. Ahmed also has significant additional contacts with Florida concerned with fundraising and political activism, for example, Ahmed's contacts with Florida are sufficient to establish specific jurisdiction, as the claims arise from his intentional conduct targeting Florida residents, and the exercise of jurisdiction comports with fair play and substantial justice given the significant harm suffered by Plaintiffs in this district. On information and belief, Ahmed does substantial fundraising in Florida on behalf of CCDH. For example, in 2025, CCDH received a $130,000 grant from the Miami Foundation, a Florida non-profit. Additionally, The Elevate Prize Foundation is another Florida non-profit corporation that in 2025 awarded CCDH $250,000 in unrestricted funding and an additional $50,000 in unrestricted funding to Ahmed himself.

26. **John and Jane Does 1-10** are currently unidentified federal government officials, employees, contractors, agents, representatives of non-governmental organizations, or private individuals who acted in concert with the Government Defendants and under color of federal law in the coordinated campaign to censor, suppress, or deplatform Plaintiffs as described in this Complaint. These individuals include, but are not limited to: (a) government officials who communicated with the Social Media Companies or other social media platforms to flag, target, or pressure for removal of Plaintiffs' content; (b) government employees who participated in regular meetings with Social Media Companies or other social media platforms where enforcement actions against the Disinformation Dozen were discussed; (c) individuals who contributed to, amplified, or operationalized the CCDH's report within the Government Defendants or government agencies; (d) federal officials who directed, supervised, or facilitated the creation or implementation of systems, policies, or procedures designed to monitor or suppress Plaintiffs' protected speech; (e) representatives of currently unidentified non-governmental organizations who collaborated with the Government Defendants or federal officials to target Plaintiffs through joint initiatives, information sharing, resource coordination, or participation in private-public partnerships focused on content moderation; and (f) individuals employed by or affiliated with non-profit organizations who received federal funding, guidance, or direction to flag, monitor, or suppress Plaintiffs' protected speech while acting as de facto agents of the Government Defendants or other government actors. Plaintiffs intend to amend this Complaint to name these individuals once their identities are revealed through discovery. This Court has subject matter

jurisdiction over claims against these Defendants pursuant to 28 U.S.C. §§ 1331 and 1343 because the claims arise under the United States Constitution and 42 U.S.C. § 1983, and personal jurisdiction because these individuals purposefully directed their activities at residents of this forum, causing harm that they knew or should have known would be suffered in this District.

## STATEMENT OF FACTS

### A. Background

#### The Regulatory Danger Facing Social Media Companies

27. Social media companies are dependent on the federal government's continued goodwill for two reasons: the liability protections of Section 230 of the Communications Decency Act and the threat of antitrust enforcement. Together, these legal vulnerabilities give federal governmental actors leverage over these platforms as the platforms seek to maintain a favorable regulatory environment.

28. Section 230 of the CDA, 47 U.S.C. § 230, provides liability protections for internet publishers of information, including social media companies, that are unavailable to other publishers such as those of printed media. It shields platforms from being treated as the "publisher or speaker" of user-generated content, and it purports to protect platforms from liability for censoring content they deem "objectionable."

29. On information and belief, credible threats to amend or repeal the Section 230 immunities are powerful motivators to social media platforms.

30. The largest and most powerful social media platforms are also greatly concerned about antitrust liability and enforcement, given their dominance in the social

media market. Credible threats to impose antitrust liability and enforcement are powerful motivators to those platforms as well.

31. Federal officials are aware of these regulatory vulnerabilities and the resulting leverage it gives them over those platforms when making requests and demands for content moderation.

32. Beginning before the events at issue in this case, senior government officials and members of Congress began to make explicit and repeated threats linking adverse regulation—particularly the amendment or repeal of Section 230 and the imposition of antitrust liability—to demands for more aggressive censorship of disfavored speakers and viewpoints on social media.

33. Such threats were sufficiently common, forceful, and authoritative that during all times relevant to this case, any reasonable actor in the position of social media platforms in general and the Social Media Companies[3] in particular would have feared that failure to appease the content moderation wishes of powerful government officials could have resulted in unfavorable regulation.

34. Federal government officials used the above-described leverage to bring coercive pressure on social media companies to censor speech that those officials disfavored. This pressure reflected a general pattern, escalating over several years, in

[3] The "Social Media Companies" as referred to herein are the three major social media platforms. Platforms, Inc. ("Meta" or "Facebook") operating the social media platforms known as Facebook and Instagram; Google LLC ("Google"), operating the video-sharing platform known as YouTube; and X Corp., ("X" or "Twitter"), operating the social media platform known as X (formerly Twitter).

which elected officials and the Government Defendants became increasingly aggressive in seeking to control social media speech across a range of subjects

35. Starting as early as 2019, senior federal officials and members of Congress made repeated public statements explicitly linking the prospect of adverse legislative and regulatory action—particularly the amendment or repeal of Section 230 and the initiation of antitrust proceedings—to demands that social media platforms engage in more aggressive content moderation.

36. For example, in April 2019, Speaker of the House Nancy Pelosi warned that Section 230 was a "gift" to tech companies that were "in jeopardy," stating, "I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it. And it is not out of the question that that could be removed."[4]

37. That same month, Representative Cedric Richmond warned Facebook and Google that they had "better" restrict what he and his colleagues saw as harmful content or "[w]e're going to make it swift, we're going to make it strong, and we're going to hold them very accountable." Representative Jerrold Nadler added: "Let's see what happens by just pressuring them."[5] Then-Senator Kamala Harris publicly demanded that Twitter

---

[4] Taylor Hatmaker, *Nancy Pelosi warns tech companies that Section 230 is 'in jeopardy*,' TECHCRUNCH (Apr. 12, 2019, 12:35 PM), https://techcrunch.com/2019/04/12/nancy-pelosi-section-230/.

[5] Vivek Ramaswamy & Jed Rubenfeld, *Save the Constitution from Big Tech*, WALL ST. J. (Jan. 11, 2021), https://www.wsj.com/opinion/save-the-constitution-from-big-tech-11610387105.

suspend President Trump's account, tweeting directly at Twitter's CEO in September and October 2019.[6] Senator Richard Blumenthal urged "a breakup of tech giants" and "even possible repeal" of Section 230 "in large part because their immunity is way too broad."[7]

38. In a January 2020 interview with the New York Times editorial board, then-candidate Joseph Biden ("Biden") stated that Section 230 "should be revoked, immediately should be revoked," as a result of Facebook failing to censor political content.[8] Biden further threatened that Facebook CEO Mark Zuckerberg "should be submitted to civil liability" and even potential criminal prosecution for not censoring such political speech, stating: "Whether he engaged in something that amounted to collusion that in fact caused harm that would in fact be equal to a criminal offense, that's a different issue. That's possible."[9] Then-Senator Harris similarly threatened Social Media Companies, stating in 2019: "If you profit off of hate—if you act as a megaphone for

---

[6] *Missouri, et al. v. Joseph R. Biden, Jr., et al.,* No. 3:22-cv-01213-TAD-KDM (W.D. La. Monroe Division) ("*Missouri v. Biden*") [Doc. 268, Third Amended Complaint ("TAC"), ¶ 186] (citing Harris statements in September and October 2019).

[7] U.S. Senate Comm. on the Judiciary, *Hearing on Breaking the News: Censorship, Suppression, and the 2020 Election*, at 35:45-36:20 (Nov. 17, 2020), https://www.judiciary.senate.gov/committee-activity/hearings/breaking-the-news-censorship-suppression-and-the-2020-election (statement of Sen. Blumenthal).

[8] N.Y. Times Ed. Bd., Joe Biden (Jan. 17, 2020), https://www.nytimes.com/interactive/2020/01/17/opinion/joe-biden-nytimes-interview.html.

[9] *Id.*

misinformation or cyberwarfare, if you don't police your platforms—we are going to hold you accountable as a community."[10]

39. Congressional members used congressional hearings for the same purpose, threatening and criticizing executives of Social Media Companies for failing to censor aggressively enough. During these hearings—which included an antitrust hearing before the House Judiciary Committee on July 29, 2020, a Senate Judiciary Committee hearing on November 17, 2020, and a joint hearing of the House Energy and Commerce Committee's Communications and Technology Subcommittee on March 25, 2021—members of Congress repeatedly linked the prospect of antitrust enforcement and Section 230 reform to demands for increased content moderation.[11] In the March 2021 hearing, Committee Chairs issued a joint statement declaring: "Industry self-regulation has failed. We must begin the work of changing incentives driving Social Media Companies to allow and even promote misinformation and disinformation."[12]

40. In June 2020, the Biden campaign published an open letter and online petition on Facebook itself, demanding that Facebook "proactively stem the tide of false

[10] Scott Shackford, *Kamala Harris Wants to Be Your Online Censor-in-Chief*, REASON.COM (May 7, 2019, 2:05 PM), https://reason.com/2019/05/07/kamala-harris-promises-to-pursue-online-censorship-as-president/.

[11] *Missouri v. Biden*, Doc. 268, TAC, ¶ 188.

[12] See Yaël Eisenstat & Justin Hendrix, *A Dozen Experts with Questions Congress Should Ask the Tech CEOs—On Disinformation and Extremism*, JUST SECURITY (Mar. 25, 2021), https://www.justsecurity.org/75439/questions-congress-should-ask-the-tech-ceos-on-disinformation-and-extremism/.

information by no longer amplifying untrustworthy content."[13] On September 28, 2020, the Biden-Harris campaign sent a formal letter to Facebook accusing it of being a "propagator of disinformation" and demanding "more aggressive" censorship of political speech.[14]

41. Once in office, the Biden White House directly participated in this coercive environment. On May 5, 2021, White House Press Secretary Jen Psaki ("Psaki") publicly stated that the President's "view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections."[15] Psaki coupled these statements with a reminder of the government's regulatory leverage, stating that the President "supports better privacy protections and a robust anti-trust program."[16]

42. The National Security Council's June 2021 "National Strategy for Countering Domestic Terrorism" repeatedly characterized "disinformation and misinformation" as elements of domestic terrorism and stated that the government was

---

[13] Joe Biden, *Our Open Letter to Facebook*, MEDIUM (Jun. 11, 2020), https://medium.com/@JoeBiden/our-open-letter-to-facebook-f6bcec1a3077.

[14] *Missouri v. Biden*, Doc. 268, TAC, ¶ 197 (citing Sept. 28, 2020 Biden-Harris Letter, at https://www.documentcloud.org/documents/7219497-Facebook-Letter-9-28.html).

[15] *Missouri v. Biden*, Doc. 268, TAC, ¶ 197-98 (citing White House Press Briefing by Jen Psaki (May 5, 2021)).

[16] *Id.*

"currently funding and implementing or planning" programs to "strengthen[] user resilience to disinformation and misinformation online for domestic audiences."[17]

43. In June 2022, White House National Climate Advisor Gina McCarthy publicly demanded that social media platforms censor speech contradicting the administration's preferred narratives, stating: "[W]e have to get tighter, we have to get better at communicating, and frankly, the tech companies have to stop allowing specific individuals over and over again to spread disinformation."[18] McCarthy explicitly tied these demands to the prospect of adverse legislation, praising Congress for "trying to hold companies accountable."[19]

**The Federal Bureaucracy Intervenes in Online Speech**

44. These developments among elected and senior officials were accompanied by the growth of a bureaucracy to directly intervene in on-line speech.

45. The federal government developed an infrastructure for monitoring, flagging, and influencing the moderation of online speech. Federal agencies – often acting in coordination with Social Media Companies, non-governmental organizations, and academic institutions—established formal channels for communication and reporting by

---

[17] Exec. Office of the President, National Strategy for Countering Domestic Terrorism (2021) at 9, 20, *available at https://www.govinfo.gov/app/details/GOVPUB-PR-PURL-gpo174845*.

[18] *Missouri v. Biden*, Doc. 268, TAC, ¶¶ 330–332 (citing Alexander Hall, Biden climate advisor demands tech companies censor 'disinformation' to promote 'benefits of clean energy,' FOX NEWS (June 14, 2022)).

[19] *Id*.

social media platforms, deployed advanced surveillance and analytics tools, directed changes to platform algorithms and moderation systems, funded outside research organizations to serve as intermediaries, and created internal task forces and coordination bodies dedicated to shaping what Americans could say and see on social media.[20]

46. The primary agencies/offices responsible for supervision of and intervention in social media censorship / content moderation on behalf of the federal government in the period beginning in about 2019 were the Government Defendants

47. On information and belief, each of the Government Defendants developed the above-described infrastructure within their own agency or office, including

a. special portals, reporting channels, and / or flagging systems for flagging and reporting online content to the Social Media Companies;
b. social media monitoring, analytics, and /or tracking tools;
c. collaborations with non-governmental entities engaged in social media monitoring, analytics, and tracking;
d. internal social media tracking and monitoring systems and specialized personnel assigned to this task; and
e. participation in intra-governmental organizations to coordinate content monitoring, analysis, and moderation.

---

[20] Staff of H.R. Comm. on the Judiciary & Select Subcomm. on the Weaponization of the Fed. Gov't., 118th Cong., *The Censorship-Industrial Complex: How Top Biden White House Officials Coerced Big Tech to Censor Americans, True Information, and Critics of the Biden Administration,* (Interim Staff Report, May 1, 2024) (hereinafter "CIC Report").

48. On information and belief, among the tools used by the Government Defendants when seeking to influence online speech were and are data tracking, data visualization, and data dashboards. These tools aggregate public and backend data obtained from social media platforms to identify anchors and influential spreaders of content challenging official narratives, including vaccine safety, efficacy, and informed consent. Examples of such tools are the CoVaxx Dashboard and MIT Media Lab's "COVID-19" Story visualization platform. MIT Media Lab's "COVID-19 Story" visualization platform, for example, launched in 2020, ingested Twitter data (e.g., retweets, mentions, and interactions) to generate interactive graphs of disinformation clusters. The platform applied network analysis to tag and connect users based on behavioral patterns, explicitly labeling accounts like those of Plaintiffs as nodes in "anti-vaccine" or "anti-mask" networks purportedly radiating misinformation to "persuadable" audiences, thereby facilitating targeted suppression.

49. Beginning around 2019 and thereafter, the Government Defendants adopted a collection of censorship euphemisms, inventing categories such as "misinformation," "disinformation," and "malinformation" designed to give government actors broad discretion to target truthful speech that contradicted their preferred political narratives.[21] In this new vocabulary, governmental officials purported that their speech

[21] Cybersecurity & Infrastructure Sec. Agency, We're in This Together. Disinformation Stops with You (2020), https://www.cisa.gov/sites/default/files/publications/SLTTCOVIDToolkit_FINAL_508.pdf (last visited April 10, 2026).

suppression advanced the interest of "healthy information ecosystems," "healthy information environments," or "healthy news environment."

50. On information and belief, this infrastructure and these activities on the part of the Government Defendants remain in place and are ongoing to this day.

51. The role of each of the Government Defendants in this infrastructure is discussed below.

52. **CISA**: Brian Scully served as chief of CISA's Mis-, Dis-, and Malinformation Team, which, before the Biden Administration, had been known as the Countering Foreign Influence Task Force, but transferred into domestic operations. Beginning in 2018, CISA implemented and operated a "switchboarding" system through which officials could identify content on social media they deemed to be disinformation, forward it to CISA, and CISA would in turn relay it to the social media platforms for action.[22]

53. CISA maintained multiple layers of regularly scheduled meetings with Social Media Companies. The primary vehicle was the "Industry" meetings, which began in 2018 and included Facebook, Twitter, Microsoft, Google/YouTube, Reddit, LinkedIn, and sometimes the Wikipedia Foundation. Government participants included CISA, the Department of Justice, the Office of the Director of National Intelligence, DHS, and the FBI's Foreign Influence Task Force. These meetings were monthly but ultimately increased to biweekly; in addition, CISA hosted bilateral meetings with individual platforms and separate interagency planning meetings. CISA has disclosed five distinct

[22] *Missouri v. Biden*, 680 F. Supp. 3d 630 (W.D. La. 2023)

sets of recurring meetings with platforms that involved discussions of misinformation, disinformation, and censorship.[23]

54. CISA cultivated extensive relationships with non-governmental organizations that served as intermediaries in its content-moderation efforts. CISA established relationships with researchers at Stanford University, the University of Washington, Graphika, and the Virality Project. All of these entities were involved in online monitoring to analyze and police speech.[24]

55. The Virality Project, in particular, was a short-term research coalition launched in early 2021 by the Stanford Internet Observatory to monitor, analyze, and share real-time insights on COVID-19 vaccine-related mis-and disinformation across social media. The Virality Project used a “ticket system” where partner organizations identified content of concern, which content was then analyzed and shared with external partners. An Executive Editor of the Virality Project’s final report, Renee DiResta, stated that the purpose of that organization was “to get around unclear legal authorities, including very real First Amendment questions” that would arise if the work of such organizations had been undertaken directly by the government. CISA also funded a non-profit, the Center for Internet Security, that channeled disinformation reports from state and local officials to the platforms.[25]

---

[23] *Id.*

[24] *Id.*

[25] *Id.*

56. CISA also maintained a "tracking spreadsheet" of its misinformation reports to platforms and asked the platforms to report back on how they handled each referral. Social media platforms responded swiftly to CISA's reports and also reported to CISA whenever they updated their content-moderation policies to make them more restrictive. CISA made no attempt to determine whether the flagged content originated from foreign or domestic sources before forwarding it to platforms for review.[26]

57. Jen Easterly, Director of CISA, exemplified the growing enthusiasm for federal control over online speech. CISA is responsible for safeguarding critical infrastructure and federal civilian networks against cyber and physical threats. In November 2021, Easterly announced that she would "grow and strengthen" CISA's Mis-, Dis-, and Malinformation team, redefining the concept of "infrastructure" to encompass Americans' thoughts and beliefs. Easterly declared that CISA was "in the business of critical infrastructure, and the most critical infrastructure is our cognitive infrastructure, so building that resilience to misinformation and disinformation, I think, is incredibly important."[27] Easterly further asserted that Americans should not be permitted to "pick [their] own facts," stating: "I think [it] is really, really dangerous if you get to pick your own facts."[28]

---

[26] *Id.*

[27] Maggie Miller, *Cyber agency beefing up disinformation, misinformation team*, THE HILL (Nov. 10, 2021, 2:52 PM), https://thehill.com/policy/cybersecurity/580990-cyber-agency-beefing-up-disinformation-misinformation-team/.

[28] *Id.*

58. By 2022, the federal government had deployed a small army of officials across the Government Defendants—who were actively engaged in shaping what Americans could say and see on social media. CISA Director Easterly asserted that platforms needed to "get more comfortable with government" involvement in their editorial decisions—an acknowledgement that the federal government sought to establish itself as a permanent participant in the curation of online speech.[29]

59. **GEC**: The GEC originated in 2011 under Executive Order 13584 as the Center for Strategic Counterterrorism Communications and operated under the Bureau of Public Affairs using data analytics and funding for external research to combat so-called disinformation. The GEC maintained regular meetings with social media platforms. The GEC's senior leadership met with platforms every few months, sometimes quarterly, bringing between five and ten officials—including deputy coordinators, team chiefs, and working-level staff—to each meeting. These meetings focused on the "tools and techniques" of stopping the spread of disinformation, and the platforms sent their content-moderation teams. In addition, the GEC's Technology Engagement Team met with the platforms on a more frequent basis.[30]

60. The GEC also embedded a permanent liaison in Silicon Valley. Samaruddin Stewart, the GEC's Senior Advisor, was stationed there for the purpose of

---

[29] *Missouri v. Biden*, Doc. 268, TAC, ¶¶ 349–355 (citing text of Jen Easterly).

[30] *Missouri v. Biden*, 680 F. Supp. 3d 630 (W.D. La. 2023)

meeting with platforms about disinformation and established a series of meetings regarding "countering disinformation" and to explore "shared interests and alignment of mutual goals."[31]

61. The GEC, like CISA, worked closely with the Stanford Internet Observatory and the Virality Project. Secretary of State Anthony Blinken publicly acknowledged this collaboration at a Stanford University event in October 2022, stating that the State Department was "engaging in collaboration and building partnerships" with institutions like Stanford to combat the spread of propaganda.[32]

62. **FBI**: The FBI participated in a standing "industry working group" organized through CISA, alongside Facebook, Twitter, Google/YouTube, Microsoft, Yahoo!, the Wikimedia Foundation, and Reddit. Representatives of CISA, the DHS Intelligence & Analysis Division, the Office of the Director of National Intelligence, the DOJ National Security Division, and the FBI's Foreign Influence Task Force ("FITF") all participated.[33]

63. Elvis Chan, Assistant Special Agent in Charge of the Cyber Branch for the FBI's San Francisco Division ("Chan"), was one of the primary officials communicating with social media platforms on the FBI's behalf. These Industry meetings began as early as 2017 and were continuing through at least late 2022. Chan also hosted separate bilateral meetings with each platform, held quarterly meetings that increased to monthly

[31] *Id.*

[32] *Id.*

[33] *Id.*

and weekly as elections approached. Between three and ten FITF officials and as many as a dozen FBI agents attended, meeting with senior trust-and-safety and content-moderation personnel from the platforms.[34]

64. The FBI communicated with the platforms through two encrypted channels: Signal and Teleporter. Chan estimated he sent flagging emails to seven platforms one to six times per month during 2020, each identifying anywhere from one to dozens of specific accounts, URLs, or other indicators for evaluation under the platforms' content-moderation policies. The FBI requested that the platforms report back on actions taken and followed up at quarterly meetings.[35]

65. **DHS**: The DHS participated in the government's coordinated engagement with social media platforms principally through its component agency, CISA, and through its Intelligence & Analysis Division ("I&A"). The I&A Division was among the federal entities—alongside CISA, the Office of the Director of National Intelligence, the DOJ National Security Division, and the FBI's Foreign Influence Task Force—that participated in the standing "Industry" working group meetings with Facebook, Twitter, Google/YouTube, Microsoft, Yahoo!, the Wikimedia Foundation, and Reddit. Yoel Roth, then-Head of Site Integrity at Twitter, confirmed in a sworn declaration that since 2018 he had "regular" and "weekly" meetings with the Department of Homeland Security, the FBI,

---

[34] *Id.*

[35] *Id.*

the Office of the Director of National Intelligence, and industry peers.[36]

66. A draft of the DHS Quadrennial Homeland Security Review stated that the department planned to target "inaccurate information" on a wide range of topics, including the origins of the COVID-19 pandemic and the efficacy of COVID-19 vaccines. CISA's work in coordinating with social media platforms on disinformation was itself carried out in engagement with DHS and the Center for Disease Control.[37]

67. Perhaps the most disturbing development in this evolution was the creation of the "Disinformation Governance Board" within the DHS, announced on April 27, 2022. The Disinformation Governance Board was designed to provide a stronger bureaucratic structure to the censorship apparatus that was already in place within DHS and across the federal government. The Board's charter called for it to "coordinate, deconflict, and harmonize departmental efforts to address MDM" and to serve as "the Department's internal and external point of contact for coordination with . . . the private sector . . . regarding MDM."[38] DHS Secretary Mayorkas confirmed in August 2021 that DHS was working with the tech companies to address purported disinformation, and that this was a government-wide effort being pursued "across the federal enterprise."[39]

---

[36] *Id.*

[37] *Id.*

[38] *Missouri v. Biden*, Doc. 268, TAC, ¶ 288.

[39] *Id*. ¶¶ 283–285.

68. **FCC**: On information and belief, the FCC collaborates with the other Government Defendants in monitoring and communicating with social media platforms, including the Social Media Companies. In approximately April 2022, the FCC directly pressured the social platform and messaging app "Community" to ban Plaintiff Rizza Islam's account for allegedly violating the FCC's COVID-19 misinformation policies. This intervention resulted in the immediate termination of Rizza Islam's account, which served as a critical channel for his health advocacy and educational outreach. The FCC's involvement was particularly problematic given its statutory power to issue or revoke broadcasting licenses and impose substantial fines on regulated entities, creating an implicit threat of adverse regulatory action for platforms that failed to comply with censorship demands. Through public statements, private communications, and regulatory guidance, FCC officials signaled to platforms that removing Plaintiffs' content would be viewed favorably in regulatory matters, effectively converting private content moderation decisions into state action subject to First Amendment constraints. The FCC's actions directly contributed to the suppression of Plaintiffs' constitutionally protected speech, causing substantial economic, reputational, and expressive harm that continues to this day.

69. The allegations contained here present just a small picture of the beauracratic organization and structure that the Government Defendants had assembled and were already putting to use to monitor, pressure, encourage, and coerce social media platforms as of the time of the publication of CCDH's reports. The Government

Defendants then unleashed this federal apparatus to target, censor, and deplatform the Disinformation Dozen.

**B. CCDH Attacks the "Disinformation Dozen"**

70. The Center for Countering Digital Hate, Inc. ("CCDH") and its chief executive, Imran Ahmed, exploited the atmosphere of coercion and censorship described above.

71. On or about March 24, 2021, CCDH published *The Disinformation Dozen* (the "Disinformation Dozen Report"), which accused 12 individuals,[40] including each of the Plaintiffs, of being responsible for "up to 65%" of anti-vaccine content on social media generally, and "up to 73%" of the anti-vaccine content on Facebook specifically.[41]

---

[40] There are actually 13 individuals named on the CCDH's list, but it still referred to them as the "Disinformation Dozen," which was just the first of many liberties CCDH took with the facts.

[41] CCDH, *The Disinformation Dozen: Why Platforms Must Act on Twelve Leading Online Anti-Vaxxers* (Mar. 24, 2021). A copy of the Disinformation Dozen Report is attached to this Complaint as **Exhibit A**.




72. The clear implication was—and is—that if these twelve people could be effectively silenced, the vast majority of anti-vaccine “misinformation” could be removed.

73. CCDH recklessly published and promoted its Disinformation Dozen Report to stoke fear and anger against—and discredit, *i.e.*, destroy the reputations of—the so-called “Disinformation Dozen” (the “Disinformation Dozen”). Imran Ahmed promoted the Disinformation Dozen Report on an episode of *DOOMED with Matt Binder*, published on or about March 29, 2021, in which Ahmed claimed that the Plaintiffs were defined by “a psychological need . . . to cause pain and to cause chaos” and specifically accused Plaintiff Sayer Ji of “profiting from causing death.”[42]

[42] Matt Binder, The Anti-Vaxxer Disinformation Dozen (w/ Imran Ahmed), *DOOMED*, (Mar. 29, 2021), https://metacast.app/podcast/doomed-with-matt-binder/WZKfZ5JO/160-the-anti-vaxxer-disinformation-dozen-w-imran-ahmed/a5VWcYGL.

74. Defendant Ahmed also directly targeted Plaintiff Ben Tapper, repeating Ahmed's hyperbolic and unsubstantiated claims on local news programs in Nebraska, where Dr. Tapper lives and works. Mr. Ahmed stated as fact: "[t]welve individuals are responsible for two-thirds of the misinformation shared on social media." Mr. Ahmed falsely continued: "He's [Ben Tapper] someone who seeks to undermine vaccines. Full stop."

75. The Disinformation Dozen Report targeted Plaintiffs and the others as leading sources of so-called "misinformation," urging social media platforms to act against them, including explicitly calling for censoring and deplatforming them.

76. CCDH's Disinformation Dozen Report became a central tool used by the Government Defendants to target and censor Plaintiffs.

77. The Disinformation Dozen Report purported to rely on an "analysis of social media content" to identify individuals spreading misinformation. However, CCDH failed to disclose any detailed methodology or criteria for its analysis.

78. The Disinformation Dozen Report:

a. Did not provide data sources, algorithms, or metrics used to calculate the claim that the Disinformation Dozen were responsible for "65%" of vaccine misinformation.

b. Omitted any explanation of how content was categorized as "misinformation" or the qualifications of those making such determinations.

c. Lacked peer review or independent verification, rendering its conclusions unverifiable and unscientific.

79. CCDH's failure to articulate a transparent and reproducible methodology raises significant questions about bias and the reliability of its conclusions. By focusing disproportionately on individuals with large followings, such as Plaintiffs, CCDH appeared to prioritize their visibility and influence over any objective assessment of their content's accuracy or public harm.

80. CCDH explicitly called for social media platforms to remove or restrict the accounts of the listed individuals. This recommendation was made without presenting concrete evidence linking the Plaintiffs to demonstrable harm or establishing that their content violated applicable laws. The report's inflammatory language and conclusory claims were crafted to provoke a reaction from platforms and the public, effectively weaponizing the report as a tool for censorship.

**Deplatform the Disinformation Dozen**

The most effective and efficient way to stop the dissemination of harmful information is to deplatform the most highly visible repeat offenders, who we term the Disinformation Dozen. This should also include the organisations these individuals control or fund, as well as any backup accounts they have established to evade removal.

1. Joseph Mercola
2. Robert F. Kennedy, Jr.
3. Ty and Charlene Bollinger
4. Sherri Tenpenny
5. Rizza Islam
6. Rashid Buttar
7. Erin Elizabeth
8. Sayer Ji
9. Kelly Brogan
10. Christiane Northrup
11. Ben Tapper
12. Kevin Jenkins

81. CCDH published a follow-up report, *The Disinformation Dozen: The Sequel*, on or about April 28, 2021, (the "Sequel Report") which again pressured Social Media Companies and Big Tech to increase censorship of the "Disinformation Dozen." A copy of The Sequel Report is attached to this Complaint as **Exhibit B**.




82. CCDH's campaign against the Disinformation Dozen was not limited to seeking censorship of their speech. CCDH also set out to financially destroy them. In or about 2022, CCDH published a report titled *Pandemic Profiteers*,[43] (the "Pandemic Profiteers Report", together with the Disinformation Dozen Report and the Sequel Report, the "CCDH Reports")[44] which specifically targeted Plaintiffs Dr. Sherri Tenpenny and Sayer Ji, among others, in sections devoted to their respective business models. The

---

[43] Center for Countering Digital Hate, *Pandemic Profiteers* (2022), https://counterhate.com/wp-content/uploads/2022/05/210601-Pandemic-Profiteers-Report.pdf (last visited April 10, 2026).

[44] The CCDH Reports were each available in Florida at and after the time of their publication via CCDH's website and were accessed in Florida at or shortly after the time of public by many third-parties, including Florida resident Peter Boutan.

Pandemic Profiteers Report boasted of CCDH's extensive research into Plaintiffs' online monetization strategies, claiming that it "details how individual anti-vaxxers raise money through donations and sales" and that it would "break down how anti-vaxxers fund their fight against science."[45]

> **How leading anti-vaxxers collaborate**
>
> The rest of this report details how individual anti-vaxxers raise money through donations and sales to carry on promoting their views and products on social media.
>
> In this report, CCDH exposes the network of businesses, nonprofits, political action committees, affiliate schemes and social media marketing empires that form the AntiVaxx Industry. While small businesses struggled through the pandemic, these enterprises reaped at least $1.5 million in PPP loans from the US government. From books on the latest 'Great Reset' conspiracy to propaganda films targeting the vaccine hesitant, we break down how anti-vaxxers fund their fight against science and how they specifically shifted their strategies to profit during the pandemic.

83. The Pandemic Profiteers Report was, by its own terms, designed to disrupt Plaintiffs' revenue and funding. Its table of contents devoted an entire section to identifying how "twelve leading anti-vaxxers use social media to generate funding."[46] The report's stated recommendations were targeted at preventing fund raising, including through social media deplatforming and the disruption of their payment-processing relationships. Specifically, the report recommended that platforms reduce Plaintiffs' "ability to reach a large audience online" so they "cannot broadcast their deadly

---

[45] CCDH, *Pandemic Profiteers*, at 5.

[46] CCDH, *Pandemic Profiteers*, Table of Contents.

messages, recruit new anti-vaccine campaigners, or raise funding from donations or products."[47]

CCDH
Center for Countering Digital Hate

## Recommendations

This report demonstrates that the use of social media is instrumental to the business and campaigning strategies of anti-vaxxers. When their ability to reach a large audience online is reduced, anti-vaxxers cannot broadcast their deadly messages, recruit new anti-vaccine campaigners, or raise funding from donations or products.

84. CCDH boasted that its deplatforming campaign was already having its intended effect—inflicting financial pain on Plaintiffs and others. The Pandemic Profiteers Report noted that "[l]egal complaints from organizations associated with leading anti-vaxxers reveal that deplatforming has prevented them from reaching a wider audience and raising funds."[48]

**Deplatforming works**

Legal complaints from organisations associated with leading anti-vaxxers reveal that deplatforming has prevented them from reaching a wider audience and raising funds.[266]

85. CCDH recommended actions explicitly designed to interfere with Plaintiffs' payment processing activities, which CCDH pejoratively characterized as "profiteering":[49]

---

[47] CCDH, *Pandemic Profiteers*, Recommendations section.

[48] CCDH, *Pandemic Profiteers*, "Deplatforming works" section.

[49] *Id.*

> **Add warning screens when users click links to misinformation sites**
>
> Add a warning screen in front of third-party websites housing content associated with vaccine misinformation profiteering. Additionally, platforms should stand up a task force

86. In the Appendix to the Pandemic Profiteers Report, CCDH provided revenue figures for three entities associated with Sayer Ji and one entity associated with Dr. Tenpenny. The Appendix linked out to events, X posts, and websites associated with or promoted by Dr. Tenpenny and Sayer Ji—with donation, payment, and membership options displayed prominently—and further linked to Dun & Bradstreet reports and IRS Form 990s for these entities.[50] CCDH's footnotes embedded in the report linked to events, webinars, websites, X posts, Instagram posts, and many other forums where Dr. Tenpenny and Sayer Ji supported themselves through fundraising and ticket sales through payment processors, including PayPal.[51]

87. Thus, CCDH's own reports demonstrate its actual knowledge of Plaintiffs' business relationships with payment processors, including PayPal and Venmo.[52] CCDH's reports explicitly traced Plaintiffs' fundraising, donations, and what it characterized as "profiteering," including through PayPal and other payment processors. CCDH and Ahmed were not merely seeking to silence Plaintiffs' speech—they were seeking to destroy Plaintiffs' livelihoods.

---

[50] CCDH, *Pandemic Profiteers*, Appendix.

[51] *See* CCDH, *Pandemic Profiteers*, footnotes 164–178 and 232–247.

[52] *See, e.g.,* CCDH, *Pandemic Profiteers*, linking directly to the donation page for Stand for Health Freedom, an entity associated with Sayer Ji, which lists PayPal and Venmo as available payment processors).

88. Critically, the social media platforms that CCDH sought to weaponize against Plaintiffs themselves recognized the CCDH Reports as fundamentally unreliable. Within days of the report's publication, by March 31, 2021, Facebook had determined internally that "most of the accounts" associated with the CCDH's Disinformation Dozen did not violate its policies and would not be removed under its content moderation policies.[53] Facebook's internal assessment further concluded that some of the entities identified in the CCDH report "were completely benign."[54]

89. In internal communications in July 2021, Facebook employees acknowledged that CCDH's Disinformation Dozen Report was "both flawed" and yet was nevertheless "being repeatedly cited by those who were alleging that Facebook was 'contributing significantly to vaccine hesitancy.'"[55] One Facebook employee lamented that CCDH's data was "now being used to guide major governmental policy decisions" and expressed concern that the Biden White House may not be making decisions "based on grounded data."[56]

---

[53] CIC Report at 20 (citing Facebook internal communications, Mar. 31, 2021), Ex. 20.

[54] *Id*. at 22 (citing internal email between Facebook personnel, Apr. 7, 2021), Ex. 20

[55] *Id*. at 35 (citing internal email between Facebook personnel, July 16, 2021), Ex. 57

[56] *Id*. (citing internal email between Facebook personnel, July 16, 2021), Ex. 57

**From:** [redacted]@fb.com>
**Date:** Friday, July 16, 2021 at 11:58 AM

CONFIDENTIAL TREATMENT REQUESTED - NOT FOR DISTRIBUTION - MEMBERS & STAFF ONLY META-118HJC-0058

**To:** [redacted]@fb.com>, [redacted]@fb.com>, [redacted]@fb.com>, [redacted]@fb.com>, [redacted]@fb.com>, [redacted]@fb.com>
**Cc:** [redacted]@fb.com>, Brian Rice <[redacted]@fb.com>, [redacted]@fb.com>, [redacted]@fb.com>, [redacted]@fb.com>, [redacted]@fb.com>, [redacted]@fb.com>, [redacted]@fb.com>, [redacted]@fb.com>, [redacted]@fb.com>, [redacted]@fb.com>, [redacted]@fb.com>, [redacted]@fb.com>
**Subject:** Re: Push back on CCDH vaccine misinformation report

Thanks all!

It seems like these data are now being used to guide major governmental policy decisions.

If they are misleading or incorrect, that can be damaging to (our and their shared) efforts to arrive at productive and substantive solutions, so I think critical we establish some shared understanding of truth. People also trust the USG to not put out information that is false or misleading and to have policy decisions be based on grounded data -- if USG is not doing so, this can result in worse outcomes for the broader ecosystem of efforts here and be counterproductive to our shared goal of improving health.

For example, it seems like the WH thinks that if we just removed these 12 accounts, this would cause 65 percent of anti-vax misinformation to go away ("there's about 12 people who are producing 65 percent of anti- vaccine misinformation on social media platforms"). If this were true, I also would want us to do this and feel tremendous urgency that we had not -- including exerting policy pressure as they are doing -- but it unfortunately isn't that simple. I'm sure we can do better, and would love to discuss how, but it's much more nuanced -- and we have executed on many of the obvious things. (Understand that some of the accounts are still on our platform, but removing them won't have any appreciable impact on anti-vax misinfo, which I think is the actual substantive goal).

90. Facebook further noted internally in July 2021 that it was "in a tough spot as the WH's case—while wrong—is very simple: 12 people are responsible for the vast majority of the anti-vaccine content on Facebook and they're (almost) all still active on the platform."[57] Facebook recognized the "unrelenting staying power of the misleading stat that 12 people are responsible for 65% of COVID/vaccine misinformation," which had

[57] *Id*. at 45 (citing internal email from Facebook staff, July 24, 2021), Ex. 66

been featured twice "in comments last week from President Biden."[58] Facebook's own data showed that, over the preceding two months, not a single post in its most-viewed vaccine content was from a Disinformation Dozen-associated account.[59]

91. On August 18, 2021, Monika Bickert, Facebook's Vice President of Content Policy, publicly stated that CCDH's central claim was false: "People who have advanced this narrative contend that these 12 people are responsible for 73% of online vaccine misinformation on Facebook. There isn't any evidence to support this claim."[60] Ms. Bickert continued: "In fact, these 12 people are responsible for about just 0.05% of all views of vaccine-related content on Facebook."[61] Facebook further stated that CCDH's report, contrary to its claims, "did not analyze, or provide evidence that it analyzed representative samples of Facebook posts about COVID-19 vaccines nor did CCDH provide an explanation for how it defined or identified content it considered to be 'anti-vax' or how it chose the 30 groups included in its analysis."[62]

92. Thus, by Facebook's own analysis, the central premise of the Disinformation Dozen Report was off by a factor of more than one thousand. The CCDH

---

[58] *Id*. at 45–46 (citing internal Facebook communications, July 26, 2021), Ex. 70

[59] *Id*. at 46, Ex. 70

[60] Monika Bickert, *How We're Taking Action Against Vaccine Misinformation Superspreaders*, META (Aug. 18, 2021), https://about.fb.com/news/2021/08/taking-action-against-vaccine-misinformation-superspreaders/.

[61] *Id*.

[62] *Id*.; *see also* CIC Report at 49.

Reports were neither science nor credible analysis. They were pseudo-science designed to suppress the speech of Plaintiffs.

93. On information and belief, prior to and after the publication of the Disinformation Dozen Report, CCDF and Ahmed systematically coordinated and conspired with the Government Defendants and other government officials, media outlets, and others to achieve the goal of infringing Plaintiffs' First Amendment speech and interfere with their contracts and advantageous business relationships. Two public record examples of such coordination were CCDH's collaboration with Anti-Vax Watch to prepare the CCDH Reports (as stated therein) and CCDH and Imran Ahmed's direct lobbying of the Surgeon General's Office to generate White House support to use government pressure to coerce social media platforms to censor the Disinformation Dozen, *see infra*.

**C. Government Officials Seize on the Disinformation Dozen Report**

94. In the days immediately following the publication of the Disinformation Dozen Report, government officials publicly endorsed its findings and the censorship it recommended.

95. Viewed as a whole, the uncritical acceptance of the conclusions of the CCDH Reports, notwithstanding their facially dubious character, along with the timing and breadth of the censorship campaign brought against Plaintiffs, demonstrates coordination between CCDH, Imran Ahmed and government actors including the Government Defendants to infringe Plaintiffs' First Amendment rights and interfere with their contracts and business relationships.

96. *On the same day as the publication of the Disinformation Dozen Report*—March 24, 2021—Attorneys General from 12 states sent a letter to the Facebook and Twitter CEOs demanding that the Disinformation Dozen be deplatformed, explicitly citing to the Disinformation Dozen Report.[63] This coordinated action by 12 state governments was necessarily coordinated in advance by CCDH and Imran Ahmed.

97. The very next day, a House Energy & Commerce subcommittee held a hearing titled "Disinformation Nation: Social Media's Role in Promoting Misinformation." Lawmakers, armed with the CCDH findings, grilled tech CEOs (including Mark Zuckerberg, Jack Dorsey, and Sundar Pichai (CEOs of the respective Social Media Companies) and pressed them on why the "Disinformation Dozen" were still active, urging tougher action against anti-vaccine misinformation. This hearing was also necessarily coordinated in advance by CCDH and Imran Ahmed.

98. On or about May 14, 2021, approximately two weeks after the Sequel Report, Senator Amy Klobuchar, citing the Disinformation Dozen Report, stated: "I have called on social media platforms to take action against the accounts propagating the majority of these lies." Senator Klobuchar thereafter co-wrote a letter with Senator Ben Ray Lujan pressuring Dorsey and Zuckerberg to remove the Disinformation Dozen from their platforms based on the CCDH's Disinformation Dozen Report.

[63] *See, e.g.,* Letter from Willian Tong, Att'y Gen. of Conn., et al., to Jack Dorsey, CEO, Twitter, Inc. & Mark Zuckerberg, CEO, Facebook, Inc. (March 24, 2021) https://portal.ct.gov/-/media/AG/Press_Releases/2021/AG-Letter-to-Tech-CEOs.pdf.

99. On July 15, 2021, Surgeon General Vivek Murthy released an official Advisory titled *Confronting Health Misinformation* (the "Advisory") which referenced the CCDH's Disinformation Dozen Report as an authoritative source. Murthy adopted the CCDH's report and cited the Disinformation Dozen Report as the sole source for the claim that "[r]esearchers have identified leading sources of COVID-19 misinformation, including misinformation 'super-spreaders.'"[64] According to Eric Waldo, the Senior Advisor to the Surgeon General, to the best of his memory, the Center for Countering Digital Hate briefed the Office of the Surgeon General about the so-called "Disinformation Dozen" in anticipation of the Advisory .[65]

100. That same day, White House Press Secretary Jen Psaki held a joint press briefing with Surgeon General Murthy and publicly criticized "Facebook specifically for [its] handling of COVID misinformation," listing "four steps" the White House believed Facebook should be taking. Psaki directly cited CCDH's claim that "12 people"—the so-called Disinformation Dozen—were "producing 65 percent of anti-vaccine misinformation on social media platforms" and stated that it was "important to take faster action against

---

[64] *See also* Office of the Surgeon Gen., U.S. Dep't of Health and Hum. Servs., Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment (2021), https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf. The only reference to so-called "super-spreaders" in the Surgeon General's report was made in reference to the Disinformation Dozen.

[65] *Missouri v. Biden*, Doc. 210-1 at 42-48.

harmful posts."[66] Psaki then added: "[W]e are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team."[67]

101. On information and belief, the "COVID-19 team" referred to by the White House here is a combined task-force drawn from the various Government Defendants.

102. The following day, Psaki again called out Facebook, citing CCDH's claim that 12 people were responsible for most of the problematic content online, and adding that there were "additional steps" that platforms could take.[68]

103. On July 16, 2021, President Biden himself publicly pressured Social Media Companies to censor the Disinformation Dozen, stating that platforms like Facebook "are killing people." [69]

---

[66] CIC Report at 35-37 (citing Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy, July 15, 2021) (internal email from Facebook personnel to Nick Clegg, July 15, 2021), Ex. 55.

[67] *Missouri v. Biden*, Doc. 268, TAC, ¶ 221-230 (citing to The White House, Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy, July 15, 2021, at https://bidenwhitehouse.archives.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/).

[68] CIC Report at 37 (citing Press Briefing by Press Secretary Jen Psaki, July 16, 2021, The White House).

[69] Nandita Bose and Elizabeth Culliford, *Biden says Facebook, others 'killing people' by carrying COVID misinformation*, REUTERS (July 16, 2021, 8:09 PM), https://www.reuters.com/business/healthcare-pharmaceuticals/white-house-says-facebooks-steps-stop-vaccine-misinformation-are-inadequate-2021-07-16/.

104. Four days later, the White House explicitly threatened to seek the amendment or repeal of Section 230's liability protection. Per the White House communications director "[t]he White house is assessing whether social media platforms are legally liable for misinformation spread on their platforms."[70] USA Today reported at the time that "[r]elations are tense between the Biden administration and social media platforms, specifically Facebook, over the spread of misinformation online." [71]

105. Congressional representatives extended public pressure campaign to cut off Plaintiffs' ability to receive payment. On December 15, 2021, Representative Jake Auchincloss led a group of members of Congress in a letter to PayPal specifically requesting "deactivation of the accounts of the 'Disinformation Dozen.'" The letter was joined by 18 members of Congress. On information and belief, this action was taken at the urging of and through coordination by CCDH and Imran Ahmed.

106. The "Disinformation Dozen" became a focal point of White House interest. Rob Flaherty ("Flaherty"), former Deputy Assistant to the President and Director of Digital Strategy, and Andrew Slavitt ("Slavitt"), former White House Senior COVID-19 Advisor, appear to have run point on the White House's communications with social media platforms regarding the Disinformation Dozen and COVID-19 more generally.

---

[70] Matthew Brown, *'They should be held accountable': White House reviews platforms' misinformation liability*, USA TODAY (July 20, 2021, 8:06 PM), https://www.usatoday.com/story/news/politics/2021/07/20/white-house-reviews section-230-protections-covid-misinformation/8024210002/.

[71] *Id.*

107. In this role, Slavitt and Flaherty met and communicated regularly with all three Social Media Companies and other social media platforms, demanding and receiving reports and data from them concerning the Disinformation Dozen and other COVID-19 related disinformation issues.[72] On information and belief, Slavitt and Flaherty shared this information with the Government Defendants for the purposes of coercing social media platforms, including the Social Media Companies.

108. Slavitt and Flaherty's interactions with social media platforms, and the Social Media Companies in particular, were often threatening and ominous. In one email Slavitt informed Facebook that we are "internally considering our options on what to do about"[73] Facebook's purported failure to adequately control COVID-19 disinformation. And in another, he indicated that the White House had informants inside of Facebook that reported to the White House on Facebook's internal business.[74] At a meeting with YouTube, Flaherty indicated that concerns about vaccine misinformation were shared at "the highest (and I mean the highest) levels of the White House".[75]

109. On information and belief, Slavitt, Flaherty, and other White House officials shared the information generated from these communications and this espionage with

---

[72] *Missouri v. Biden*, 680 F. Supp. 3d 630 (W.D. La. 2023).

[73] CIC Report at 34 (citing email from Rob Flaherty to Facebook personnel, July 15, 2021), Ex. 51.

[74] CIC Report, Ex. 29.

[75] *Missouri v. Biden*, 680 F. Supp. 3d 630 (W.D. La. 2023)

the Government Defendants for the purpose of coercing social media platforms, including the Social Media Companies into censoring the Plaintiffs.

110. Further, on information and belief, President Biden and the White House staff coordinated the Government Defendants' actions and directed them to conduct a campaign of coercion against the Social Media Companies to censor the Plaintiffs and otherwise moderate information and posts regarding COVID-19 that appeared on their platforms. This coercive campaign utilized the infrastructure and lines of communication the Government Defendants had developed in the previous two-three-year period.

111. A coordinated campaign of coercion has been acknowledged by both Facebook and Google. In an August 26, 2024 letter to Congress, Mark Zuckerberg, Facebook's CEO, publicly confirmed the coercion stating that "senior officials from the Biden Administration . . . repeatedly pressured [Facebook's] teams for months to censor certain COVID-19 content."[76] Zuckerberg further acknowledged that Facebook "made some choices that, with the benefit of hindsight and new information, [he] wouldn't make today," and specifically referenced the government revolving around vaccine.[77]

112. By a September 23, 2025, letter to the Chairman of the Committee on the Judiciary, Google also admitted that the Biden Administration had "unacceptabl[y] and wrong[ly]…created a political atmosphere that sought to influence the actions of platforms

---

[76] Letter from Mark Zuckerberg, Founder, Chairman & CEO, Meta Platforms, Inc., to Jim Jordan, Chairman, Comm. on the Judiciary, U.S. House of Representatives (Aug. 26, 2024), https://prod-i.a.dj.com/public/resources/documents/meta-letter-082024.pdf.

[77] *Id*.

based on their concerns regarding misinformation" surrounding COVID-19.[78]

### D. Social Media Companies Censored Plaintiffs in Response to Coercion by the Government Defendants

113. Each of the Social Media Companies perceived the pressure alleged above as coercive and significant encouragement and as a means of joint action by each of the Government Defendants (each and collectively) to participate in each of the Social Media Companies' decision-making processes regarding the censorship of the Disinformation Dozen.

114. Each of the Social Media Companies knew that the pressure imposed on them by the Government Defendants to censor the Plaintiffs originated with the CCDH Reports. Further, the Social Media Companies knew that the CCDH Reports lacked scientific merit and had not been published in the public interest but rather with the goal of infringing the First Amendment rights of Plaintiffs and censoring, silencing, and interfering in the business of Plaintiffs.

115. The Social Media Companies agreed to censor Plaintiffs in exchange for the implied (or express) possibility of a more favorable regulatory environment and thereby cooperated with the Government Defendants and participated in the coordinated censorship campaign against Plaintiffs as well as the conspiracy against them.

---

[78] Letter from Daniel Donovan, Counsel for Alphabet, Inc., to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (Sept. 23, 2025), https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/2025-09-23-letter-to-hjc.pdf.

116. On information and belief, each of the acts of censorship described in the following section was undertaken by the Social Media Companies as a direct result of the pressure, coercion, and entanglement of the Government Defendants (each and collectively).

### ***Censorship of Plaintiff Erin Elizabeth Finn***

117. Plaintiff Erin Elizabeth Finn was systematically de-platformed and censored by each of the Social Media Companies as a direct and proximate result of the coordinated censorship campaign undertaken by Government Defendants.

118. Plaintiff Finn is the founder and publisher of Health Nut News, a health and wellness news website and social media presence with millions of followers across multiple platforms.

119. On or about September 29, 2021, Google, through its subsidiary YouTube, removed Plaintiff Finn's YouTube channel, citing its "Medical Misinformation" policy. On information and belief, this act of censorship was a direct result of the pressure and coercion exerted by the Government Defendants (each and collectively) upon Google. Plaintiff Finn's YouTube channel has not been restored and the censorship continues to the present day.

120. Facebook, through its Facebook platform and Instagram, banned multiple accounts belonging to Plaintiff Finn, which collectively had approximately two million followers. On or about May 16, 2022, Facebook permanently banned Plaintiff Finn from all of its platforms, including Facebook and Instagram. On information and belief, these

acts of censorship were a direct result of the pressure and coercion exerted by the Government Defendants (each and collectively) upon Facebook.

121. X Corp. (formerly Twitter, Inc.) banned Plaintiff Finn's Twitter account and subjected her to block bans. On information and belief, these acts of censorship were a direct result of the pressure and coercion exerted by the Government Defendants (each and collectively) upon X Corp.

122. On information and belief, Plaintiff Finn has suffered other acts of improper censorship and content moderation by the Social Media Companies as a result of the coordinated censorship campaign.

123. The coordinated censorship campaign has had lasting negative impact on Ms. Finn's business. In the most recent year, Ms. Finn's revenue was less than 50% of the revenue Ms. Finn's business generated in the year prior to the Defendants' censorship campaign. Ms. Finn has lost more than $2,000,000 in revenue as a direct and proximate result of Defendants' actions. As a direct and proximate result, HealthNutNews has been forced to lay off two full-time employees. Ms. Finn has suffered lasting reputational harm.

***Censorship of Plaintiff Rizza Islam***

124. Plaintiff Rizza Islam was systematically de-platformed and censored by each of the Social Media Companies as a direct and proximate result of the coordinated censorship campaign undertaken by Defendants together with the Social Media Companies.

125. Plaintiff Islam is a lecturer, author, and social media personality who, prior to the acts of censorship described herein, maintained a significant presence across multiple social media platforms.

126. Between March 2021 and May 10, 2021, Defendant Facebook, through Instagram, deleted four of Plaintiff Islam's Instagram pages, which collectively had approximately 539,000 followers. On or about July 8, 2021, Facebook removed an Instagram post by Plaintiff Islam. Facebook has deleted Plaintiff Islam's Instagram pages on seven or more occasions, deleting it anew each time Plaintiff Islam re-creates a new page. As basis for this removal, Instagram cited “recognized health organizations” who took a position contrary to Plaintiff Islam.

127. Additionally, Facebook disabled Plaintiff Islam's Facebook account from approximately 2021 through early 2023. On information and belief, each of these acts of censorship was a direct result of the pressure and coercion exerted by the Government Defendants (each and collectively) upon Facebook.

128. On or about March 22, 2021, Google, through YouTube, deleted Plaintiff Islam's YouTube channel. Google subsequently deleted three additional YouTube accounts created by Plaintiff Islam after he re-created them and has never restored any of these channels. On information and belief, each of these acts of censorship was a direct result of the pressure and coercion exerted by the Government Defendants (each and collectively) upon Google.

129. Defendant X Corp. (formerly Twitter, Inc.) disabled Plaintiff Islam's Twitter account following the publication of the CCDH's "Disinformation Dozen" report. Although

Plaintiff Islam's account was restored on or about January 26, 2023, his follower count was significantly diminished. On information and belief, this act of censorship was a direct result of the pressure and coercion exerted by the Government Defendants (each and collectively) upon X Corp.

130. On information and belief, Plaintiff Islam has suffered other acts of improper censorship and content moderation by the Social Media Companies as a result of the coordinated censorship campaign.

131. In addition to censorship by the Social Media Companies, The FCC declared Rizza Islam to have violated Covid misinformation policies, and Rizza Islam was banned from the messaging app Community, which he attempted to use to reach his followers to conduct health advocacy and educational outreach in light of the other social media platforms' collusion with the Government Defendants to effect broad censorship.

132. Plaintiff Islam has been harmed by these acts and has suffered lasting reputational harm.

***Censorship of Plaintiff Sayer Ji***

133. Plaintiff Sayer Ji was systematically de-platformed and censored by each of the Social Media Companies as a direct and proximate result of the coordinated censorship campaign undertaken by Defendants together with the Social Media Companies.

134. Plaintiff Sayer Ji is the founder and director of GreenMedInfo, LLC, which operates a widely-read health and wellness research platform.

135. On or about March 7, 2021, X Corp. (formerly Twitter, Inc.) deleted the GreenMedInfo Twitter account, which had been in good standing for 13 years. On information and belief, this act of censorship was a direct result of the pressure and coercion exerted by the Government Defendants (each and collectively) upon X Corp.

136. On or about July 3, 2021, Facebook deleted the GreenMedInfo Instagram account, the GreenMedInfo Facebook account, and Plaintiff Ji's personal Facebook account. At the time of deletion, Plaintiff Ji's Instagram following exceeded 500,000. On information and belief, these acts of censorship were a direct result of the pressure and coercion exerted by the Government Defendants (each and collectively) upon Facebook.

137. On or about July 22, 2021, Google, through YouTube, deleted the GreenMedInfo YouTube account. On information and belief, this act of censorship was a direct result of the pressure and coercion exerted by the Government Defendants (each and collectively) upon Google.

138. On information and belief, Plaintiff Ji has suffered other acts of improper censorship and content moderation by the Social Media Companies as a result of the coordinated censorship campaign.

139. On March 15, 2022, PayPal shut down GreenMedInfo's business account and Sayer Ji's personal PayPal and Venmo accounts, stating that the measures were taken "due to the nature of [Sayer Ji's] activities." As a direct result, Sayer Ji suffered financial damages.

a. **Financial Losses (GreenMedInfo):** From 2020–2023, GreenMedInfo went from being profitable to running annual net losses, with a total

shortfall of nearly $450,000.

b. **Unite.Live Platform Closure:** Due to continued suppression and reputational damage, and as a direct result of being deplatformed, Mr. Ji was forced to shut down Unite.Live in April 2025 after investing over $1 million.

c. **Reputational Harm – CCDH Report:** CCDH's June 2021 "Pandemic Profiteers" report named Sayer Ji and his organization, Stand for Health Freedom, directly causing Mr. Ji's reputational and financial harm.

d. Sayer Ji has suffered lasting reputational harm.

***Censorship of Plaintiff Dr. Christiane Northrup***

140. Plaintiff Dr. Christiane Northrup was systematically de-platformed and censored by each of the Social Media Companies as a direct and proximate result of the coordinated censorship campaign undertaken by Defendants together with the Social Media Companies.

141. Dr. Northrup is a board-certified OB/GYN physician, a *New York Times* best-selling author, and a prominent voice in the field of women's health.

142. On or about August 18, 2021, Facebook through its Facebook platform, deactivated Dr. Northrup's ability to boost content. As a result, Dr. Northrup's audience on Facebook declined from approximately two million followers to fewer than 500,000. Facebook further subjected Dr. Northrup to shadow banning on its Facebook platform, suppressing the visibility and reach of her content. On information and belief, each of these acts of censorship was a direct result of the pressure and coercion exerted by the Government Defendants (each and collectively) upon Facebook.

143. Facebook through Instagram, permanently suspended two of Dr. Northrup's Instagram accounts, which collectively had approximately 200,000 followers. Facebook further subjected Dr. Northrup to shadow banning on its Instagram platform, suppressing the visibility and reach of her content. On information and belief, these acts of censorship were a direct result of the pressure and coercion exerted by the Government Defendants (each and collectively) upon Facebook.

144. Google, through its subsidiary YouTube, repeatedly shut down Dr. Northrup's content and removed her posts. YouTube also demonetized other content creators who hosted or interviewed Dr. Northrup, further chilling her ability to reach audiences through that platform. On information and belief, each of these acts of censorship was a direct result of the pressure and coercion exerted by the Government Defendants (each and collectively) upon Facebook.

145. On information and belief, Plaintiff Northrup has suffered other acts of improper censorship and content moderation by the Social Media Companies as a result of the coordinated censorship campaign.

146. As a direct and proximate result of these censorship activities, Dr. Northrup's business has suffered damages and she has maxed out her personal line of credit to pay staff salaries and keep her business afloat. Dr. Northrup lost her ability to accept payments through PayPal. On December 15, 2021, PayPal sent Dr. Northrup an email with the subject line "You can no longer do business with PayPal." In the email, PayPal claimed to have determined that Dr. Northrup was "in violation of the Acceptable Use Policy" without any further elaboration. When Dr. Northrup called to inquire, PayPal

confirmed its ban, and declared, "You can no longer use PayPal," without further explanation. Dr. Northrup's publisher refused to market new editions of her widely published books and New York Times bestsellers. Dr. Northrup has suffered lasting reputational harm.

***Censorship of Plaintiff Dr. Ben Tapper***

147. Plaintiff Dr. Ben Tapper was systematically de-platformed and censored by each of the Social Media Companies as a direct and proximate result of the coordinated censorship campaign undertaken by Defendants together with the Social Media Companies.

148. Plaintiff Dr. Tapper is a licensed chiropractor and health advocate who maintained an active social media presence to share health-related content.

149. Facebook, through its Facebook platform, subjected Dr. Tapper to an escalating campaign of censorship. Facebook filtered Dr. Tapper's content, added restrictions to his account, censored posts it deemed to contain "false information about COVID-19," moved his posts lower in news feeds to reduce their visibility, restricted sharing of his content, and suspended his account on multiple occasions for periods of up to 30 days. Facebook also tagged Dr. Tapper's posts as "False Information", reduced distribution of his Page, and imposed "other restrictions because of repeated sharing of false news". On information and belief, each of these acts of censorship was a direct result of the pressure and coercion exerted by the Government Defendants (each and collectively) upon Facebook.

150. Facebook, through its platform Instagram, labeled Dr. Tapper's posts as "False information," based on unidentified “third-party fact-checkers”, prohibited users from mentioning his handle "dr.bentapper," limited the reach of his content, removed his posts and stories on multiple occassions, and ultimately deleted his Instagram accounts, which had more than 500,000 followers. On information and belief, each of these acts of censorship was a direct result of the pressure and coercion exerted by the Government Defendants (each and collectively) upon Facebook.

151. Google, through its platform YouTube, removed content posted by Dr. Tapper, including podcast episodes, citing its "medical misinformation policy." On information and belief, these acts of censorship were a direct result of the pressure and coercion exerted by the Government Defendants (each and collectively) upon Google.

152. X Corp. (formerly Twitter, Inc.) indefinitely suspended Dr. Tapper's Twitter account. On information and belief, this act of censorship was a direct result of the pressure and coercion exerted by the Government Defendants (each and collectively) upon X Corp.

153. On information and belief, Plaintiff Northrup has suffered other acts of improper censorship and content moderation by the Social Media Companies as a result of the coordinated censorship campaign.

154. As a direct and proximate result of these censorship activities, Dr. Tapper has been harmed. Among other things:

a. PayPal permanently banned Dr. Tapper from using PayPal’s services. Following the release of the Disinformation Dozen Report, Dr. Tapper’s

TheTimeIsNow.movie and bhtapper personal account's were suspended indefinitely by PayPal. Dr. Tapper had used PayPal, and its subsidiary Venmo, to fundraise for his documentary *The Time is Now*, but those fundraising efforts were terminated by PayPal.

b. Dr. Tapper has suffered lasting reputational harm.

***Censorship of Plaintiff Dr. Sherri Tenpenny***

155. Plaintiff Dr. Sherri Tenpenny was systematically de-platformed and censored by each of the Social Media Companies as a direct and proximate result of the coordinated censorship campaign undertaken by Defendants together with the Social Media Companies.

156. Dr. Tenpenny is an osteopathic medical doctor and the founder of Tenpenny Integrative Medical Center. Dr. Tenpenny is a nationally recognized expert on the potential risks and side effects of vaccines.

157. Facebook, through its Facebook platform, permanently banned Dr. Tenpenny from its platform. On information and belief, this act of censorship was a direct result of the pressure and coercion exerted by the Government Defendants (each and collectively) upon Facebook.

158. Facebook, through its platform Instagram, permanently banned Dr. Tenpenny from its platform. On information and belief, this act of censorship was a direct result of the pressure and coercion exerted by the Government Defendants (each and collectively) upon Facebook.

159. Google, through YouTube, permanently banned Dr. Tenpenny from its platform. On information and belief, this act of censorship was a direct result of the pressure and coercion exerted by the Government Defendants (each and collectively) upon Google.

160. X Corp. (formerly Twitter, Inc.) indefinitely suspended Dr. Tenpenny's Twitter account. When Dr. Tenpenny's account was eventually reinstated, her follower count had decreased by approximately 200,000. On information and belief, this act of censorship was a direct result of the pressure and coercion exerted by the Government Defendants (each and collectively) upon X Corp.

161. On information and belief, Dr. Tenpenny has suffered other acts of improper censorship and content moderation by the Social Media Companies as a result of the coordinated censorship campaign.

162. As a direct and proximate result of these censorship activities, Dr. Tenpenny has been harmed. Among other things:

a. PayPal shut down Dr. Tenpenny's account, interrupting her various domestic and international business lines and directly impacting Dr. Tenpenny's business income and ability to pay her employees. Additionally, PayPal confiscated $7,000 from Dr. Tenpenny's PayPal account without notice or reason.

b. Dr. Tenpenny has suffered lasting reputational harm.

## COUNT I
## First Amendment Freedom of Speech
### *All Plaintiffs Against All Government Defendants*

163. Plaintiffs incorporate and reallege paragraphs 1 to 162 above.

164. Each of the Plaintiffs was engaged in speech on the platforms on which they were censored by the Social Media Companies that was protected by the First Amendment to the U.S. Constitution. Plaintiff Islam was also censored by Community.

165. The Government Defendants (each and collectively) used their influence and coercive power to suppress the Plaintiffs' speech by pressuring the Social Media Companies (and in the case of Plaintiff Islam, Community) to remove or restrict content associated with the Disinformation Dozen. This suppression, conducted under the guise of combating "misinformation," interfered with the Plaintiffs' right to express their views, particularly on controversial issues such as vaccines and health freedom and was adverse action against Plaintiffs' speech.

166. The Government Defendants (each and collectively) targeted Plaintiffs speech because of their specific viewpoint.

167. The Social Media Companies (and, in the case of Plaintiff Islam, Community) became state actors through their pervasive joint participation with the Government Defendants (each and collectively) in the censorship enterprise and as a result of the coercion and significant encouragement by the Government Defendants (each and collectively) that resulted in interdependence, entanglement, and entwinement with the Government Defendants into the decision-making of the Social Media Companies (and, in the case of Plaintiff Islam, Community) .

168. Plaintiffs were harmed by this censorship.

169. The Social Media Companies' (and, in the case of Plaintiff Islam, Community') censorship decisions were and are not merely influenced by pressure from

the Government Defendants (each and collectively) but were and are effectively directed and controlled by Government Defendants (each and collectively) through both coercion, significant encouragement, voluntary participation in a joint enterprise and entanglement, interdependence, and entwinement with the Social Media Companies' (and, in the case of Plaintiff Islam, Community's) decision-making process concerning its decisions to censor Plaintiffs. This level of entwinement between government actors and private entities in suppressing specific viewpoints and speakers creates a "symbiotic relationship" that renders the private conduct attributable to the state, as recognized in *Burton v. Wilmington Parking Auth.,* 365 U.S. 715 (1961) and subsequent cases.

170. By targeting Plaintiffs based on their dissenting viewpoints, the Government Defendants (each and collectively) violated the principle of "viewpoint neutrality," which prohibits the government from favoring or suppressing speech based on its content or perspective. The Supreme Court has consistently held that "[t]he government may not prohibit the verbal or nonverbal expression of an idea merely because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 398 (1989).

171. The First Amendment applies with particular force when, as here, the suppressed speech concerns matters of public importance where "debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

172. The Government Defendants (each and collectively) violated the Free Speech Clause of the First Amendment by (1) systematically and repeatedly using coercive threats to force the Social Media Companies (and, in the case of Plaintiff Islam,

Community) to censor protected speech and/or (2) entering into collusive partnerships with the Social Media Companies (and, in the case of Plaintiff Islam, Community) and working jointly with those private entities to censor protected speech.

173. The Government Defendants (each and collectively) circumvented First Amendment prohibitions by employing what the Supreme Court has termed an "unconstitutional condition"—coercing private entities to restrict speech that the government itself could not directly censor. “[I]nhibition as well as prohibition against the exercise of precious First Amendment rights is a power denied to government.” *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 309 (1965) (Brennan, J., concurring). The conduct at issue violates the principle established in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), that the government cannot use its power and influence to achieve indirectly what the Constitution forbids it to achieve directly.

174. The Government Defendants' actions transformed ostensibly private content moderation decisions into state action subject to First Amendment constraints. This entanglement between government actors and private platforms created a "joint participation" arrangement that the Supreme Court has recognized as sufficient to subject nominally private conduct to constitutional scrutiny. See *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982).

175. The censorship campaign against Plaintiffs was particularly egregious because it targeted core political speech on matters of public concern, which receives the highest level of First Amendment protection. The government's labeling of Plaintiffs' speech as "misinformation" or "disinformation" does not diminish this protection, as "the

First Amendment there is no such thing as a false idea." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974).

176. Plaintiffs have faced and continue to face social media censorship by the Social Media Companies (and, in the case of Plaintiff Islam, Community), blacklisting, reputational damage, negative economic consequences including reduced advertising revenue, and reduced circulation of reporting and speech, all as a direct result of the Government Defendants' unlawful conduct.

177. The removal and suppression of Plaintiffs' content across multiple platforms following intervention by the Government Defendants (each and collectively) resulted in a concrete and particularized injury to Plaintiffs' free speech rights. This injury is ongoing, as the censorship infrastructure established by Government Defendants continues to suppress Plaintiffs' ability to reach their audience and communicate their views on matters of public importance, and the censorship against them is ongoing.

178. Plaintiffs suffered and continue to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of the Government Defendants' conduct.

179. Plaintiffs have no adequate remedy at law for the violation of their constitutional rights. Money damages alone cannot remedy the ongoing suppression of their speech or restore their ability to participate in public discourse. Only declaratory and injunctive relief from this Court can provide complete relief by ending the Government Defendants' unconstitutional censorship campaign and preventing similar violations in the future.

WHEREFORE, Plaintiffs respectfully request that this Court:

A) Issue a declaratory judgment that the Government Defendants' actions to censor, suppress, and deplatform Plaintiffs violated their First Amendment rights;

B) Issue a permanent injunction prohibiting the Government Defendants from continuing to censor, suppress, and deplatform Plaintiffs; and

C) Grant such other and further relief as the Court deems just and proper.

## COUNT II
## Violation of Privacy Act of 1974, 5 U.S.C. § 552a(e)(7)
### *All Plaintiffs Against All Government Defendants*

180. Plaintiffs incorporate and reallege paragraphs 1 to 162 above.

181. The Privacy Act of 1974 (the "Privacy Act") places certain restrictions on government agencies that maintain a "system of records". 5 U.S.C. § 552a. For the purposes of the Privacy Act a "record" means

> any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph

5 U.S.C. § 552a(4). A "system of records" is defined as

> the term "system of records" means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual;

5 U.S.C. § 552a(5).

182. Where an agency maintains a "system of records", the agency must publish in the Federal Register the existence and nature of applicable records and systems of

records, and the agency is prohibited from disclosing records contained in such system in an unauthorized fashion. 5 U.S.C. § 552a(b), (e)(4). Additionally, with certain exceptions not applicable here, agencies may not maintain records describing how an individual exercises rights guaranteed by the First Amendment. 5 U.S.C. § 552a(e)(7).

183. As alleged *supra*, the Government Defendants maintained reporting and information exchange relationships with social media platforms and made use of data tracking and visualization tools to monitor, map, and target networks of alleged disinformation, misinformation, and malinformation across social media platforms including the Social Media Companies. These tools were either developed in-house or provided by third-parties such as the Stanford Observatory or the Virality Project.

184. It would have been impossible for the Government Defendants to have implemented these tools and maintain these reporting and information exchange relationships without coming into possession of and creating "systems of records" that "described how an individual exercises rights guaranteed by the First Amendment," in violation of the Privacy Act. 5 U.S.C. § 552a(5); 5 U.S.C. § 552a(e)(7).

185. Additionally, CISA's Mis-, Dis-, and Malinformation ("MDM") "switchboard" began functioning in early 2021. As CISA openly admitted on April 12, 2022, the 'MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms' and has 'expanded the breadth of reporting to include... more social media platforms.' This centralized reporting system allowed government officials across agencies to funnel censorship requests through a single channel. CISA's switchboard similarly required the creation of records describing how an individual exercises rights

guaranteed by the First Amendment. This is because the "switchboard" requests and reports necessarily concerned how an individual exercises First Amendment rights and, to be usable by social media platforms, such requests would need to contextualize personally identifiable information (PII) on their subjects, encompassing social media aliases (e.g., @sayerji for Plaintiff Sayer Ji, @healthnutnews for Plaintiff Erin Elizabeth Finn), IP addresses, email addresses, and behavioral metadata from their online speech and associations. Per the National Institute of Standards and Technology ("NIST"), and in particular, NIST Special Publication 800-122 (Guide to Protecting the Confidentiality of PII), isolated data elements like social media aliases become linkable PII when combined with governmental context, such as "misinformation" tags or targeting based on inclusion in the Disinformation Dozen. NIST defines PII broadly as any information that can distinguish or trace an individual's identity, which includes social media aliases or usernames and associated entities. Via the Federal Information Security Modernization Act ("FISMA") of 2014, NIST standards and guidelines are required to be implemented and operationalized within the Executive Branch.

186. Public record documents provide a concrete example the administration's use of the Government Defendants' data visualization systems, requiring the maintenance of a "system of records" for the purposes of the Privacy Act, and using it to apply pressure to censor the individual's speech, in violation of the Privacy Act. On April 21, 2021, Flaherty, Slavitt, and another White House staff member met with four Twitter employees regarding covid misinformation. The following day, on an internal slack channel, Twitter employees discussed the meeting, describing the pressure the White

House officials had applied for Twitter to censor vaccine skeptic named Alex Berenson. According to these slack exchanges, the White House officials “allege that they’ve done some data visualization that show he’s, like, ground zero for covid misinformation that radiate outward.” A data visualization tool with this capacity would be a “system of records” and would “describe how an individual exercises rights guaranteed by the First Amendment” for the purposes of the Privacy Act.

187. On information and belief, the Government Defendants maintained and provided access to their personnel data visualization, data tracking, or data dashboards—either in coordination with the White House or otherwise—to coordinate and allow for the censorship of the Disinformation Dozen and such tools contained Plaintiffs’ personally identifiable information, such that such tools constituted “systems of records” under the Privacy Act.

188. Additionally, the widespread use of the information exchange relationships—such as the regular meetings the Government Defendants had and have with social media platforms to discuss disinformation—required the creation of “systems of records”, and disclosing “records” on an unauthorized basis, or maintaining records describing how an individual exercises rights guaranteed by the First Amendment, all in violation of the Privacy Act. *Id.*

189. Each communication in which a Government Defendant received from or sent to a social media platform a communication containing PII and information concerning an individuals’ exercise of their First Amendment rights based on records of the same was a Privacy Act violation. The Censorship Report contains confirmed

instances of administration officials engaging in this activity with regard to the Disinformation in communications with social media platforms.

190. On information and belief, as part of the Government Defendants' coordinated censorship campaign against the Plaintiffs, the White House and administration officials shared the reporting it received from the Social Media Companies with the Government Defendants, and each in turn sent and received communications that contained PII and information concerning the Disinfomation Dozen's' exercise of their First Amendment rights based on records of the same in violation of the Privacy Act.

191. Further, on information and belief, using data visualization, dashboards, and data tracking tools, the Government Defendants systematically collected and contextualized personally identifiable information (PII) on Plaintiffs, encompassing social media aliases (e.g., @sayerji for Plaintiff Sayer Ji, @healthnutnews for Plaintiff Erin Elizabeth Finn), IP addresses, email addresses, and behavioral metadata from their online speech and associations. Per the National Institute of Standards and Technology ("NIST"), and in particular, NIST Special Publication 800-122 (Guide to Protecting the Confidentiality of PII), isolated data elements like social media aliases become linkable PII when combined with governmental context, such as "misinformation" tags or targeting based on inclusion in the Disinformation Dozen. NIST defines PII broadly as any information that can distinguish or trace an individual's identity, which includes social media aliases or usernames and associated entities. Via the Federal Information Security Modernization Act of 2014, NIST standards and guidelines are required to be implemented and operationalized within the Executive Branch. Through these systems

and in coordination with the Social Media Companies, the Government Defendants violated Plaintiffs' privacy. To illustrate:

a. Under NIST SP 800-53 Rev. 5, privacy controls such as those in the Privacy and Transparency ("PT") and Program Management ("PM") families require agencies to establish authority for PII processing (PT-2), document purposes (PT-3), obtain consent (PT-4), provide notices including Privacy Act statements (PT-5), and publish System of Records Notices (SORNs) for systems retrievable by identifiers (PT-6). Upon information and belief, the Government Defendants did none of this with respect to the Disinformation Dozen.

b. PT-3 limits processing to specified purposes, and the sharing of data and records across systems and agencies without tracking violated NIST's minimization and integrity controls (PM-25 and PM-22). Upon information and belief, the Government Defendants shared Plaintiffs' data and records without tracking.

c. DHS must consult NIST guidance to avoid conflicts in operational directives, and agencies must report to the Office of Management and Budget annually to ensure adherence to NIST standards and guidelines. With respect to the Disinformation Dozen, upon information and belief, NIST-mandated privacy assessments (PM-27) were ignored.

192. Given the Government Defendants' use of these systems to target Plaintiffs, this contextualized data evolved into records governed by the Privacy Act of 1974 and invoking other privacy protections since the records explicitly "describe[d] how any

individual exercises rights guaranteed by the First Amendment," including Plaintiffs' advocacy for health freedom and alternative medical views. The Government Defendants' activities created an undisclosed system of records, violating the Privacy Act's requirement for Federal Register publication of System of Records Notices and prohibiting maintenance of records and systems without authority under 5 U.S.C. 552a(e)(4)

193. On information and belief, the Government Defendants allowed administration officials to access these records via dedicated dashboards, switchboards, email escalations, and backend platform integrations, retrieving data by personal identifier (e.g., alias queries yielding deplatforming recommendations). This formed an interconnected "system of systems" (a NIST term of art referenced in NIST SP 800-160, for example)—maintained by or on behalf of the agencies under cooperative agreements—exceeding any published and lacking statutory authorization for First Amendment surveillance, in violation of the Privacy Act of 1974, 5 U.S.C. § 552a(e)(7).

WHEREFORE, Plaintiffs respectfully request that this Court:

A) Award Plaintiffs damages in an amount consistent with the terms of the Privacy Act;

B) Award Plaintiffs reasonable attorney's fees and other litigation costs; and

C) Grant such other and further relief as the Court deems just and proper.

## **COUNT III**
## **Tortious Interference with Contract or Advantageous Business Relationship**
*All Plaintiffs Against CCDH and Imran Ahmed*

194. Plaintiffs reincorporate paragraphs 1 to 162 above.

195. Plaintiffs each had either valid and enforceable contractual relationships or business relationships under which they had legal rights or a reasonable expectancy of economic benefit ("Advantageous Business Relationship") with payment processing companies, including PayPal, which were essential to their business operations. These contracts or Advantageous Business Relationships allowed Plaintiffs to receive payments for products, services, and donations from supporters, customers, and business partners. Specifically:

a. Plaintiff Sayer Ji had contractual relationships or an Advantageous Business Relationship with PayPal for processing payments for GreenMedInfo LLC, which had been in good standing for years prior to the interference.

b. Plaintiff Christiane Northrup had contractual relationships or an Advantageous Business Relationship with PayPal that allowed her to process payments for her health-related products, books, and services.

c. Plaintiff Ben Tapper had contractual relationships or an Advantageous Business Relationship with PayPal for both his personal account and for processing payments related to his documentary project "TheTimeIsNow.movie."

d. Plaintiff Sherri Tenpenny had contractual relationships or an Advantageous Business Relationship with PayPal that facilitated both domestic and international business transactions.

e. Plaintiff Rizza Islam had contractual relationships or an Advantageous Business Relationship with PayPal that enabled him to sell products

to his followers.

196. All Plaintiffs also had either valid and enforceable contractual relationships or Advantageous Business Relationships with social media platforms, including with the Social Media Companies (and, in the case of Plaintiff Islam, Community).

197. CCDH and Imran Ahmed knew of these contractual relationships or Advantageous Business Relationships. Specifically:

a. On December 15, 2021, Representative Jake Auchincloss, along with 18 other members of Congress, sent a letter to PayPal specifically targeting Plaintiffs' payment processing accounts, demonstrating their knowledge of these contractual relationships. On information and belief, this action was taken with the knowledge and/or at the intervention of CCDH and Imran Ahmed.

b. CCDH's "Pandemic Profiteers" Report explicitly identified and targeted certain Plaintiffs' business relationships with payment processors, demonstrating CCDH's knowledge of these contractual relationships or Advantageous Business Relationships.

c. The CCDH Reports expressly referred to Plaintiffs' contractual or Advantageous Business Relationship with the Social Media Companies.

198. All Plaintiffs also had other valid and enforceable contractual relationships or Advantageous Business Relationships which were known to CCDH and Imran Ahmed or were known to exist by CCDH and Imran Ahmed.

199. CCDH and Imran Ahmed intentionally and unjustifiably interfered with these contracts and Advantageous Business Relationships, inducing their breach or

termination:

a. Representative Auchincloss, at CCDH and Imran Ahmed's urging and pressure, explicitly "urged PayPal to ban users who disseminate disinformation and deactivate the accounts of the Disinformation Dozen," directly pressuring PayPal to breach its contracts with Plaintiffs or end its Advantageous Business Relationship with Plaintiffs.

b. CCDH's Reports, including the Disinformation Dozen Report and the Pandemic Profiteers Report, created pressure for payment processors to stop processing payments for those who profit from COVID-19 and vaccine misinformation.

c. CCDH's Reports urged the Social Media Companies to deplatform Plaintiffs.

d. CCDH and Imran Ahmed (both directly and through CCDH) colluded and conspired with government officials (including the Government Defendants), members of the media, and others to bring about a coercive censorship campaign against the Plaintiffs in order to infringe their First Amendment rights and harm their economic and business interests.

200. Plaintiffs suffered damages by CCDH and Imran Ahmed's unjustified interference, including, but not limited to:

a. All Plaintiffs were censored by the Social Media Plaintiffs with related loss of revenue and other harms.

b. Plaintiff Islam was censored by Community.

c. On March 15, 2022, PayPal shut down Plaintiff Sayer Ji's GreenMedInfo business account and his personal PayPal and Venmo accounts, stating that the measures were taken "due to the nature of [Sayer Ji's] activities."

d. PayPal permanently banned Plaintiff Ben Tapper from using its services, suspending both his personal account and the account for his documentary project "TheTimeIsNow.movie" indefinitely.

e. Plaintiff Christiane Northrup lost her ability to accept payments through PayPal, and when she called to inquire, she was simply told "you can no longer use PayPal" without further explanation.

f. PayPal shut down Plaintiff Sherri Tenpenny's account, disrupting her various domestic and international business operations.

201. CCDH and Imran Ahmed’s interference was without justification or privilege:

a. CCDH and Imran Ahmed’s actions were not based on legitimate business competition or the protection of any legally recognized interest.

b. CCDH and Imran Ahmed targeted Plaintiffs based on their protected speech, not because of any unlawful conduct or contractual violations.

c. CCDH and Imran Ahmed were not parties to the contracts between Plaintiffs and PayPal, nor did they have any legitimate authority to interfere with these private contractual relationships.

d. CCDH and Imran Ahmed’s pressure campaign was designed to financially damage Plaintiffs by cutting off their payment processing capabilities, not to advance any legitimate regulatory or public interest objective.

e. CCDH and Imran Ahmed acted with malice and the specific intent to harm Plaintiffs' economic interests based on their viewpoints regarding health-related matters.

202. As a direct and proximate result of CCDH and Imran Ahmed’s tortious interference, Plaintiffs suffered substantial damages, including but not limited to:

a. Plaintiff Sayer Ji experienced significant financial losses from being unable to process payments through PayPal and Venmo for GreenMedInfo's products and services.

b. Plaintiff Ben Tapper's fundraising efforts for his documentary "The Time is Now" were terminated, causing substantial financial harm and preventing the completion of his project.

c. Plaintiff Christiane Northrup also suffered significant financial losses, and has been forced to max out her personal line of credit to pay staff salaries and keep her business operational after losing her payment processing capabilities.

d. Plaintiff Sherri Tenpenny suffered direct business income losses from the interruption of her various business lines that relied on PayPal for payment processing.

e. Plaintiff Rizza Islam experienced substantial financial harm from reduced sales of products after losing access to payment processing services.

f. All Plaintiffs suffered ongoing financial damages, including lost revenue and additional operational costs to establish alternative payment processing methods.

203. CCDH and Imran Ahmed's actions constituted intentional misconduct as defined by Florida Statute § 768.72(2)(a), as they had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage to Plaintiffs would result, and despite this knowledge, deliberately pursued a course of conduct that caused harm to Plaintiffs. Defendants explicitly discussed targeting Plaintiffs' financial relationships as a strategy to silence their speech, demonstrating conscious and specific intent to harm Plaintiffs' business interests. Defendants acted purposefully to cause financial harm to Plaintiffs to punish them for their protected speech.

WHEREFORE, Plaintiffs request that this Court:

A) Award compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial;

B) Award punitive damages against the Defendants in an amount sufficient to deter similar misconduct in the future;

C) Award Plaintiffs their reasonable attorneys' fees and costs; and

D) Grant such other and further relief as the Court deems just and proper.

**COUNT IV**
**Civil Conspiracy**
*All Plaintiffs Against CCDH and Imran Ahmed*

204. Plaintiffs reincorporate paragraphs 1 to 162 above.

205. CCDH and Imran Ahemd entered into an agreement to target, censor, deplatform, and suppress Plaintiffs' constitutionally protected speech by achieving violations of their First Amendment rights and to tortiously interfere in their contracts and

Advantageous Business Relationships.

206. Parties to this agreement were CCDH, Imran Ahmed, the Government Defendants, the Social Media Companies, and other government officials and agencies, media outlets, individuals, and non-profit entities.

207. This agreement is evidenced by, among other things:

a. The systematic and near contemporaneous adoption and operationalization of CCDH's facially questionable CCDH Reports by multiple government agencies and senior officials in both the legislative and executive branch, as alleged herein;

b. Systematic and near contemporaneous coercion and pressure by the Government Defendants, President Biden, White House Office staff, and legislative officers on the Social Media Defendants to censor Plaintiffs, as alleged herein;

c. The agreement by the Social Media Defendants (and, in the case of Plaintiff Islam, Community) to censor COVID-19 content in general and Plaintiffs in particular in exchange for the potential maintenance of a more favorable regulatory environment; and

d. Contemporaneous and nearly identical enforcement actions taken by multiple platforms against Plaintiffs following government pressure.

261. The parties to these conspiracies (including CCDH and Imran Ahmed) agreed to commit unlawful acts and to use unlawful means to achieve the goals of the conspiracy, including, but not limited to:

a. Coercing private entities to suppress constitutionally protected speech in violation of the First Amendment;

b. Pressuring government actors to seek the suppression of constitutionally protected speech

c. Selectively targeting Plaintiffs for adverse treatment based on their viewpoints;

d. Publishing false and defamatory statements about Plaintiffs with knowledge of, or reckless disregard for, their falsity;

e. Interfering with Plaintiffs' contractual relationships or Advantageous Business Relationships with social media platforms, payment processors, and other business partners without justification or privilege; and

f. Agreeing to censor Plaintiffs in exchange for a hoped for more advantageous regulatory environment.

262. The parties to these conspiracies (including CCDH and Imran Ahmed) possessed a peculiar power of coercion that none could exercise individually—that is, suppressing Plaintiffs' First Amendment rights and interfering with the contractual relationships or Advantageous Business Relationships.

263. The parties to these conspiracies (including CCDH and Imran Ahmed) took numerous overt acts in furtherance of their conspiracies, including but not limited to:

a. CCDH publishing the CCDH Reports with methodologically unsound and defamatory claims about Plaintiffs, with the express purpose of provoking censorship and interfering in Plaintiffs' contracts and Advantageous Business

Relationships;

b. CCDH and Imran Ahmed colluding with government officials, media outlets, other non-profit entities, and individuals to organize and launch the coordinated censorship campaign against Plaintiffs;

c. Coercion by the Government Defendants of private entities to suppress constitutionally protected speech in violation of the First Amendment;

d. The Government Defendants' targeting Plaintiffs for adverse treatment based on their viewpoints in violation of their First Amendment rights;

e. Interfering with Plaintiffs' contractual relationships with social media platforms, payment processors, and other business partners without justification or privilege.

f. The urging and achieving of Congressional representatives' publicly pressuring of social media and payment processing companies to take action against the Disinformation Dozen, including a letter to PayPal joined by 18 members of Congress;

g. The Government Defendants developing and implementing formalized systems for flagging, monitoring, and suppressing Plaintiffs' speech across digital platforms.

h. Violations of the Privacy Act in an effort to suppress Plaintiffs' First Amendment speech; and

i. The direct censorship of the Plaintiffs by the Social Media Companies (and, in the case of Plaintiff Islam, by Community).

264. As a direct and proximate result of these conspiracies, Plaintiffs suffered substantial and ongoing damages, including:

a. Removal of their accounts from major social media platforms, severing their connection to audiences built over many years;

b. Algorithmic suppression and shadow-banning of their content, dramatically reducing their reach and engagement;

c. Significant financial losses from reduced audience reach, canceled business opportunities, and termination of payment processing services;

d. Reputational harm from being publicly branded as dangerous "misinformation spreaders";

e. Emotional distress from being targeted by a coordinated campaign involving the highest levels of government; and

f. Ongoing inability to participate fully in public discourse on matters of significant public concern.

265. The harm suffered by Plaintiffs was the direct, foreseeable, and intended consequence of the conspiratorial actions.

266. These conspiracies were not the result of independent parallel conduct but reflected a conscious commitment to a common scheme designed to achieve an unlawful objective—the suppression of constitutionally protected speech based on its viewpoint and content.

WHEREFORE, Plaintiffs request that this Court:

A) Award compensatory damages against CCDH and Imran Ahmed, jointly and severally, in an amount to be determined at trial;

B) Award punitive damages against CCDH and Imran Ahemd in an amount sufficient to deter similar misconduct in the future;

C) Award Plaintiffs their reasonable attorneys' fees and costs; and

D) Grant such other and further relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request this Court enter judgment in Plaintiffs' favor and:

A) With respect to Counts I, Plaintiffs respectfully request that this Court provide injunctive and declaratory relief as follows:

i. Declare that the Government Defendants' censorship activities violate the First Amendment of the U.S. Constitution, notwithstanding the issuance of Executive Order 14149, "Restoring Freedom of Speech and Ending Federal Censorship,"[79] as a judicial declaration is necessary to establish clear constitutional boundaries that cannot be altered by changing executive policies;

ii. Declare that the Government Defendants' censorship activities were ultra vires and exceeded their statutory authority, and that no federal statute authorizes government officials to coerce, pressure, or collude with Social Media Companies to suppress constitutionally protected speech;

iii. Order the Government Defendants to publicly disclose all past

---

[79] Exec. Order No. 14,149, 90 Fed. Reg. 8,623 (Feb. 13, 2025).

communications, meetings, and coordination efforts with Social Media Companies related to content moderation, including the identification of all specific posts to any social media platform by any Plaintiff flagged for removal or suppression and the government officials involved in such actions;

iv. Enjoin the Government Defendants, their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert with them, from taking any future actions to demand, urge, pressure, or otherwise induce any social media platform to censor, suppress, de-platform, suspend, shadow-ban, de-boost, restrict access to content, or take any other adverse action against any speaker, content, or viewpoint expressed on social media;

v. Order the Government Defendants to establish a notification system to inform all members of the Disinformation Dozen whose content was suppressed, removed, de-boosted, shadow-banned, or otherwise adversely affected as a result of government-induced censorship about such actions taken against their speech;

vi. Require the Government Defendants to implement mandatory First Amendment training for all federal employees who interact with Social Media Companies regarding content moderation, with court approval of the training materials and verification of completion;

vii. Establish a judicial oversight mechanism requiring the Government Defendants to report to the Court on a quarterly basis for a period of five years regarding any communications with Social Media Companies concerning content moderation, to ensure compliance with constitutional requirements regardless of

any changes to executive orders or policies;

viii. Order the Government Defendants to work with affected social media platforms to restore, where technologically feasible, all content that was improperly removed or suppressed due to government-induced censorship, and to remove any penalties, strikes, or account restrictions imposed as a result of such censorship;

ix. Establish a remedial framework to address ongoing harms caused by past censorship activities, including the creation of an independent review process for individuals who believe their speech was suppressed due to government action, with the authority to recommend appropriate remedies; and

x. Grant such other and further relief as the Court may deem just and proper to ensure that similar violations of First Amendment rights do not recur in the future, regardless of changes in executive policy, including the appointment of a Special Master to oversee compliance with the Court's orders;

B) Award all other relief requested in Counts I through IV;

C) Award attorney's fees and costs pursuant to 28 U.S.C. § 2412 and any other applicable authority; and

D) Order any further relief this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: April 10, 2026.

CHILDERS LAW, LLC

2135 NW 40th Terrace, Suite B
Gainesville, Florida 32605
tel. 866-996-6104
fax 407-209-3870

*/s/ Seldon J. Childers*
Seldon J. Childers
Florida Bar No. 61112
jchilders@smartbizlaw.com
Nicholas P. Whitney
Florida Bar No. 119450
nwhitney@smartbizlaw.com
Charles H. Hardage
*Of counsel*
Florida Bar No. 76917
chardage@smartbizlaw.com
notice@smartbizlaw.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed with the Clerk of the Court using the Court's CM/ECF system, which caused a copy to be served upon all counsel of record this April 10, 2026.

*/s/ Seldon J. Childers*
Attorney for Plaintiffs